**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SinglePoint Direct Solar LLC, et al., | No. CV-21-01076-PHX-JAT |
| Plaintiffs, | **PRELIMINARY INJUNCTION** |
| v. | |
| Pablo Diaz Curiel, et al., | |
| Defendants. | |

Pending before the Court is Plaintiffs SinglePoint, Inc. and SinglePoint Direct Solar, LLC's Motion for a Preliminary Injunction (Doc. 3). The Motion is fully briefed (Doc. 16, 20, 44, 51, 55, 59), and the Court held a preliminary injunction hearing on August 4, 2021. The Court now rules on the Motion.[1]

**I.   FINDINGS OF FACT**

This case concerns a business relationship between SinglePoint, Inc. ("SinglePoint") and Defendants Pablo Diaz Curiel, Kjelsea Johnson, and Brian Odle regarding SinglePoint Direct Solar, LLC ("SDS"). SDS provides solar energy brokerage services to homeowners and small businesses and was formed following an Asset Purchase

---

[1] In response to Plaintiffs' Motion for an Amended Temporary Restraining Order and Preliminary Injunction (Doc. 44), Defendants filed a joint response and motion to dismiss (Doc. 51). Local Rule of Civil Procedure ("LRCiv") 12.1(c) requires a party moving for dismissal under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to include "certification that, before filing the motion, the movant notified the opposing party of the issues asserted in the motion and the parties were unable to agree that the pleading was curable in any part by a permissible amendment offered by the pleading party." Because Defendants failed to meet this requirement, the Court will deny the motion without prejudice. *See* LRCiv 12.1(c) ("A motion that does not contain the required certification may be stricken summarily.").

Agreement in February 2019. SinglePoint, Diaz, and Johnson, among others, were parties to this agreement. As a result of the Asset Purchase Agreement, SinglePoint, Diaz, and Johnson own 51, 45, and 4 percent of SDS, respectively. Diaz was also subject to an Employment Agreement with SDS. Both the Asset Purchase Agreement and Employment Agreement contain several restrictive covenants. As relevant here, the Agreements contain non-compete, non-disclosure, and non-solicitation clauses.

Following SDS's creation, Diaz served as chief executive officer of SDS until his two-year Employment Contract term ended in May 2021. Johnson served as dealer concierge, and Odle served as director of finance until they both resigned in June 2021.

In the instant motion, Plaintiffs allege that following Diaz and Johnson's departure from SDS, they implemented a plan to misappropriate SDS's confidential data and intangible assets to start and sell a rival solar energy company and changed passwords to SDS accounts, which prevented SDS from continuing to operate effectively. Plaintiffs seek to enjoin Diaz and Johnson from competing nationally in the solar energy industry and from using any of the intangible assets that were the subject of the Asset Purchase Agreement.

At the August 4, 2021 preliminary injunction hearing, the Court heard testimony from SinglePoint CEO, Wil Ralston, as well as Diaz, Johnson, and Odle. Ralston testified that the restrictive covenants were essential to his agreement to go into business with Diaz. He testified that Diaz's talent is networking and cultivating business relationships, and allowing Diaz to leave SDS and provide those services elsewhere would be detrimental to SDS. Ralston further testified that at last count, SDS operated in 38 states and has a goal of expanding nationwide.

Odle testified regarding how the solar brokerage business operates. He testified that dealers typically have nonexclusive agreements with multiple brokers such as SDS, and the dealers determine which broker to refer a particular customer based on several criteria. He further testified that intangible assets such as customer lists and pricing history are "worthless" because repeat customers are rare in the solar energy industry. Odle testified

that the reason for this is because once customers have solar energy technology installed on their homes, they will have no need to purchase replacement equipment for 25 or 30 years. Because Odle's testimony is uncontroverted and the Court has no other basis in the record from which obtain this information, the Court accepts Odle's testimony regarding the common practice in solar energy brokerage industry. However, the Court notes that it did not find Odle to be a particularly credible witness. Odle did not testify as to his professional background and experience or otherwise provide any basis for his testimony; he simply relayed his understanding of the industry. But again, having no better source, the Court accepts this testimony.

