Leon B. Silver (SBN:  012884)
Kira N. Barrett  (SBN:  029778)
Mary M. Curtin (SBN: 031973)
Meagan J. Swart (SBN: 035632)
**GORDON REES SCULLY MANSUKHANI, LLP**
Two North Central Avenue Suite 2200
Phoenix, AZ 85004
Telephone:  (602) 794-2479
Facsimile:  (602) 265-4716
knbarrett@grsm.com
lsilver@grsm.com
mcurtin@grsm.com
mswart@grsm.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SinglePoint Direct Solar, LLC, and SinglePoint Inc., | **CASE NO.  2:21-cv-01076-JAT** |
| Plaintiffs, | **SECOND AMENDED COMPLAINT** |
| vs. | |
| Pablo Diaz Curiel, Kjelsey Johnson, Brian Odle, Solar Integrated Roofing Corporation, USA Solar Network, LLC, David Massey, Elijah Chaffino, Christina Berume, and Jessica Hernandez, | |
| Defendants. | |

Plaintiffs allege:

## PARTIES

1.      SinglePoint Direct Solar, LLC ("SDS" or "the Company") is a Nevada limited liability company in the business of providing homeowners and small businesses solar energy brokerage services.

2.      SinglePoint Inc. is a publicly traded corporation incorporated in Nevada and registered to do business in Arizona.

3.      SinglePoint Inc. owns a 51% membership interest in SDS.

4.      Upon information and belief, Pablo Diaz Curiel is a resident of Maricopa County, Arizona.

5.     Until May 26, 2021, Mr. Diaz served as SDS's Chief Executive Officer.

6.     Mr. Diaz also owns a 45% membership interest in SDS.

7.     Upon information and belief, Kjelsey Johnson is a resident of Maricopa County, Arizona. Until her resignation on June 3, 2021, Ms. Johnson worked as the Dealer Concierge for SDS.

8.     Ms. Johnson also owns a 4% membership interest in SDS.

9.     Upon information and belief, Brian Odle is a resident of Maricopa County, Arizona. Until his resignation on June 3, 2021, Mr. Odle worked as the Finance Director for SDS.

10.    Solar Integrated Roofing Corporation ("SIRC") is a publicly traded corporation incorporated in California which, upon information and belief, does business in Arizona.

11.    Upon information and belief, David Massey is a resident of California and Chief Executive Officer of SIRC.

12.    USA Solar Network, LLC is a Delaware limited liability company with its principal place of business in Arizona.

13.    Upon information and belief, Elijah Chaffino is a resident of Maricopa County, Arizona. Mr. Chaffino purports to be the sole member and manager of a Delaware company called SunUp Solar, LLC.

14.    Upon information and belief, Jessica Hernandez is a resident of Maricopa County Arizona.  Ms. Hernandez worked as Telemarketing Manager for SDS until her resignation on or about June 3, 2021.

15.    Upon information and belief, Christina Berume is a resident of Maricopa County, Arizona. Ms. Berume worked as a Dispatch Manager for SDS until her resignation on or about June 4, 2021.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 1125, 18 U.S.C. § 1836 *et seq*, 18 U.S.C. § 1961 *et eq*. and 17

1   U.S.C. § 501 *et seq.* This Court has supplemental jurisdiction over the state law claims

2   pursuant to 28 U.S.S. § 1367.

3       17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

4                              **<u>GENERAL ALLEGATIONS</u>**

5                              **<u>Acquisition of Direct Solar</u>**

6       18.     In 2018, SinglePoint learned of an opportunity to acquire Direct Solar, LLC,

7   a solar brokerage company founded by Mr. Diaz.

8       19.     On February 22, 2019, SinglePoint, Mr. Diaz, and Ms. Johnson entered into

9   an Asset Purchase Agreement which sets forth the terms of the acquisition of Direct Solar

10  and another one of Mr. Diaz's companies, Ai Live Transfers, LLC. A true and correct copy

11  of the Asset Purchase Agreement is attached hereto as Exhibit A.

12      20.     The Asset Purchase Agreement is governed by Arizona law.

13      21.     Under the Asset Purchase Agreement, SinglePoint acquired the assets of

14  Direct Solar in exchange for which SinglePoint agreed to provide the following Closing

15  Consideration:

16              a.  SinglePoint shares equal to $2,040,000 to Mr. Diaz and Ms. Johnson;

17              b.  A 49 percent ownership interest in a to-be-formed subsidiary of

18                  SinglePoint to Mr. Diaz and Ms. Johnson; and

19              c.  $250,000 to the to-be-formed subsidiary.

20      22.     In exchange for the Closing Consideration, Mr. Diaz and Ms. Johnson

21  agreed, among other restrictive covenants, that:

22              a.  For a period of eight years after closing, they would not engage in a

23                  "Competing Business" (Section 8.05(a));

24              b.  For a period of eight years after closing, they would not:

25                      i.  recruit any "employee, consultant, distributor, party or

26                          independent contractor" of SinglePoint or its Affiliates (which

27                          includes its subsidiaries) to work outside of SinglePoint;

28                      ii. hire any person who has a relationship with SinglePoint or its

Affiliates during that relationship or for 24 months thereafter to work outside of SinglePoint; or

    iii.  recruit any "customer, prospective customer, distributor, partner, supplier, licensee, licensor, franchisee or other business relationship" of SinglePoint or its Affiliates to terminate, reduce or adversely modify its business with SinglePoint or its Affiliates. (Section 8.05(b));

c. To keep confidential all confidential, non-public or proprietary information and materials regarding the Business, the Purchased Assets, and SinglePoint and any of its Affiliates and their services, products and practices. (Section 8.05(c));

d. They would not make any negative or disparaging statements or communications regarding the Business, the Purchased Assets, and SinglePoint and any of its Affiliates and their services, products and practices. (Section 8.05(d)).

23. Section 11.04 of the Asset Purchase Agreement specifically provides that SinglePoint and its affiliates are entitled to specific performance and injunctive relief to prevent breaches of any of the provisions therein.

24. The sale closed on May 14, 2019 and SinglePoint provided the Closing Consideration as required by the Asset Purchase Agreement.

25. The Asset Purchase Agreement specifies the assets SinglePoint acquired, which include: all processes related to running any and all operations of the sellers; customer lists; customer purchasing histories; price lists; distribution lists, supplier lists, production data; customer inquiry files; sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices); strategic plans; internal financial statements and records; trade secrets, business and technical information and know-how; databases; data collections and other confidential and proprietary information; formulas; formulations; compilations; software and firmware;

web addresses; web pages; accounts with Twitter, Facebook, and other social media companies and the content found thereon; and all goodwill and the going concern value of the Company. Asset Purchase Agreement, Section 2.01.