For his part, Diaz testified that the services he provides different companies are unique to each company and that the company that he has created since leaving SDS does not compete directly with SDS. He further testified that he did not believe that any of the provisions of the Asset Purchase Agreement or Employment Agreement would prevent him from working in the solar energy industry following his departure from SDS.

## II.  LEGAL STANDARD

For a court to issue a TRO or preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the Ninth Circuit "serious questions" test, the four *Winter* factors may be evaluated on a sliding scale, and a TRO or preliminary injunction "is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (quoting *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (*en banc*)).

## III.  DISCUSSION AND CONCLUSIONS OF LAW

Plaintiffs argue that they are entitled to preliminary injunctive relief against Diaz

and Johnson because they are violating the terms of the Asset Purchase Agreement and Diaz is violating the terms of his Employment Agreement. The Court discusses these arguments below.

### a. Likelihood of Success on the Merits

"Likelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors in the absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal citations and quotations omitted); *see also, e.g.*, *Krieger v. Nationwide Mut. Ins. Co.*, No. CV-11-1059-PHX-DGC, 2011 WL 3760876, at *1 (D. Ariz. Aug. 25, 2011) ("Because Plaintiff has failed to show a likelihood of success on the merits or the existence of serious questions, the Court will not issue a preliminary injunction. The Court need not address the other requirements for preliminary injunctive relief.").

### 1. Non-Compete

First, Plaintiffs argue that Diaz and Johnson are violating the non-compete provision of the Asset Purchase Agreement and that Diaz is violating the non-compete provision of his Employment Agreement. Plaintiffs' Motion requests that the Court enjoin Diaz and Johnson from starting or working at a competing solar energy enterprise. The Court, however, agrees with Defendants that these non-compete provisions are unenforceable under Arizona law.

In Arizona, although the determination of whether a restrictive covenant is enforceable is a "fact-intensive inquiry that depends on weighing the totality of the circumstances," it is ultimately a question of law. *Valley Med. Specialists v. Farber*, 982 P.2d 1277, 1280–81 ¶ 11 (Ariz. 1999). "[A] restrictive covenant is unreasonable if '(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.'" *Fearnow v. Ridenour, Swenson, Cleere & Evans, P.C.*, 138 P.3d 723, 725, ¶ 8 (Ariz. 2006) (quoting Restatement (Second) of Contracts § 188 (1981)).

"Restrictive covenants that tend to prevent an employee from pursuing a similar vocation after termination of employment are disfavored and are strictly construed against the employer." *Bryceland v. Northey*, 772 P.2d 36, 39 (Ariz. Ct. App. 1989). "A restrictive covenant cannot be greater than necessary to protect the employer's legitimate interests, and its scope is defined by its duration and geographic area." *McKesson Med.-Surgical Inc. v. Caccavale*, No. CV-04-1351-PHX-SRB, 2008 WL 11338486, at *5 (D. Ariz. Dec. 23, 2008).

Here, Section 8.05(a) of the Asset Purchase Agreement provides that for a period of eight years, the parties may "not, directly or indirectly, render services or assistance to, own, manage, operate, control, invest or acquire an interest in . . . any Person that engages in a Competing Business . . . or otherwise engage in or conduct . . . in a Competing Business." (Ex. 1). Section 8.05(a) does not specify any geographic scope, and this lack of geographic scope proves fatal for its enforceability.

Plaintiffs' motion largely ignores this point. Plaintiffs instead rely heavily on *Gann v. Morris*, 596 P.2d 43 (Ariz. Ct. App. 1979). In *Gann*, the Arizona Court of Appeals recognized that "[c]ourts distinguish between covenants incidental to employment contracts and those incidental to sales of businesses because the policy considerations necessarily differ." *Id.* at 44. The court noted that the sale of a "business necessarily includes the sale of good will and the purchaser has the right to assure himself as best he can of the transfer of the good will." *Id.* at 45. Relying on this language, Plaintiffs argue that the eight-year restriction in the Asset Purchase Agreement is reasonable under the circumstances and should be upheld as the ten-year restriction was in *Gann*.