**Formation of SDS & Employment of Mr. Diaz**

SDS Operating Agreement

26.     On May 14, 2019, SinglePoint formed SDS.

27.     SDS and its members are governed by the "Operating Agreement of SinglePoint Direct Solar, LLC" ("Operating Agreement") dated May 15, 2019. A true and correct copy of the Operating Agreement is attached hereto as Exhibit B.

28.     The Operating Agreement is governed by Nevada law.

29.     SDS is governed by two Managers designated by SinglePoint, Inc. ("SinglePoint Managers") and a third Manager, which was Mr. Diaz until his resignation on June 2, 2021.

30.     Until May 28, 2021, the SinglePoint Managers were Wil Ralston and Greg Lambrecht.

31.     On May 28, 2021, Corey Lambrecht replaced Greg Lambrecht as a SinglePoint Manager.

32.     The Managers and any officers owe the Company and its Members a duty of loyalty. Operating Agreement, Section 5.2.

33.     Managers and officers are also liable to the Company for any acts or omissions "not in good faith or which involve intentional misconduct or knowing violation of law" and for "a transaction from which the [Manager or officer] derived an improper personal benefit or a wrongful distribution in violation of the Law." Operating Agreement, Section 5.2.

34.     Section 11.11 of the Operating Agreement specifically provides that the non-breaching Members are entitled to specific performance and injunctive relief to prevent breaches of any of the provisions therein.

/ / /

Employment Agreement

35.     Also on May 14, 2019, SDS entered into an Employment Agreement with Mr. Diaz pursuant to which Mr. Diaz was to serve as Chief Executive Officer of SDS for a period of two years.  A true and correct copy of the Employment Agreement is attached hereto as Exhibit C.

36.     The Employment Agreement is governed by Arizona law

37.     Under the Employment Agreement, Mr. Diaz agreed he would "devote all of his business time, attention and energies to the business and affairs of the Company," would "use his best efforts to advance the best interest of the Company" and would not "be actively engaged in any other business activity" that would interfere with performance of his contractual duties or that would "adversely affect, or negatively reflect upon the Company."  Employment Agreement, Section 3(a).

38.     Mr. Diaz also agreed that he would not disclose, make accessible or use for any purpose other than fulfillment of his duties as CEO "any Confidential and Proprietary Information . . . owned by, or received by or on behalf of the Company or any of its affiliates." Employment Agreement, Section 5(a).

39.     The Employment Agreement defines Confidential and Proprietary Information as including "confidential or proprietary scientific or technical information, data, and related concepts, business plans (both current and under development), client lists, promotion and marketing programs, trade secrets or any other confidential or proprietary business information relating to development programs, costs, revenues, marketing, investments, sales activities, promotions, credit and financial data, manufacturing processes, financing methods, plans or the business and affairs of the Company or of any affiliate or client of the Company." Employment Agreement, Section 5(a).

40.     Among other provisions of the Employment Agreement, Mr. Diaz  agreed:

a.  to return all Company material and reproductions in his possession to the Company  upon  request  and  immediately  upon  termination  of

employment.  Employment Agreement, Section 5(a).

b.  not to disclose or make public any Confidential and Proprietary Information at any time during or after his employment. Employment Agreement, Section 5(b).

c.  to cooperate in all regards with the Company in any and all matters, "including but not limited to, the execution of any and all documents pertaining to the Company (even after termination of this Agreement)." Employment Agreement, Section 5(d).

41.    The Employment Agreement also contains the following restrictive covenants:

a.  During the term of employment and for 36 months thereafter, Mr. Diaz shall not "enter into or engage in any business which is engaged in any business directly competitive with the business of the Company. . . within the geographic area of the Company's business, which is deemed by the parties . . .  to be nationwide." Employment Agreement, Section 6(a).

b.  During the term of employment and for 12 months thereafter, Mr. Diaz shall not (without prior written consent of the Company),

  i.  solicit or induce any employee of the Company or its affiliates to leave the Company, hire any employee of the Company or its affiliates within one year of the termination of such employee's employment with the Company/affiliate.

  ii.  Solicit or accept employment with any Person who was an agent, client or customer of the Company or its affiliates while Mr. Diaz was employed with the Company, if the new position will be related to the business of the Company/affiliate.

  iii.  Solicit or accept the business of any agent, client or customer of the Company or its affiliates with respect to products or services which compete directly with the Company/affiliate.

42.     The Employment Agreement also contains a mutual non-disparagement clause. Employment Agreement, Section 6(c).

43.     Section 6(d) of the Employment Agreement specifically authorizes injunctive relief for a breach or threatened breach of Sections 5 or 6.

44.     SinglePoint and SDS hired Mr. Diaz believing that Mr. Diaz would work diligently and in the best interests of the Company as CEO.

**Plaintiffs' Relationship with Mr. Chaffino**

45.     Mr. Chaffino is a longtime friend of Mr. Diaz and owns a company called Standard Eco, LLC.

46.     In October 2020, SDS and Standard Eco, LLC entered into a joint venture agreement pursuant to which they jointly formed a Nevada limited liability company called SunUp Solar, LLC ("SunUp Solar Nevada").

47.     SDS owns 51% of SunUp Solar Nevada and Elijah Chaffino owns 49%.

48.     Mr. Diaz and Mr. Chaffino served as Managers of SunUp Solar Nevada along with three other representatives of SDS/SinglePoint.

49.     SunUp Solar Nevada was intended to function as the solar installation entity for SDS and its clients.

50.     Mr. Chaffino has no authority to act in his sole capacity on behalf of SunUp Solar Nevada.

**Mr. Diaz's Performance as CEO**

51.     In the two years that Mr. Diaz was CEO, SDS was not profitable at any point.

52.     Because SDS was not profitable under Mr. Diaz, the members never received any distributions.

53.     Mr. Diaz also abused his authority as CEO.  For example, Mr. Diaz signed a joint venture agreement purportedly on SDS's behalf with a company called Eco Management without requesting or obtaining authorization from SDS's Board of Managers ("SDS Board") as the Operating Agreement requires.  In fact, he did not even inform the SDS Board about the venture.