But a fundamental distinction exists between *Gann* and the instant case. *Gann* involved an agreement not to compete within "a 100 mile radius of Tucson," and the court noted that "[*w*]*here limited as to time and space*, [a] covenant is ordinarily valid unless it is to refrain from all business whatsoever." *Id.* at 44. Here, as discussed above, the non-compete provision of the Asset Purchase Agreement is limited in time, but not in space. Accordingly, Section 8.05(a) of the Asset Purchase Agreement is unenforceable under

Arizona law.

At the preliminary injunction hearing, Plaintiffs argued that Section 8.05(a) should not be read in isolation, and even though Section 8.05(a) does not itself contain a geographic scope, it refers specifically to a "Business" and a "Competing Business," and these defined terms make clear that the non-compete is national in scope. The Court is unpersuaded. "Business" under the Asset Purchase Agreement refers to "the business of solar brokerage whereby they advise consumers in the solar field and introduce consumers to suitable professional contractors," and "Competing Business" "means any business which manufactures, distributes, designs, creates, or sells products or provides services that compete directly with those distributed, manufactured, designed, sold, developed, in development, or provided by Buyer as of immediately after the Closing or at any time during the thirty-six (36) month period immediately preceding the Closing." (Ex. 1). The Court is unable to extrapolate a national scope from this language.

But even assuming the Asset Purchase Agreement did have a national scope, Plaintiffs have failed to show that a national scope is reasonable under the circumstances. Neither SinglePoint nor SDS operate in all 50 states. Accordingly, Plaintiffs have not demonstrated that a national non-compete is no "greater than necessary to protect the employer's legitimate interests" *See McKesson Med.-Surgical Inc.*, 2008 WL 11338486, at *5.

Plaintiffs also argue that the Court can modify the non-compete provision of the Asset Purchase Agreement pursuant to Section 8.05(e), the severability provision. Section 8.05(e) provides:

> Severability. If the final judgment of a court of competent jurisdiction declares that any term or provision of this Section 8.05 invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power to reduce the scope, duration or area of such term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified after the expiration of the time within which the judgment may be appealed.

(Ex. 1). Although the plain meaning of Section 8.05(e) would allow the Court to restrict the scope of Section 8.5(a), the severability provision is inconsistent with Arizona law. Arizona law does not allow a court to rewrite an agreement "in an attempt to make it enforceable." *Farber*, 982 P.2d at 1285–86, ¶ 30. Instead, "Arizona courts will 'blue pencil' restrictive covenants, eliminating grammatically severable, unreasonable provisions." *Id.* Here, because the non-compete provision does not contain *any* restriction on geographic scope, no language exists for the Court to "blue-pencil" or "eliminate." The Court would instead be required to *add* a geographic limitation that does not exist. Because Arizona law does not permit this sort of judicial contract-drafting, Section 8.05(e) does not allow the Court to reduce the scope of the Asset Purchase Agreement's non-compete provision.

The non-compete provision of Diaz's Employment Agreement fares no better. Section 6(a) of the Employment Agreement provides that for a period of three years, Diaz "shall not in any manner, directly or indirectly . . . enter into or engage in any business which is engaged in any business directly competitive with the business of the Company . . . within the geographic area of the Company's business, which is deemed by the parties hereto to be nationwide." (Ex. 2). Here, as discussed, the Court does not find that a nationwide scope is reasonable under the circumstances. Because SDS does not do business in all 50 states, a prohibition on competition in all 50 states is broader than necessary to protect SDS's interest.

In sum, the Court finds that the non-compete provisions of both the Asset Purchase Agreement and the Employment Agreement unenforceable, and Plaintiffs have therefore failed to demonstrate a likelihood of success on the merits of their claims related to these provisions.

### 2. Non-Disclosure/Confidentiality

Next, Plaintiffs argue that Diaz and Johnson are violating the non-disclosure provision of the Asset Purchase Agreement by using and attempting to sell the confidential information that Plaintiffs purchased. Plaintiffs also argue that Diaz is violating the confidentiality provision of his Employment Agreement. The Court finds that Plaintiffs

have shown a likelihood of success on the merits of these claims as they relate to some, but not all, of the assets listed in the Asset Purchase Agreement.