54.     On March 16, 2021, while still employed as CEO and while a manager and member of SDS, Diaz sent a letter, through counsel Donald Hudspeth, to SinglePoint and its officers which purported to be a derivative demand on behalf of SDS demanding that SinglePoint take corrective action to cure various alleged breaches of the Operating Agreement by SinglePoint ("SinglePoint Demand Letter"). A true and correct copy of the SinglePoint Demand Letter is attached hereto as Exhibit "D".

55.     In the SinglePoint Demand Letter, Mr. Hudspeth paraphrased Don Vito Corleone, a mafia boss from 1973 movie "The Godfather."

56.     Mr. Hudspeth also accused SinglePoint executives of committing state and federal crimes, including "other unlawful misconduct, which bears investigation, and if confirmed would be extremely prejudicial to [SinglePoint directors and officers], the company, Direct Solar, Pablo Diaz Curiel, i.e. all concerned."

57.     Further, Mr. Hudspeth wrote that "[I]n the event of litigation the Complaint will need to be filed in federal court. This can have some devastating practical effects. One effect of that is that the names of the parties go to the top of Google search results … [t]he practical effect of litigation then is a "lose-lose" where the actions taken can destroy the value of the company and its principals' ability to do business."

58.     Mr. Hudspeth also warned that "I really think you do not want this and the other facts and allegations stated herein in a Complaint and on Google."

59.     The SinglePoint Demand Letter threatened that if SinglePoint did not take the action demanded: "The alternative is that the facts and allegations herein become public knowledge, if not directly then through filings in federal court and Google search results. There is likely to be a nasty and public dispute, involving third parties and the shareholders with the probable destruction of the companies."

60.     On May 26, 2021, at the conclusion of Mr. Diaz's two-year term under the Employment Agreement, the SDS Board elected not to extend or renew the Employment Agreement and informed Mr. Diaz that he would not continue as the Company's CEO.

61.     Upon information and belief, Mr. Diaz has been making good on his threat

to make his allegations "public knowledge" by disparaging SinglePoint and its officers amongst its other shareholders and affiliates.

## Defendants' Plot to Gut SDS of its Valuable Data, Trade Secrets, and Customer Information to Compete Directly with SDS

62.     On May 26, 2021 at 2:00am, the same day that SDS would inform Mr. Diaz that his Employment Agreement would not be renewed for a second term, Mr. Diaz sent an email to Mr. Massey seeking "to potentially find a new home for our companies, our staff, our infrastructure, our relationships and our revenue streams."  A true and correct copy of the May 26, 2021 Email is attached hereto as Exhibit E.

63.     Mr. Diaz's email claims that he is CEO of five companies that are subsidiaries of SinglePoint, which companies have agreements with "72 Sales Companies/Dealers and 30 plus contractors that install our sales platforms in over 30 states."

64.     In fact, Mr. Diaz's term as CEO of SDS had terminated per the terms of his Employment Agreement on May 14, 2021.

65.     Within days of being notified that SDS was not going to renew his contract as CEO, Mr. Diaz instructed employees of SDS, including Mr. Odle, Ms. Berume, and Ms. Hernandez, to transfer Company assets and remove SinglePoint Managers from SDS accounts to prevent them from accessing SDS client lists, current projects and Company data portals.

66.     Upon information and belief, the sole purpose of Mr. Diaz's instructions was to steal SDS assets and move them into a new company in order to effectuate the sale of SDS assets to SIRC consistent with Mr. Diaz's May 26 proposal to Mr. Massey.

67.     Mr. Odle immediately took steps to comply with Mr. Diaz's directive, including by removing SinglePoint Managers from at least twenty accounts on SDS's Podio platform, which is a customer relations management database and a crucial component of SDS's business.

68.     On June 1, 2021, after learning that Mr. Odle was removing documents from

the SDS system, SDS suspended Mr. Odle's account access and began an investigation.

69.     Also within days of being notified that his contract was not going to be renewed, Mr. Diaz transferred $4,500 from SDS's First International Bank and Trust Account to his personal account.

70.     Ms. Johnson and Mr. Odle resigned their positons at SDS on June 3, 2021.

71.     Upon information and belief, Ms. Johnson and Mr. Odle resigned their positions at SDS to join Mr. Diaz in starting a new venture to compete directly with SDS.

72.     On June 1, 2021, SinglePoint Managers discovered in SDS's Google Drive account a document titled "Transition To Do List" which had been prepared by Mr. Odle.

73.     The Transition To Do List evidences a plot by Mr. Diaz, Ms. Johnson, and Mr. Odle to steal SDS's confidential and proprietary data, and trade secrets belonging to without SDS's knowledge or permission, and give that information to a competing entity named U.S.A. Direct Solar.

74.     Specifically, the Transition To Do List:

    a.  Outlines a plan to have SDS's "HR docs rewritten under USA's [sic?] Direct Solar."  The document sets forth plans for "rebranding" of "Process Docs" belonging to SDS, taking SDS's DocuSign platform, and rebranding SDS's Facebook messaging, which has been a source of solar customer leads for SDS in the past;

    b.  Evinces an intent to misappropriate SDS's Solar Nexus database which is a specialized software platform for the solar energy market that houses information starting from project leads all the way to completion, including: customer lists (any dealers, installers, suppliers, lenders and other strategic partners on SDS projects); pricing information; transaction records; and internal and external communications during the course of SDS projects;

    c.  Orders an "Agreement Update" to Xencall, SDS's platform for customer relations management and lead dialing services which would allow use

by a different entity, suggesting a plan by Mr. Diaz and others to take SDS off of the account and put U.S.A. Direct Solar in its place;

    d.  Discusses taking Formstack, a productivity platform allowing SDS to use online forms, digital documents, and eSignatures in its operations;

    e.  Confirms plans to move SDS's entire Podio database;

    f.  Discusses editing the ZipRecruiter ads placed by SDS without knowledge of or authorization from SDS;

    g.  Discusses having SDS's dealer and contractor agreements "[f]ixed" evidently so they could be used by U.S.A. Direct Solar; and

    h.  Evinces an intent by Mr. Diaz, Ms. Johnson, and Mr. Odle to interfere with SDS's existing business relationships with Soligent, which is the largest supplier of materials in the North American solar market, and Loanpal, a major lender and critical component of SDS deals.

75.    SDS uncovered emails after Mr. Diaz, Ms. Johnson, and Mr. Odle left the Company which confirm they followed through on the Transition To Do List and offloaded proprietary and confidential information belonging to the company.

76.    On June 1, 2021, Mr. Diaz formed USA Solar Network, LLC in Delaware.

77.    Also on June 1, 2021, Ms. Hernandez emailed dozens of documents belonging to SDS to her personal Gmail account, including lists and spreadsheets containing information about valuable leads and other contractor information.