Among the assets that SinglePoint purchased in the Asset Purchase Agreement were "Intellectual Property Assets." (Ex. 1). These Intellectual Property Assets include "all processes related to running any and all operations of the sellers; customer lists; customer purchasing histories; price lists; distribution lists, supplier lists, . . . strategic plans; . . . business and technical information and know-how; databases; . . . web addresses; web pages; accounts with Twitter, Facebook, and other social media companies and the content found thereon." (*Id.*). Section 8.05(c) of the Asset Purchase Agreement requires the parties to "keep confidential all confidential, non-public or proprietary information and materials" and provides that the parties "shall take all appropriate steps (and cause each of such Person's Affiliates and each of their respective Representatives acting on their behalf to take all appropriate steps) to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft." (*Id.*).

Under the circumstances presented in this case, the Court finds that this restriction is reasonable as it pertains to the Intellectual Property Assets that contain information specific to SDS such as customer lists, databases, and webpages. The Intellectual Property Assets SinglePoint purchased in the Asset Purchase Agreements such as customer lists and purchase history have value because they provide information that a business can use to generate revenues and are not publicly available. Requiring a party not to disclose this information is a reasonable method of preserving this value. Allowing Diaz to sell the information to SinglePoint only to then use the information for his own benefit would undermine the purpose of including Intellectual Property Assets in the Asset Purchase Agreement.

However, certain information included among the Intellectual Property Assets that Plaintiff's claims are their "property," such as Mr. Diaz's "business and technical information and know-how," are not readily identifiable. Plaintiffs seemingly argue that they purchased Diaz's knowledge and talent in the Asset Purchase Agreement. The Court

- 8 -

does not find that Arizona law recognizes the sale of one's knowledge in such a manner. "As another court has rather memorably put it, absent a special and enforceable duty, an alert salesperson is not required to undergo a prefrontal lobotomy." *Amex Distrib. Co. v. Mascari*, 724 P.2d 596, 603 (Ariz. Ct. App. 1986) (citing *Fleming Sales Co., Inc. v. Bailey*, 611 F. Supp. 507, 514 (N.D. Ill. 1985)). Accordingly, the Court finds that the Asset Purchase Agreement preventing Diaz from disclosing his "know-how" effectively amounts to a non-compete agreement. And as discussed above, such a non-compete with no geographic limitation is unenforceable under Arizona law.

The same rationale applies to the confidentiality provision of Diaz's Employment Agreement. Under the confidentiality provision, Diaz agreed "(i) not to use any such Confidential and Proprietary Information for himself or others; and (ii) not to take any Company material or reproductions . . . thereof from the Company's offices at any time during his employment by the Company, except as required in the execution of the Executive's duties to the Company." (Ex. 2). The Employment Agreement further provides:

> Confidential and Proprietary Information shall include, but shall not be limited to, confidential or proprietary scientific or technical information, data, and related concepts, business plans (both current and under development), client lists, promotion and marketing programs, trade secrets, or any other confidential or proprietary business information relating to development programs, costs, revenues, marketing, investments, sales activities, promotions, credit and financial data, manufacturing processes, financing methods, plans or the business and affairs of the Company or of any affiliate or client of the Company.

(*Id.*). Again, by its nature, confidential information derives its value from not being publicly available, and the Court finds that preventing a party from disclosing confidential information enforceable.

Accordingly, the Court will enjoin Diaz and Johnson from using any information specific to SDS that was the subject of the Asset Purchase Agreement or Employment Agreement. This includes any specific customer information, price lists, accounts, web pages, and the like. However, Diaz may use his knowledge and expertise to compete in the

- 9 -

solar energy market. What Diaz may not do is compete by reselling, disclosing, or otherwise using SDS trademarks, client lists, or any other proprietary data.

### 3. Non-Solicitation/Non-Hire

Next, Plaintiffs argue that Defendants Diaz and Johnson violated the Asset Purchase Agreement's and Employment Agreement's prohibitions on non-solicitation and non-hire provisions.