78.    On June 2, 2021, Mr. Diaz resigned as Manager of SDS.

79.    An alert sent to Ms. Johnson at her SDS email address shows that she updated her contact information with Wells Fargo, the bank at which Direct Solar, LLC (the original entity that SinglePoint purchased) maintained its business accounts, to include the email address k*****y@usadirectsolar.net sometime prior to June 4, 2021.

80.    Sometime before his June 3 resignation, Mr. Odle also removed SDS's remaining employees and Managers from being able to access critical information belonging to SDS, such as SDS project files, financial records, and customer relations

management records.

81.    Upon information and belief, Defendants also registered the domain "usadirectsolar.net" on May 29, 2021 as an attempt to intentionally mislead current and potential customers, clients, contractors, dealers, and installers and to begin funneling those parties and any revenues flowing from those relationships to a new entity controlled by Mr. Diaz

**Misappropriation of SDS Property**

**and False Advertising**

82.    SDS no longer has access to its critical software systems, including Solar Nexus and Podio, because Defendants Diaz, Johnson, Odle, Berume, and Hernandez, or someone working at their behest, changed the login information.

83.    Until a few days ago, SDS was previously unable to exercise any administrative control over the Company's website because Mr. Diaz holds the domain in his personal GoDaddy account which only he can access.

84.    Because Defendants previously denied access, SDS was unable to update its official company website which identifies Mr. Diaz and Mr. Odle as the CEO and the Finance Director of SDS, respectively.

85.    While Defendants were implementing plans to misappropriate SDS's confidential and proprietary information and preventing SDS from accessing its public-facing platforms like the SDS website, Mr. Diaz continued to hold himself out as the CEO of SDS.

86.    Because SDS was unable update its website for over a month, current or potential customers, as well as installers, dealers, suppliers and other key partners who visit SDS's website, had impressions that Mr. Diaz and Mr. Odle still worked on behalf of SDS; that any dealings with Mr. Diaz and Mr. Odle were dealings with SDS; or that SDS transitioned into a different entity.

87.    The Defendants, having taken control of or denied Plaintiffs access to the Company's public-facing platforms and customer-lead databases, caused substantial and

irreparable harm to SDS both financially and reputationally, including lost customers, lost leads and other damages that cannot be measured in a way that will make SDS whole through monetary relief alone.

### Interference with SDS's Existing and Prospective

### Business Opportunities

88.     On or about April 21, 2021, while Mr. Diaz was still CEO, SDS submitted a response to a Request For Proposal for a project with the Richland School District One ("District") in Columbia, SC.

89.     Mr. Diaz and Mr. Odle continued to have discussions with district representatives purportedly on behalf of SDS after they were no longer with the company.

90.     Upon information and belief, Mr. Diaz and Mr. Odle continued to hold themselves out to the District as representatives of SDS to capitalize on the goodwill that SDS had built with the District, while intending to secure the deal for U.S.A. Direct Solar or some other entity competing with SDS.

91.     Mr. Diaz himself estimated that the Richland contract was worth $7 million.

92.     Upon information and belief, Mr. Diaz has disparaged and continues to publicly disparage SinglePoint and SDS and its Managers in violation of the Asset Purchase Agreement and his Employment Agreement.

### Mr. Diaz Sues SinglePoint

93.     On June 7, 2021, Mr. Hudspeth sent SinglePoint another demand letter on behalf of Mr. Diaz, Ms. Johnson, and others which at various times throughout the letter either threatened to sue SinglePoint and various SinglePoint officers and/or sought settlement to prevent the filing of a lawsuit. A true and correct copy of the June 7, 2021 letter is attached hereto as Exhibit "F".

94.     That same day, and without waiting for SDS or SinglePoint to respond to the demand letter, counsel for Mr. Diaz and others filed a complaint in the federal District Court of Arizona against certain of SDS's current and former Managers and SinglePoint (Case No. 2:21-cv-00989-SMB) which attempts to allege various breach of contract, fraud,

1    and securities fraud claims on behalf of the individual plaintiffs and SDS.

2        95.    Upon information and belief, Mr. Diaz improperly retained Mr. Hudspeth

3    and his firm as counsel for SDS, in violation of any of his authority under the Operating

4    Agreement.

5        96.    Upon information and belief, Mr. Diaz caused SDS to make at least three

6    separate payments to Mr. Hudspeth and his firm, also in violation of Mr. Diaz's authority

7    under the Operating Agreement, including:

8            a.  $4,000.00 on March 11, 2021;

9            b.  $5,000.00 on March 15, 2021; and

10           c.  $3,975.00 on April 5, 2021.

11                      **Sale of SDS Assets to SIRC**

12       97.    On June 30, 2021, SDS, SinglePoint, and Mr. Odle (apparently on behalf of

13   all of the original Defendants) appeared before the Court for a hearing on Plaintiffs'

14   Application for entry of a Temporary Restraining Order.

15       98.    The hearing resulted in a Stipulated Temporary Restraining Order.

16       99.    Mr. Diaz was not present at that hearing because, upon information and

17   belief, he was actively signing an agreement with SIRC for the sale of his new company,

18   USA Solar Network. A true and correct copy of the June 30, 2021 Membership Interest

19   Purchase and Employment Agreement ("SIRC Agreement") between SIRC, Mr. Diaz, Mr.

20   Chaffino, USA Solar Network, and SunUp Solar, LLC, a Delaware company is attached

21   hereto as Exhibit "G".

22       100.   Pursuant to the SIRC Agreement:

23           a.  Mr. Diaz agreed to sell 60% of USA Solar Network to SIRC in

24               exchange for $200,000 cash and $12,000,000 worth of SIRC

25               common stock.

26           b.  Mr. Chaffino agreed to sell 60% of SunUp Solar Delaware to SIRC

27               in exchange for $200,000 cash and $200,000 worth of SIRC common

28               stock.

          c.   Mr. Diaz would be hired as CEO of USA Solar Network for a term of two years.

          d.   Mr. Chaffino would be hired as CEO of SunUp Solar Delaware.

101.    Based on the consideration contemplated by the SIRC Agreement, SIRC has valued USA Solar Network—a company which was formed just 30 days prior to the date of the SIRC Agreement—at over $20 million.

102.    To the extent that USA Solar Network has any valuable assets, any and all of the valuable assets attributed to USA Solar Network by virtue of this valuation belong to SDS and were wrongfully diverted by Mr. Diaz, Ms. Johnson, Mr. Odle, Ms. Berume, and Ms. Hernandez.