The non-solicitation provision of the Asset Purchase Agreement (Section 8.05(b)) provides:

> <u>Non-Solicitation: No-Hire.</u> In consideration of the payment of all amounts hereunder by Buyer and as a condition precedent to Buyer's consummation of the Transactions, during the Restrictive Covenant Period, no Seller or Beneficial Owner shall, and each shall cause such Person's Affiliates not to, directly or indirectly (i) recruit, solicit or otherwise induce or attempt to induce any employee, consultant, distributor, partner, or independent contractor of Buyer or any of its Affiliates to leave the employ or services Buyer or any of its Affiliates, as applicable, or in any way interfere with the relationship between Buyer or any of its Affiliates and any employee, consultant, distributor, partner, or independent contractor thereof, (ii) employ, hire or otherwise retain any Person who is an employee, consultant, distributor, partner, or independent contractor of Buyer or any of its Affiliates while such Person has any relationship with Buyer or any of its Affiliates, as applicable, and for twenty four (24) months thereafter, (iii) recruit, solicit or otherwise induce or attempt to induce any customer, prospective customer, distributor, partner, supplier, licensee, licensor, franchisee or other business relation of any of Buyer or any of its Affiliates to terminate, reduce or adversely modify its business with Buyer or any of its Affiliates, as applicable, or in any way interfere with the relationship between any such customer, supplier, distributor, partner, licensee or business relation and Buyer or any of its Affiliates, as applicable, or (iv) enter into any office, warehouse, or other location where the Business is operated, or talk to or have any conversation with any employee, consultant, distributor, partner, supplier, customer, or independent contractor of any Seller for any business purpose without Buyer's prior written consent.

The non-solicitation provision of the Employment Agreement, Section 6(b) provides:

> During the Term and for a period of 12 months thereafter, the Executive shall not, directly or indirectly, without the prior

- 10 -

      written consent of the Company:

      (i) solicit or induce any employee of the Company or any of its affiliates to leave the employ of the Company or any such affiliate; or hire for any purpose any employee of the Company or any affiliate or any employee who has left the employment of the Company or any affiliate within one year of the termination of such employee's employment with the Company or any such affiliate or at any time in violation of such employee's non-competition agreement with the Company or any such affiliate; or

      (ii) solicit or accept employment or be retained by any Person who, at any time during the term of this Agreement, was an agent, client or customer of the Company or any of its affiliates where his position will be related to the business of the Company or any such affiliate; or

      (iii) solicit or accept the business of any agent, client or customer of the Company or any of its affiliates with respect to products or services which compete directly with the products or services provided or supplied by the Company or any of its affiliates, or

      (iv) Notwithstanding the foregoing, Sections 6(b)(ii) and 6(b)(iii) shall not be enforceable by the Company against Executive if the Executive (i) is terminated by the Company without Cause; or (ii) terminates this Agreement for Good Reason.

The Court finds that Section 8.05(b)'s eight-year duration (the "Restrictive Covenant Period") and Section 6(b)'s three-year duration ("the Term and for a period of 12 months thereafter") are broader than necessary to protect Plaintiffs' legitimate interests.

"In determining whether a restraint extends for a longer period of time than necessary to protect the employer, the court must determine how much time is needed for the risk of injury to be reasonably moderated." *Amex Distrib. Co.*, 724 P.2d at 604 (quoting Blake, *Employment Agreements Not to Compete*, 73 Harvard L. Rev. 625, 677 (1960)). Here, Plaintiffs have not carried their burden of showing that the eight- or three-year durations are necessary. Aside from Ralston testifying generally that several employees have left SDS following Diaz's departure and that SDS was harmed by these employees

leaving, there is no evidentiary record to establish the extent of the damage caused by these employees' departure or how long would be necessary to replace them. The same goes with the restriction as it pertains to non-employees. Plaintiffs have failed to justify the duration of the temporal limitation established by the Agreements. Accordingly, on this record, the Court concludes that the non-solicitation provisions are too broad to be enforced.[2]

### 4. Conversion

Finally, Plaintiffs argue that they are likely to succeed on the merits of their conversion claim against Defendants. (Doc. 37 at 23–24; Doc. 44 at 12–13). As it pertains to the confidential and proprietary information at issue in the instant Motion, the Court disagrees.