103.    SIRC and Mr. Massey had actual notice of Plaintiffs' Complaint against Mr. Diaz, the fact of Mr. Diaz's various contractual obligations including his obligation not to compete with SDS, and Plaintiffs' request for a temporary restraining order based on these obligations because this action was disclosed in Schedule A of the SIRC Agreement.

104.    On June 13, 2021, SIRC and Mr. Diaz issued a press release announcing the SIRC Agreement ("Press Release"). A true and correct copy of the Press Release is attached hereto as Exhibit "H".

105.    The Press Release claims:

          a.   USA Solar Network is a solar energy and EV charging infrastructure developer with a "vast network of sales companies, dealers and installation partners" operating in 37 states.

          b.   Pablo and his team have "over 7,000 solar projects completed to-date."

106.    The "network" described in the Press Release belongs to SDS and SinglePoint.

107.    A portion of completed projects described in the Press Release were completed by SDS following SinglePoint's acquisition of Direct Solar, LLC.

108.    It is clear that the assets described in the Press Release are those of SDS

1   because a draft press release directs readers to visit directsolaramerica.com, which is SDS's

2   site. A true and correct copy of the draft press release is attached hereto as Exhibit "I".

3   109.   The Press Release was reported on by at least one news outlet which

4   attributed Mr. Diaz, USA Solar Network, and the SIRC Sale to SinglePoint, which caused

5   significant confusion in the marketplace generally and among SinglePoint shareholders,

6   resulting in further damage to SinglePoint and SDS's reputation and industry goodwill.

7   110.   Upon information and belief, Mr. Diaz never intended to comply with the

8   Temporary Restraining Order or any of the terms of the Asset Purchase Agreement or his

9   Employment Agreement because, by the time the Temporary Restraining Order was

10   entered, Mr. Diaz believed he had already negotiated the sale of SDS assets to SIRC.

11   **USA Solar Network Copies SDS's Website**

12   111.   SDS operates a webpage located at directsolaramerica.com.

13   112.   SDS registered a copyright on the contents of its website, including the

14   written text therein.

15   113.   The written text of SDS's webpage was written by an employee of SDS,

16   whose written work was a product of SDS.

17   114.   SDS's webpage includes a "Who We Are" section that is linked at the top of

18   the home page. This section contains a written description of the Company, what it does,

19   and its mission. A true and correct copy of SDS's "Who We Are" section is attached hereto

20   as Exhibit "J".

21   115.   The language of USA Solar Network's "About Us" section on its website

22   mirrors the "Who We Are" section on SDS' website. A true and correct copy of USA Solar

23   Network's "About Us" section is attached hereto as Exhibit "K".

24   116.   USA Solar Network's page is entitled "We Are a Solar Energy Developer."

25   SDS' page is entitled "We are a solar energy brokerage."

26   117.   Both webpages state "We here at [USA Solar Networks/Direct Solar

27   America] are a solar energy [developer/brokerage], we help find and install the best

28   available solar energy system for any building residential or commercial. NO money down,

1    NO cost for an estimate and with the potential to help you save up to 50% off of your

2    electricity bill."

3         118.   The next paragraph is identical: "Have you ever asked the question to

4    yourself, 'How do I get solar for my home?' Well we can help you with that and even if

5    you have solar already, we can save you more money on your bill."

6         119.   The following paragraph on both webpages reads "Our **second-to-none**

7    [energy developer/brokerage] model benefits our customers by making sure they see

8    increased benefits and complete satisfaction, while we make sure they realize the most

9    optimal cost savings. With various financing options, multiple choices for Solar Power

10   technology, and 100's of contractors our customers value our extensive experience in

11   creating customized solutions that meet their needs."

12        120.   And finally, "After years of experience and **more than [6,500/3,500] homes**

13   **powered** with the help of our solar [energy development/brokerage services], we think the

14   choice is clear!"

15        121.   SDS never gave USA Solar Network or any of its associates permission to

16   use the copyrighted language from its website.

17        122.   As of August 27, 2021, the identical language remains on USA Solar

18   Network's "About Us" section.

19                          **Mr. Diaz's Press Release to Investors**

20        123.   On or about August 13, 2021, Mr. Diaz published a "press release" to his

21   "fellow SIRCers" in response to comments about the consolidated actions before this Court

22   on conversation boards. A true and correct copy of this press release is attached hereto as

23   Exhibit "L". This press release was further circulated online.

24        124.   In this press release, Mr. Diaz claimed he wanted to give investors "full

25   visibility" of the litigation but instead, intentionally mischaracterized events and rulings of

26   this Court.

27        125.   Mr. Diaz falsely stated in the press release:

28              a.   that all plaintiffs in his original action (Case No. 2:21-cv-0989-SMB)

did not know each other and "have never met in life."

126.   Mr. Diaz stated that he was "forced to bring justice in order to stop [SinglePoint and its executive board] from plundering another well intentioned hard working business owner."

127.   Mr. Diaz also stated that "[o]ne thing is clear: SinglePoint's management is willing to do almost anything to avoid answering their shareholders' concerns about fraud and mismanagement. The open question, however, is how much SinglePoint money management will spend for attorney's [sic] fees and costs to try and do so."

128.   Mr. Diaz included a link to the SinglePoint Demand Letter in the press release, thereby publishing its contents.  The SinglePoint Demand Letter falsely states:

        a.  That SinglePoint executives committed state crimes;

        b.  That SinglePoint executives committed federal crimes, including securities violations; and

        c.  That SinglePoint executives committed "other unlawful misconduct, which bears investigation, and if confirmed would be extremely prejudicial to [SinglePoint directors and officers]."

129.   All of Defendants' actions alleged herein caused serious harm to SDS in the form of lost business with current and prospective customers, interference with relationships with customers, dealers, suppliers, installers, lenders, and other strategic partners, and loss of business advantage and goodwill.

130.   Plaintiffs demand a jury trial on all causes of action to which they are entitled to a jury.

131.   Plaintiffs are entitled to attorneys' fees and costs incurred in pursuing this action pursuant A.R.S. § 12-341.01.

## FIRST CAUSE OF ACTION
### (Lanham Act Violation (15 U.S.C. § 1125(a))– SDS against all Defendants)

132.   Plaintiffs incorporate by reference the preceding allegations.

133.   Defendants' made unauthorized use of, claims of ownership, and/or offers

for sale under SDS's commercial identity.