To succeed on a conversion claim under Arizona law, Plaintiffs must show "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Focal Point, Inc. v. U–Haul Co. of Ariz.*, 746 P.2d 488, 489 (Ariz. Ct. App. 1986) (quoting Restatement (Second) of Torts § 222(A)(1) (1965)). Furthermore, "[a]n action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Id.* The Arizona Court of Appeals considered a claim for conversion of a customer list in the context of a breach of a restrictive covenant in *Miller v. Hehlen*, 104 P.3d 193 (Ariz. Ct. App. 2005).

In *Miller*, the defendant employee allegedly took "customer information and interfer[ed] with the relationships Miller had established with those customers." *Id.* at 203. The court held that a claim for conversion was not appropriate because "Miller did not allege that Hehlen took a customer list in the form of a single, unified document that had

---

[2] Diaz and Johnson also argue that the non-solicitation provisions violate their First Amendment right to freedom of speech. But the First Amendment, applicable to the states through the Fourteenth Amendment, provides that "*Congress* shall make no law . . . abridging the freedom of speech," U.S. Const. amend I (emphasis added), and "is a restraint on government action, not that of private persons." *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114 (1973); *accord Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1926 (2019) ("The Free Speech Clause of the First Amendment constrains governmental actors and protects private actors."). Because there is no state action at issue in this case, any argument rooted in the First Amendment is inapposite.

value as tangible property." *Id.*; *see also Barton & Assocs. Inc. v. Trainor*, No. CV-20-01560-PHX-SPL, 2020 WL 6081496 (D. Ariz. Oct. 15, 2020) ("CVs and strategic documents are not independently valuable as tangible property; rather, by Barton's own admission, their value is derived from the competitive advantage they afford Barton."); *Swisher Hygiene Franchise Corp. v. Clawson*, No. CV-15-1331-PHX-DJH, 2017 WL 11247886, at *9 (D. Ariz. Sept. 11, 2017) (finding that "the customer and pricing information at issue is not the proper subject of a conversion action. The information is intangible but has not been merged in a document that has its own value in the same sense as a stock certificate or insurance policy").

Here, Plaintiffs argue that "[Diaz] and others in concert with him methodically took steps to prevent Plaintiffs from accessing and possessing their own property by locking them out of crucial online accounts containing confidential and proprietary business information." (Doc. 44 at 13). Although this information may be valuable, it is neither tangible property, nor is it merged in a document that has its own value. Accordingly, Plaintiffs' Motion fails to demonstrate a likelihood of success on the conversion claims the Motion discusses.[3]

### b. Irreparable Harm

Because the Court concludes that Plaintiffs have shown a strong likelihood of success on the merits of their claim that Diaz and Johnson violated the non-disclosure provision of the Asset Purchase Agreement, the Court next considers whether Plaintiffs will suffer irreparable harm absent the Court's intervention. As discussed above, the confidential business information that the Asset Purchase Agreement and Employment Agreement protect from disclosure derives its value in part from its secret nature. The Court finds that dissemination of this information poses a significant risk that Plaintiffs would

---

[3] Plaintiffs' First Amended Complaint also alleges that Defendants misappropriated SDS funds as an additional basis of conversion. (Doc. 37 at 24). The Court expresses no opinion on the merits of Plaintiffs' conversion claim as it pertains to those funds, but to the extent those claims have merit, Plaintiffs have failed to demonstrate that their harm could not be remedied through a damages award rather than preliminary injunctive relief. *Calence, LLC v. Dimension Data Holdings, PLC*, 222 F. App'x 563, 566 (9th Cir. 2007) ("The district court employed the correct legal standard and was not required to reach the likelihood of success on the merits where it determined that there was no evidence of irreparable harm.").

lose customer relationships, revenue, and goodwill. Accordingly, the Court finds that Plaintiffs are likely to suffer irreparable harm in the absence of preliminary injunctive relief. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm.").

### c.     Balance of Equities

The Court also finds that the balance of equities tip in Plaintiffs' favor. As discussed above, SinglePoint purchased certain Intellectual Property Assets as part of the Asset Purchase Agreement. This information derives it value from not being publicly available, and this value may be severely diminished by disclosure of this information.

### d.     Public Interest

The Court also finds that "granting the injunction is consistent with the public policy of protecting a company's interest in its trade secrets and confidential information." *See Metso Mins. Indus. Inc. v. Oakes*, No. CV-14-00013-PHX-DGC, 2014 WL 1632927, at *3 (D. Ariz. Apr. 23, 2014).