134.    Defendants have used and will continue to use a false designation of origin that is likely to cause confusion, mistake, or deception as to affiliation, connection, or association of Defendants with SDS and is also likely to cause confusion as to the origin, sponsorship, or approval of Defendants' products, services, or commercial activities by SDS in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

135.    As a direct and proximate result of Defendants' conduct, SDS has been irreparably harmed and will continue to suffer irreparable harm unless Defendants are restrained from making false designations of origin, false descriptions, or misrepresentations regarding the Defendants' products and/or services.

136.    Defendants' continuing infringement is willful and intentional. SDS is entitled to an award of treble damages pursuant to 15 U.S.C. § 1117(a).

**SECOND CAUSE OF ACTION**
**(Misappropriation of Trade Secrets in violation of the**
**Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.* –**
**SDS against all Defendants)**

137.    Plaintiffs incorporate by reference the preceding allegations.

138.    Plaintiffs have developed, maintained, and possess trade secrets and confidential business information and documents including, but not limited to proprietary and confidential information, material, work product, client information, processes, produces, methods, strategies, protocols, and intellectual property which constitute a trade secret within the meaning of 18 U.S.C. § 1839(3).

139.    Plaintiffs' trade secrets have great economic and commercial value because they contain enough information to enable a competitor to usurp business opportunities from the Plaintiffs and deprive them of substantial profit. This information is not readily ascertainable to the public.

140.    Plaintiffs have made reasonable efforts to preserve the confidentiality of their trade secrets and confidential business information by, among other things, strictly monitoring, regulating and controlling access to the information; by requiring Defendants

and others to sign the contracts agreeing to confidentiality; and by mandating the return of all company property upon the termination of employment with Plaintiffs.

141.    Accordingly, the information above constitutes trade secrets under 18 U.S.C. § 1836 *et seq.*

142.    Defendants' misappropriated Plaintiffs' trade secrets as described in this Complaint.

143.    Defendants' misappropriation was willful and malicious. Therefore, Plaintiffs are entitled to an award of reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D) and exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C).

### THIRD CAUSE OF ACTION
### (Breach of Asset Purchase Agreement – SinglePoint against Mr. Diaz and Ms. Johnson)

144.    Plaintiffs incorporate by reference the preceding allegations.

145.    The Asset Purchase Agreement is a valid and enforceable contract.

146.    Mr. Diaz and Ms. Johnson breached the Asset Purchase Agreement as alleged herein, including by: recruiting and/or hiring former employees and contractors of SDS, misappropriating SDS's confidential and property information and Trade Secrets for use in starting a competing venture, and publicly disparaging SinglePoint and SDS.

147.    Mr. Diaz further breached the Asset Purchase Agreement by transferring valuable SDS assets to USA Solar Network and entering into an agreement to sell those assets to SIRC.

148.    As a direct and proximate result of Mr. Diaz's and Ms. Johnson's breaches of the Asset Purchase Agreement, SinglePoint has been damaged in an amount to be proven at trial.

149.    Monetary damages are not an adequate remedy for Mr. Diaz and Ms. Johnson's breaches.  If Mr. Diaz and Ms. Johnson are not enjoined from taking further action in violation of the Asset Purchase Agreement, SinglePoint will suffer irreparable harm in the form of lost goodwill, damage to its brand, lost business opportunities, and

diminished competitive position, which cannot be remedied by the payment of monetary damages alone.

150.   Plaintiffs are entitled to specific performance of Mr. Diaz's and Ms. Johnson's contractual obligations as set forth in the Asset Purchase Agreement.

### FOURTH CAUSE OF ACTION
### (Breach of Employment Agreement –
### SDS against Mr. Diaz)

151.   Plaintiffs incorporate by reference the preceding allegations.

152.   The Employment Agreement is a valid and enforceable contract.

153.   Mr. Diaz breached the Employment Agreement as alleged herein, including by: recruiting and/or hiring former employees and contractors of SDS, misappropriating SDS's confidential and property information and trade secrets for use in starting a competing venture, mismanaging SDS, and publicly disparaging SinglePoint and SDS.

154.   As a direct and proximate result of the breaches of the Employment Agreement by Mr. Diaz, SDS has been damaged in an amount to be proven at trial.

155.   Monetary damages are not an adequate remedy for Mr. Diaz's breaches.  If Mr. Diaz is not enjoined from taking further action in violation of his Employment Agreement, SDS will suffer irreparable harm in the form of lost goodwill, damage to its brand, lost business opportunities, and diminished competitive position, which cannot be remedied by the payment of monetary damages alone.

156.   SDS is entitled to specific performance of Mr. Diaz's contractual obligations as set forth in the Employment Agreement.

### FIFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing –
### Plaintiffs against Mr. Diaz and Ms. Johnson)

157.   Plaintiffs incorporate by reference the preceding allegations.

158.   The Asset Purchase Agreement and Employment Agreement each contain an implied covenant of good faith and fair dealing.

159.   As alleged herein, Mr. Diaz unfairly interfered with Plaintiffs' rights to receive their reasonably expected benefits, including but not limited to the reasonable

expectation that Mr. Diaz would not compete with SDS, of the Asset Purchase Agreement and Employment Agreement, thereby breaching his duties of good faith and fair dealing.

160.   As alleged herein, Defendant Ms. Johnson unfairly interfered with Plaintiffs' rights to receive the benefits of the Asset Purchase Agreement, including but not limited to the reasonable expectation that Ms. Johnson would not compete with SDS, thereby breaching her duties of good faith and fair dealing.

161.   As a direct and proximate result of the breaches by Defendants Mr. Diaz and Ms. Johnson, Plaintiffs have been damaged in an amount to be proven at trial.

**SIXTH CAUSE OF ACTION**
**(Breach of Fiduciary Duty –**
**SDS against Defendant Mr. Diaz)**

162.   Plaintiffs incorporate by reference the preceding allegations.

163.   Mr. Diaz owes fiduciary duties to the Company as set forth in the Operating Agreement.

164.   Mr. Diaz breached his fiduciary duties to SDS as alleged herein, including: transferring funds from SDS's account to his own personal bank account without authorization; wrongfully appropriating SDS's confidential and proprietary business information for his own personal benefit; interfering in SDS's existing and prospective business relationships for the purpose of competing directly with SDS; by failing to meet contractual obligations entered into during his employment with SDS, leading to claims, complaints and lawsuits against SinglePoint and/or SDS; and soliciting SDS employees to leave SDS and join him at his competing venture.