### e.     Unclean Hands

Diaz and Johnson also argue that the doctrine of unclean hands bars Plaintiffs from seeking injunctive relief. Specifically, they assert that SinglePoint has a pattern of promising individual owners of smaller companies capital for growth if the owners agree to sell the company to SinglePoint. (Doc. 16 at 3–4). Once the acquisition occurs, Diaz and Johnson assert that SinglePoint drains the company of its resources and causes the companies to become insolvent. (*Id.*).

A party "who seeks equity must do equity." *County Sanitation Dist. No. 2 of Los Angeles Cnty. v. Inland Container Corp.*, 803 F.2d 1074, 1080 (9th Cir. 1986). In order to apply the doctrine of unclean hands, the court must determine, based on its review of the facts, that the plaintiff's conduct was "inequitable" or "unconscionable," and that the plaintiff's conduct "relate[d] to the very activity that is the basis of his claim." *Barr v. Petzhold*, 273 P.2d 161, 165–66 (Ariz. 1954); *see also Smith v. Neely*, 380 P.2d 148, 149

(Ariz. 1963) ("The dirt upon his hands must be his bad conduct in the transaction complained of." (emphasis removed)).

Although Defendants raised this issue in their briefing on the motion for a preliminary injunction, Defendants did not present a sufficient factual basis for these claims at the preliminary injunction hearing. Diaz testified that SinglePoint did not provide the funds to SDS in accordance with an agreement outside the Asset Purchase Agreement, but he offered no proof that such an agreement actually existed. Accordingly, Defendants have failed their meet their burden to demonstrate that SinglePoint acted in a manner that was inequitable or unconscionable, and the Court does not find that relief is barred by the doctrine of unclean hands.

### f. Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Here, Plaintiffs argue that the bond requirement should be waived because there is "no realistic likelihood of harm to the [D]efendant[s] from enjoining [their] conduct." *See Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)). (Doc. 3 at 16). Alternatively, Plaintiffs propose a bond amount of $20,000, "which approximates the gross salary of Mr. Diaz and Ms. Johnson during the month immediately preceding their departure from SinglePoint Direct Solar, LLC ($15,000.00), plus potential attorneys' fees and costs of $5,000 . . . ." (Doc. 44 at 16).

Defendants argue that an injunction in this case will prevent them from closing a pending Membership Interest Purchase Agreement with Solar Integrated Roofing Corporation, and the Court should set the bond at $12,200,000, the purchase price in the Agreement. However, given the narrow scope of the Court's injunction and crediting the testimony of Defense witnesses that proprietary information such as customer lists, pricing information, and project lists are "worthless," the Court does not find that the injunction

issued in this case should jeopardize this deal.

However, the Court does not find that waiving the bond requirement entirely is appropriate in this case. Such waivers are rare, especially in cases involving commercial activity. *See Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010) ("We have never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities."). Accordingly, the Court will require Plaintiffs to post their proposed $20,000 bond.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that is Plaintiffs' Motion for a Preliminary Injunction (Doc. 3) is **GRANTED IN PART AND DENIED IN PART** as specified above.

**IT IS FURTHER ORDERED** that, for the duration of this action until further order of this Court or final judgment enters, whichever is sooner, Diaz and Johnson are enjoined from using any information specific to SDS that was the subject of the Asset Purchase Agreement or Employment Agreement. This includes any specific customer information, price lists, accounts, web pages and similar specifically identifiable property; this injunction includes that Diaz and Johnson may not resell, disclose, or otherwise use SDS trademarks, client lists, or any other proprietary data.

**IT IS FURTHER ORDERED** that Plaintiffs are required to post a bond in the amount of $20,000. Plaintiffs must give Defendants notice upon posting the bond and this Order will go into effect 24 hours after the bond is posted.

**IT IS FINALLY ORDERED** that Defendants' Motion to Dismiss (Doc. 51) is **DENIED WITHOUT PREJUDICE**. Defendants shall answer or otherwise respond to the Amended Complaint (consistent with the Local Rules) within 14 days of this Order.

Dated this 6th day of August, 2021.

James A. Teilborg
Senior United States District Judge