165.   Mr. Diaz further breached his fiduciary duties to SDS by forming USA Solar Network, LLC while he was still a Manager of SDS with the intent of using USA Solar Network, LLC to house SDS assets and/or compete directly with SDS.

166.   As a direct and proximate result of Mr. Diaz's breaches of his fiduciary duties, SDS has been damaged in an amount to be proven at trial.

/ / /

**SEVENTH CAUSE OF ACTION**
**(Unfair Competition –**
**SDS against all Defendants)**

167.    Plaintiffs incorporate by reference the preceding allegations.

168.    Defendants have engaged in activities which include the use of confidential information to solicit customers, theft of trade secrets, and breach of restrictive covenants.

169.    Defendants' wrongful acts have enabled Defendants to contact both SDS's existing and prospective customers, clients, dealers, and installers with improper knowledge of existing and prospective contractual relations between these parties and SDS with improper knowledge and information relating to the confidential and proprietary information and trade secrets of Plaintiffs, including the types of information described in this Amended Complaint.

170.    As a direct result of Defendants' improper knowledge and use of SDS's trade secrets and proprietary and confidential business information, Defendants have commenced, and if not restrained, will continue to pursue a program of improper and unfair competitive activity designed to wrongfully lure and entice away Plaintiffs' existing customers, clients, dealers, installers and other valuable contracts and improperly interfere with Defendants' prospective advantageous business relations between Plaintiffs and prospective customers, clients, dealers, installers.

171.    Defendants' unfair competition has directly resulted in, and if unrestrained, will continue to result in, immediate and irreparable damage to Plaintiffs' business including, but not limited to, the loss of clients and customers; loss of profits; loss of valuable proprietary and confidential business information and trade secrets; and competitive disadvantages.

172.    Defendants' conduct was intentional, willful, malicious, unjustified, and in bad faith.

173.    As a result of Defendants' actions, SDS has been damaged in an amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**
**(Violation of Arizona Uniform Trade Secrets Act (A.R.S. § 44-401 *et seq.*) –**
**Plaintiffs against all Defendants)**

174.    Plaintiffs incorporate by reference the preceding allegations.

175.    Each of Plaintiffs' Trade Secrets, and all of their trade secret information including but not limited to proprietary and confidential information, material, work product, client information, processes, produces, methods, strategies, protocols, and intellectual property constitute a trade secret within the meaning of A.R.S. § 44-401(4) and are protected from unauthorized and improper acquisition, disclosure, and use pursuant to A.R.S. § 44-401 *et seq.*

176.    Plaintiffs derive economic value from the fact that its trade secrets are not generally known and are not readily ascertainable by proper means.

177.    Plaintiffs have taken reasonable steps to secure and maintain the secrecy of their Trade Secrets and property by, among other things, strictly monitoring, regulating and controlling access to the information; by requiring Defendants and others to sign the contracts agreeing to confidentiality; and by mandating the return of all company property upon the termination of employment with Plaintiffs.

178.    Defendants have misappropriated and continue to misappropriate Plaintiffs' Trade Secrets and all related trade secret information by acquiring such trade secret information through improper means and/or with an improper motive and without Plaintiffs' consent.

179.    Defendants' misappropriation was done with the intention to unfairly profit from Plaintiffs' trade secrets and confidential and proprietary information.

180.    Plaintiffs have been damaged as a direct and proximate result of Defendants' actions.

181.    Defendants' misappropriation of Plaintiffs' Trade Secrets was willful and malicious. Therefore, Plaintiffs are entitled to an award of reasonable attorneys' fees pursuant to A.R.S. § 44-404(C) and exemplary damages pursuant to A.R.S. § 44-403(B).

**NINTH CAUSE OF ACTION**
**(Intentional Interference with Contract/Business Expectancy –**
**SDS against all Defendants)**

182.   Plaintiffs incorporate by reference the preceding allegations.

183.   SDS had valid contractual relationships with its clients and service providers.

184.   SDS had valid business expectancies with prospective clients, including but not limited to a potential contract with Richland School District One worth $7 million.

185.   SDS had a valid business expectancy in the benefits flowing from the Asset Purchase Agreement and Employment Agreement.

186.   Defendants knew of SDS's contractual relationships and business expectancies.

187.   Defendants acted intentionally, purposefully, and with an evil mind when they solicited SDS's clients and prospective clients.

188.   Defendants' intentional interference caused those relationships to terminate.

189.   As a direct and proximate result of the terminations caused by Defendants' intentional interference, Plaintiffs have been damaged in an amount to be proven at trial.

**TENTH CAUSE OF ACTION**
**(Conversion -**
**SDS against all Defendants)**

190.   Plaintiffs incorporate by reference the preceding allegations.

191.   Plaintiffs have a right to possess their confidential and proprietary business information and trade secrets.

192.   Plaintiffs have a right to possess the revenues that flow from their contracts with customers, clients, dealers and installers.

193.   SDS also has a right to possess the funds in its First International Bank and Trust Account.

194.   Defendants intentionally and substantially interfered with Plaintiffs' property rights by misappropriating SDS's confidential and proprietary information, trade secrets, and other assets for their own personal use.

195.    Defendants Mr. Massey, SIRC and USA Solar Network intentionally and substantially interfered with Plaintiffs' property rights by misappropriating SDS's confidential and proprietary information, trade secrets, and other assets for use in their business operations.

196.    Defendants Mr. Diaz, Ms. Johnson, and Mr. Odle also intentionally and substantially interfered with SDS's property right by transferring or causing to be transferred SDS's funds from the First International Bank and Trust Account to Mr. Diaz's personal account and to Mr. Hudspeth and/or his firm, as alleged herein.

197.    Plaintiffs did not consent to Defendants' actions.

198.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered damage in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**
**(Unjust Enrichment -**
**Plaintiffs against all Defendants)**

199.    Plaintiffs incorporate by reference the preceding allegations.

200.    Defendants have benefited and been enriched by their receipt and use of Plaintiffs' work product, confidential and proprietary information, and misappropriation of Trade Secrets and trade secret information as alleged in this Complaint.

201.    Defendants have also benefited and been enriched by their relationship and association with SinglePoint and their exploitation of SinglePoint's and SDS's industry good will.

202.    Defendant Mr. Diaz and Ms. Johnson have also benefited and been enriched by failing to meet contractual obligations entered into during their employment with SDS, leading to claims, complaints and lawsuits against SinglePoint and/or SDS including the following, amongst others:

    a.    Platte River Insurance Company v. Curiel Whitworth Construction, LLC, Maricopa County Superior Court Case No. CV2013-002796 resulting in a judgment against SinglePoint as garnishee in the principal amount of $7,000;

b. Powur, PBC v. SinglePoint, Inc. et. al., United States District Court Southern District of California;

c. Arizona Attorney General Complaint No. CIC 21-008235, Complainant Steven Russell Madden alleging damages in the amount of $50,000 arising out of alleged false promises made by SDS under Mr. Diaz's management;

d. Arizona Attorney General Complaint No. CIC 21-007511, Complainant Cream City Solar alleging failure to comply with contractual obligations. Due to Defendants misappropriation of SDS proprietary information and data, SinglePoint and SDS have been unable to locate numerous contracts in order to properly respond and/or address the Complaint.

203. Despite Plaintiffs' demands, Defendants refuse to cease using and misappropriating this information or holding themselves out as being associated with or acting on behalf of SDS.

204. Plaintiffs are entitled to the fair and reasonable value of the lost revenue, market share, economic advantage and other losses that have resulted and will result from Defendants' wrongful actions.

**TWELFTH CAUSE OF ACTION**
**(Copyright Infringement (17 U.S.C. § 501) –**
**Plaintiffs against USA Solar Network, LLC)**

205. Plaintiffs incorporate by reference the preceding allegations.

206. Plaintiff registered a copyright of its website, including the written text therein.

207. Because Plaintiffs registered this copyright, as the owners, Plaintiffs have the exclusive rights to do and to authorize reproduction of its copyrighted work.

208. USA Solar Network, LLC, reproduced Plaintiffs' copyright on its website for commercial purposes.

209. USA Solar Network, LLC, did not have permission of Plaintiffs' to reproduce Plaintiffs' copyright.

210.   USA Solar Network, LLC, willfully reproduced Plaintiffs' copyright on its website.

211.   USA Solar Network, LLC, violated Plaintiffs' exclusive rights to its copyrighted work.

212.   As a direct and proximate cause of the infringement by USA Solar Network, LLC, Plaintiffs have suffered actual damages in an amount to be proven at trial.

213.   As a result of the infringement by USA Solar Network, LLC, Plaintiffs are additionally entitled to any profits of USA Solar Network, LLC, that are attributable to the infringement.

214.   Alternatively, Plaintiffs are entitled to statutory damages in an amount to be determined by the Court in an amount not to exceed $150,000, as the infringement was willful.

215.   Plaintiffs are additionally entitled to full recovery of costs and attorneys' fees pursuant to 17 U.S.C. § 505.

**THIRTEENTH CAUSE OF ACTION**
**(Defamation –**
**SinglePoint against Mr. Diaz)**

216.   Plaintiffs incorporate by reference the preceding allegations.

217.   Mr. Diaz wrote false statements of fact about SinglePoint in his press release published on or about August 15, 2021.

218.   By publishing the SinglePoint Demand Letter, Mr. Diaz also published the false statements of fact contained therein.

219.   These false statements constitute defamation per se.

220.   Mr. Diaz published his press release online, which was further circulated amongst third parties via email.

221.   When he published the press release, Mr. Diaz knew the statements therein to be false, acted in reckless disregard of whether the statements were true or false, or was negligent in failing to determine the truth or falsity of the statements.

222.   As a result of Mr. Diaz's false statements, SinglePoint's reputation and

1   standing in the community was damaged.

2       223.  As a result of Mr. Diaz's actions, SinglePoint suffered actual damages.

3       224.  As a result of Mr. Diaz's actions, SinglePoint is entitled to presumed

4   damages.

5       225.  SinglePoint is entitled to punitive damages because Mr. Diaz acted with

6   actual malice.

7   **PRAYER FOR RELIEF**

8       WHEREFORE, Plaintiffs pray as follows:

9       a.    For judgment in favor of SDS and SinglePoint and against Defendants;

10       b.    For compensatory damages in an amount to be determined at trial;

11       c.    For presumed damages in an amount to be determined at trial;

12       d.    For an order compelling specific performance of Kjelsey Johnson's and

13   Pablo Diaz Curiel's obligations under the Asset Purchase Agreement;

14       e.    For an order compelling specific performance of Pablo Diaz Curiel's

15   obligations under the Employment Agreement.

16       f.    For a permanent order restraining Defendants Mr. Diaz, Ms. Johnson, Mr.

17   Odle, Mr. Chaffino, Ms. Berume, and Ms. Hernandez, their officers, agents, employees,

18   firms, and attorneys, and all those acting in concert or participation with them, from:

19           i.    using, altering, copying, destroying, moving, or disclosing any data or

20               information obtained from Plaintiffs;

21           ii.    accessing or utilizing any of Plaintiffs' cloud-based storage accounts,

22               including but not limited to Google Drive;

23          iii.    accessing or utilizing any software or online business applications

24               obtained from Plaintiffs, including but not limited to Solar Nexus,

25               Docusign, Formstack, and Podio;

26          iv.    accessing, utilizing or modifying any of Plaintiffs' postings with

27               online recruitment services, including but not limited to ZipRecruiter;

28          v.    using or modifying any login information or passwords obtained from

1    Plaintiffs;

2          vi.     accessing, utilizing or modifying any of Plaintiffs' websites and social

3                  media platforms, including but not limited to Plaintiffs' websites and

4                  Facebook;

5          vii.    using any agreements (including, but not limited to, dealer

6                  agreements, contractor agreements, and employment agreements),

7                  logos, reproductions, or any other forms or materials obtained from

8                  Plaintiffs;

9    g.     For an award of exemplary damages pursuant to A.R.S. § 44-403 and 18

10   U.S.C. § 1836(b)(3)(C);

11   h.     For an award of actual damages or alternatively, statutory damages, pursuant

12   to 17 U.S.C. § 504.

13   i.     For an award of punitive damages;

14   j.     For an award of their reasonable attorneys' fees and costs incurred herein

15   pursuant to 17 U.S.C. § 505 A.R.S. §§ 12-341, 12-341.01, and as otherwise authorized by

16   law;

17   k.     For pre- and post-judgment interest as authorized by law; and

18   l.     For such other and further relief as the Court may deem fair and equitable.

19   RESPECTFULLY SUBMITTED this 27th day of August, 2021

20

21                          GORDON REES SCULLY MANSUKHANI,
                            LLP

22

23                          /s/ *Kira N. Barrett*_____
                            Leon B. Silver
24                          Kira N. Barrett
                            Mary M. Curtin
25                          Meagan J. Swart

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 27, 2021, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

<u>Kimberley M. Davison</u>

1241073/60816469v.1