**Marquis Aurbach Coffing**
Alexander K. Calaway, Esq. *(pro hac)*
Nevada Bar No. 15188
Kathleen Wilde LaBay Esq.
Arizona Bar No. 035862
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
kwilde@maclaw.com
acalaway@maclaw.com
*Attorneys for Counterclaimants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PABLO DIAZ, JAGUSA HOLDINGS, INC., DAN SHIKIAR, ELIJAH LEE CHAFFINO, KJELSEY JOHNSON, BRIAN ODLE, | Case Number:  2:21-cv-01076-JAT<br><br>Consolidated with:<br>2:21-cv-00989-MSB |
| Counterclaimants, | |
| vs. | **COUNTERCLAIMANTS PABLO DIAZ CURIEL, KJELSEY JOHNSON, ELIJAH CHAFFINO, DAN SHIKIAR, JAGUSA HOLDINGS, INC., AND BRIAN ODLES'S COUNTERCOMPLAINT** |
| SINGLEPOINT INC., SINGLEPOINT DIRECT SOLAR, LLC, GREG LAMBRECHT, WIL RALSTON, COREY LAMBRECHT, DOES I-X, inclusive, and ROE CORPORATIONS I-X, inclusive, | |
| Counterdefendants | |

Pursuant to this Court's Order Granting the Parties' Joint Motion to Consolidate (Doc. 23), Counterclaimants PABLO DIAZ, JAGUSA HOLDINGS, INC., DAN SHIKIAR, ELIJAH LEE CHAFFINO, KJELSEY JOHNSON, and BRIAN ODLE ("Counterclaimants") complain and allege as follows:

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

## I.   JURISDICTION AND VENUE

1.     This court has jurisdiction pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims that are included in this Counterclaim, pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in the United States Court for the District of Arizona, pursuant to 28 U.S.C. § 1391, because the all defendants reside in or have their principal place of business in Maricopa County, Arizona, the contracts at issue were executed in Maricopa County, Arizona, and a substantial part of the events or events underlying this counterclaim events or omissions giving rise to the claim occurred in Maricopa County, Arizona.

## II.   PARTIES

### COUNTERDEFENDANTS

3.     Counterdefendant SINGLEPOINT, INC. ("SinglePoint") is a Nevada corporation, a publicly traded corporation on the OTC market exchange[1] using the ticker symbol SING, and regulated by the U.S. Securities and Exchange Commission ("SEC").

4.     Counterdefendant SINGLEPOINT DIRECT SOLAR LLC ("Direct Solar") is a Nevada limited liability company, with the following members: SinglePoint which owns 51% of the membership interests; Counterclaimant PABLO DIAZ CURIEL ("Diaz") who owns 45% of the membership interests; and Counterclaimant KJELSEY JOHNSON ("Johnson") who owns 4% of the membership interests.

5.     SinglePoint is vicariously liable for all such conduct alleged herein by Counterdefendants GREG LAMBRECHT ("Greg"), COREY LAMBRECHT ("Corey"),

---

[1] OTC Markets Group ("OTC") (formerly known as Pink Sheets) is a financial market in the United States which provides price and liquidity information for almost 10,000 over-the-counter (i.e. OTC) securities. *See* OTC Markets, About Our Company, available at: (https://www.otcmarkets.com/about/our-company) (last visited Sep. 10, 2021). OTC traded securities are organized into three markets to inform investors of opportunities and risks: OTCQX, OTCQB and Pink. *Id*.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

and WIL RALSTON ("Ralson"), and the conduct of any party not yet known and which may be added as DOE or ROE.

6.     Upon Information and belief and during all times relevant to the instant action, Counterdefendant Greg was a resident of Maricopa County, Arizona. Greg is an officer, director, stockholder, managing-speaking agent, and/or fiduciary of SinglePoint. Greg is also a manager of Direct Solar.

7.     Upon Information and belief and during all times relevant to the instant action, Counterdefendant Corey was a resident of Maricopa County, Arizona. Corey is an is an officer, director, controlling stockholder, and/or is otherwise a managing-speaking agent and fiduciary of SinglePoint.

8.     Upon Information and belief and during all times relevant to the instant action, Counterdefendant Ralston was a resident of Maricopa County, Arizona. Ralston is an officer, director, controlling stockholder, and/or is otherwise a managing-speaking agent and fiduciary of SinglePoint. Ralston is a manager of Direct Solar.

9.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Counterdefendants named herein as DOES I-X, inclusive, and ROE CORPORATIONS I-X, inclusive, are presently unknown to Counterclaimants and cannot be known or confirmed until such time as discovery is permitted.

10.     Upon information and belief, said DOE and ROE Counterdefendants are responsible for damages suffered by Counterclaimants.  As a result, Counterclaimants sue said Counterdefendants by such fictitious names. Counterclaimants will seek leave to amend its pleading to reflect the true names and capacities of each DOE and ROE Counterdefendant at such time as the same have been ascertained.

11.     Collectively, each and every Counterdefendant herein is hereinafter collectively referred to as "Counterdefendants."  Greg, Corey, and Ralston are hereinafter collectively referred to as the "Individual Counterdefendants."

## **COUNTERCLAIMANTS**

12.     Diaz is an individual and a resident of Maricopa County Arizona.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

13.     Diaz is stockholder of SinglePoint.

14.     Diaz is a member of Direct Solar.

15.     Johnson is an individual and a resident of Maricopa County, Arizona.

16.     Johnson is a stockholder of SinglePoint.

17.     Johnson is a member of Direct Solar.

18.     Counterclaimant DAN SHIKIAR ("Shikiar") is a resident of Arapahoe County, Colorado.

19.     Counterclaimant JAGUSA HOLDINGS, INC. ("JAGUSA") is a Colorado corporation, with its headquarters in Arapahoe County.

20.     Shikiar owns JAGUSA.

21.     JAGUSA is a stockholder of SinglePoint.

22.     JAGUSA owns 49% of the membership interests of nonparty Jiffy Auto Glass USA ("Jiffy"), a Colorado limited liability company.

23.     Counterclaimant ELIJAH LEE CHAFFINO ("Chaffino") is a resident of Maricopa County, Arizona.

24.     Chaffino owns 49% of non-party a non-party entity called SunUp Solar LLC ("SunUp"), a Nevada limited liability company.

25.     Chaffino is a member of a non-party entity called Standard Eco, LLC ("ECO").

26.     BRIAN ODLE ("Odle") is a resident of Maricopa County, Arizona.

27.     Olde is a stockholder of SinglePoint.

III.    **FACTUAL ALLEGATIONS**

**DIAZ AND DIRECT SOLAR**

28.     This case involves an ongoing scheme of SinglePoint and the Individual Counterdefendants, to acquire controlling interests in privately owned businesses by promising these business owners funding for expansion and acquisitions, then issue press releases and public filings with the SEC to tout the acquisitions and boost the price of its

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

stock, and then reneging on these promises and by looting these businesses to line their own pockets, rather than funding these privately owned businesses.

29.     Upon information and belief, SinglePoint's agents included as Counterdefendants herein, including but not limited to, Greg, Corey, and Ralston, and any other persons who are unknown to Counterclaimants at this time, were acting for the benefit of SinglePoint, at all times relevant herein, and within the scope of their agency relationship with SinglePoint; thus, SinglePoint is responsible for their actions under the theory of *respondeat superior.*

30.     Counterdefendants owed a fiduciary duty to all companies acquired herein but breached this duty by, *inter alia*, having the officers and directors of the parent serve as managers of the various Counterclaimant entities, and abusing their power to act for the sole benefit of SinglePoint and its officers and directors to the serious and permanent detriment of the companies acquired.

31.     Direct Solar was formed on May 14, 2019, with SinglePoint, Diaz and Johnson as members, and was created pursuant to an Asset Purchase Agreement dated February 22, 2019, wherein SinglePoint purchased the assets of Diaz' pre-existing and profitable company, Direct Solar LLC d/b/a Direct Solar of America ("DSA"), a Delaware limited liability company (the "Direct Solar Acquisition").

32.     Due to Diaz' experience in and knowledge of the solar industry, and his extensive marketing connections, DSA was able to find, negotiate, and consummate more than $200,000,000 in solar industry related transactions since its inception.

33.      As stated below, Diaz consummated more than $11,000,000 in Direct Solar sales in the first year after the Direct Solar Acquisition (May 2019-June 2020).

34.     Despite these figures, DSA lacked the capital to fund these transactions and to enable DSA to expand and continue to grow.

35.     Diaz' friends, Greg and Ralston, owned and operated the company SinglePoint, and its shares were traded on the OTC market exchange.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

36.     Greg and Ralston represented to Diaz that SinglePoint's access to capital through the public market could provide DSA with the capital it needed to expand and grow.

37.     Together, Greg, Ralston, and Diaz prepared a capital flow statement (the "Capital Flow Statement") which set forth the capital that would be needed for DSA to continue to grow, and projected the revenue and profits that would be realized on this capital, which SinglePoint promised to provide as part of the Direct Solar Acquisition.

38.     Due to the revenue delay in the solar industry between the solar equipment sale, installation, and collection, the parties understood that SinglePoint would need to fund Direct Solar in quarterly tranches of $250,000.00 and up to $1,000,000.00 for the first year of operation (the "Tranches"), which are reflected in the Capital Flow Statement.

39.     This quarterly $250,000.00 amount was based on the projected operational expenses comprised of the average cost to generate a sale from a lead, times a sales goal, plus monthly overhead costs.

40.     During the second Tranche, Diaz, Ralston, and Greg predicted that Direct Solar could become self-funding pursuant to the Capital Flow Statement, which represented the understanding of the parties.

41.     SinglePoint agreed to continue providing its capital in Tranches quarterly.

42.     As further consideration, Greg and Ralston agreed that Diaz would be employed as the CEO with a robust bonus structure (later memorialized in the "Diaz Employment Agreement").

43.     Greg, Ralston, and Diaz understood this plan, as reflected in the Capital Flow Statement and the bonus schedule attached to the Diaz Employment Agreement.

44.     Diaz was committed to seeing Direct Solar succeed.

45.     For example, Diaz even offered to forego his base salary, if necessary, and to forego distributions from Direct Solar for the first two years (or until $2,000,000.00 of distributions were distributed to SinglePoint from Direct Solar), just to support SinglePoint's funding of Direct Solar.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

46.     Greg, Ralston and Diaz had the Capital Flow Statement with and in front of them when they negotiated and executed the Asset Purchase Agreement, with the agreement date of February 22, 2019, and which closed in or around May 2019.

47.     On May 14, 2019, SinglePoint and Diaz formed Direct Solar.

48.     On or about the same date of May 14, 2019, Direct Solar and Diaz entered into the Diaz Employment Agreement to continue as the CEO of Direct Solar, which was executed by Greg as the CEO of SinglePoint and as manager of Direct Solar.

49.     The Diaz Employment Agreement included an aggressive bonus compensation program based on revenues generated.

50.     On May 15, 2019, Greg, Ralston, and Diaz signed the SinglePoint Direct Solar Operating Agreement.

51.     During the following months SinglePoint refused to provide any additional funding beyond the initial $250,000.00 Tranche made as part of the closing of the Asset Purchase Agreement, and arbitrarily conditioned all future Tranches on earnings of and distributions by Direct Solar to SinglePoint ("Condition").

52.     Contrary to the promises made to induce Diaz to sign the Asset Purchase Agreement, and in violation of the Greg and Ralston's fiduciary duty as managers of Direct Solar, SinglePoint refused to fund Direct Solar for the Tranches as outlined in the Capital Flow Statement.

53.     This Condition to funding is inconsistent to the Capital Flow Statement upon which the Direct Solar Acquisition was based, and is inconsistent with the bonus system of the Employment Agreement which was executed the day before the Operating Agreement was signed.

54.     This Condition to funding was never a part of the Direct Solar Acquisition or Employment. But for the promise of continued funding, Diaz would not have agreed to the Direct Solar Acquisition.

55.     The parties' Capital Flow Statement, which was relied on by Diaz when he sold DSA, showed that this Condition would not work since Direct Solar needed at least

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

two initial periods of funding to operate and both Greg and Ralston (not just Diaz) knew that the expansion of Direct Solar would not otherwise work.

56.     The Condition put Diaz and Direct Solar in the impossible position of needing Direct Solar earnings for growth, but not having the requisite capital to generate those earnings from SinglePoint.

57.     The Condition would have undermined the entire purpose of the Direct Solar Acquisition, as it would require Direct Solar to effectively fund its own operations and acquisitions, which would have placed Direct Solar in essentially the same funding position as before the Direct Solar Acquisition (i.e., using Direct Solar funds for operations and future acquisitions).

58.     The Condition was contrary to the entire purpose and spirit of the Direct Solar Acquisition, and Diaz did not agree to the Condition.

59.     Moreover, Direct Solar had a major acquisition pending with Soligent, which Diaz introduced to Greg and Ralston as SinglePoint's majority owners, directors, and officers.

60.     Diaz' sophistication in the industry has allowed Direct Solar to have working relationships with at least six large companies, including Loan Pal Bank, Dividend Bank, Sunnova, My Home, SchollyMe, and Enphase. Diaz, on behalf of Direct Solar, spent time and money lining up these opportunities; and these companies were interested in being acquired by or doing deals with Direct Solar that would have generated revenue for Direct Solar.

61.     Companies for which Diaz had done the leg work and negotiated the terms of multiple deals, include the following:  Eco Management; Stellar Solar, a subsidiary of Soligent Holdings (the largest distributor of solar material in the nation); SunUp Solar; SVG Solar (this company alone could bring more than 100 sales teams). But without SinglePoint's promised funding, Direct Solar could not complete transactions with any of the above companies.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

62.     Not only did SinglePoint refuse to fund Direct Solar per the Direct Solar operating agreement, SinglePoint also demanded that Diaz, instead, should use his newly acquired SinglePoint shares to fund Direct Solar.

63.     The effect of SinglePoint's suggestion, would be that not only would Diaz no longer be a Single Point stockholder (his entire compensation received as part of the Asset Purchase Agreement); but this suggestion revealed Greg and Ralston's true intentions of squeezing out Diaz from SinglePoint, looting Direct Solar of its contacts and assets, and pump the SinglePoint share price on the public markets.

64.     When presented with the above candidates for acquisition, Greg and Ralston either rejected these proposals (to the detriment of SinglePoint), or attempted to circumvent Direct Solar and Diaz from these deals.

65.     For example, Corey, on behalf of majority member, SinglePoint, advised Diaz via text message that SinglePoint would be handling the deal with Soligent directly through SinglePoint, and would be circumventing Direct Solar (to avoid paying bonus payments to Diaz, and distributions to Pablo and Johnson). This was after Diaz established the relationship and set up the deal with Soligent, and introduced Greg and Ralston to Soligent's management team and proposed the idea for the transaction.

66.     A similar situation occurred with Eco Management. This created further conflict between Diaz, SinglePoint and the seller, since the principal of Eco Management was Diaz' brother.

67.     By taking Direct Solar out of the deal, the Individual Counterdefendants knew that this would prevent Diaz from getting his bonus under his employment agreement with Direct Solar, and would prevent Direct Solar from making distributions to its members.

68.     In another act inconsistent with its deal with Diaz, and detrimental to Direct Solar, SinglePoint formed a new company, Single Solar, to perform tasks similar to Direct Solar and has appointed Corey as SinglePoint's point man for acquisitions.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

69.     In a word, the Individual Counterdefendants diverted transactions away from Direct Solar in derogation of its business and Diaz Employment Agreement and the fiduciaries duties of Greg, Ralston, and SinglePoint (as a member with the majority membership interest).

70.     Diaz compensation under the bonus program in the Diaz Employment Agreement was based on revenues generated.

71.     Over the one-year period between May 14, 2019 – May 14, 2020, Diaz generated $11,122,273.90 in sales revenue, and SinglePoint still refused to fund Direct Solar as promised.

72.     Instead, upon information and belief, money that was generated went to line the pockets of Greg and Ralston, and other SinglePoint principals.

73.     According to the bonus plan, Diaz has earned approximately $506,000 in compensation.

74.     To date, this promised bonus compensation has not been paid.

75.     To date, neither Diaz and Johnson have received their promised distributions.

76.     Greg and Ralston who are the majority stockholders, directors, and/or officers of SinglePoint also serve and control Direct Solar as managers. Thus, the same persons serve as the management of both SinglePoint and Direct Solar.

77.     Direct Solar is at or near insolvency due to SinglePoint not funding the Company.

78.     Despite promises to fund Direct Solar and making representations in public securities filings, SinglePoint has not properly funded Direct Solar.

79.     In its 10-K annual financial disclosure filed for the calendar year ending December 31, 2020, which was signed and certified by SinglePoint's officers and directors, including Greg (as CEO) and Corey (as CFO), SinglePoint made the following statement, despite the fact that SinglePoint had failed to fund Direct Solar as agreed:

> In May 2019 the Company bought 51% of Direct Solar America (as defined below) a solar brokerage company headquartered in Phoenix, Arizona. Direct Solar America currently works with homeowners to define the best solar

installation provider and financer for their particular need. The unique brokerage model is scalable nationally and in its first 10 months of operation has expanded into multiple states and is expected to continue expanding into additional markets. In connection with this acquisition the Company has issued an aggregate value of approximately $2,000,000 in common stock and has committed to additional cash capital for business expansion upon business milestone goal achievements. In addition to the multistate expansion of the residential solar brokerage model, Direct Solar America post acquisition, has identified market opportunities related to small and medium commercial solar projects and has committed staff and resources adding to its core business competencies to pursue these types of underserved commercial solar opportunities. The majority of the targeted projects are comprised of commercial buildings, schools, parking lot structures looking for solar based solutions that offset and reduce traditional energy consumption through a green solution that saves them money while reducing their impact on the planet.

80.     In its 10-K filed for the calendar year ending on year ending on December 31, 2020, signed and certified by SinglePoint's officers and directors, including the Individual Counterdefendants, SinglePoint made the following material statement:

SinglePoint Direct Solar, LLC ("Direct Solar America") In May 2019 the Company formed Direct Solar America, and owns fifty one percent of the membership interests. Direct Solar America is a solar brokerage company headquartered in Phoenix, Arizona that currently works with homeowners to define the best solar installation provider and financer for their particular need in multiple cities around the United States. We believe the unique brokerage model is scalable nationally and in its first 10 months of operation has expanded into multiple states and is expected to continue expanding into additional markets. In addition to the multistate expansion of the residential solar brokerage model. In October 2020 Direct Solar America entered into a first-of-its-kind collaboration agreement with Soligent the allows approved and licensed EPC's, Contractor's, or Installer's that are within and operate under the Direct Solar of America network additional procurement and financial flexibility. Direct Solar America acts as the principal and is the guarantor under this collaboration agreement and a majority of the residential solar projects in 2021 will operate within the framework of this agreement in which Direct Solar America will benefit from additional incremental margins and as the principal will benefit from recognizing the entire project revenue versus a portion under the historical DSA Residential Brokerage Model. Direct Solar America has identified market opportunities related to small and medium commercial solar projects and has committed staff and resources, adding to its core business competencies to pursue these types of underserved commercial solar opportunities. The majority of the targeted projects are comprised of commercial buildings, schools, parking lot structures looking for solar based solutions that offset and reduce traditional energy consumption through a green solution that saves them money while reducing their impact on the planet.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

81.     Furthermore, in its SinglePoint's Form S-3/A, filed on March 1, 2021, signed and certified by SinglePoint's officers and directors, including the Individual Counterdefendants, SinglePoint made the following statement:

> Our subsidiary, Singlepoint Direct Solar LLC ("Direct Solar America", 51% interest) operating as Direct Solar of America is focused on providing renewable energy and storage solutions to residential consumers and small commercial businesses and growing its national footprint, which has grown to operate in 38 states in U.S. during 2020 alone.

82.     The Individual Counterdefendants made such statement, knowing that Direct Solar was not actually operating in 38 states and was, in reality, financially insolvent.

83.     Greg and Ralston have re-directed Direct Solar's Paycheck Protection Program ("PPP") funds granted through the federal CARES Act to SinglePoint, without any legal justification.

84.     In or around May 2021, SinglePoint sent notice to Diaz and the Direct Solar employees that Diaz Employment Agreement would not be renewed and that his employment with the company had been terminated.

85.     Upon information and believe, this termination occurred because, in March 2021, Diaz sent a letter advising SinglePoint that the company and its officers and directors were violating ARS §29-3409, violating ARS §23-353, violating the Securities Enforcement Remedies and Penny Stock Reform Act of 1990, manipulating the share price of SinglePoint, and violating the CARES Act by usurping PPP funds.

**SHIKIAR, JIFFY, AND SHIELDSAVER**

86.     SinglePoint acquired a 51% majority stake in Jiffy in October 2017.

87.     SinglePoint acquired a 51% majority stake in ShieldSaver in January 2018.

88.     On or about January 2018, SinglePoint took control of the bookkeeping and accounting for Jiffy, bogusly citing as a reason their fiduciary duty to the company to do so but thereby admitting a fiduciary duty.

89.     In or around September 2018, SinglePoint stopped funding ShieldSaver, despite numerous verbal commitments from Greg to do so. This left ShieldSaver without cash to cover payroll for Shikiar.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

90.     On or around January 2019, SinglePoint stopped paying the bills. This left the company Jiffy Auto Glass without money to pay $21,000 owed for glass to its glass supplier Mygrant Glass.

91.     SinglePoint's actions as management left Jiffy Auto Glass unable to operate, insolvent and unable to pay its primary vendor, Mygrant Glass.

92.     Jiffy had access and use of the SinglePoint credit card which it had used before without objection and used it to pay this essential bill (Jiffy could not operate without a glass supplier.)

93.     SinglePoint, contrary to its promise of funding, later contested this basic operations charge and had this and about $40,000 in other charges reversed. Mygrant Glass is now suing Jiffy Auto Glass for this amount.

94.     SinglePoint did not pay, or as majority owner cause, Jiffy Auto Glass to pay its sales tax. As a result, there was about $30,000 in unpaid and past due sales taxes. Sales tax is held in trust for the city or state. SinglePoint and Shikiar are now personally liable for these funds.

95.     As the party in charge of the books and accounts and majority owner, SinglePoint is the tax matters representative personally liable on these unpaid taxes.

96.     In an attempt to escape the sale tax and other liability, Greg and Ralston repeatedly demanded that Shikiar take back SinglePoint's shares of Jiffy Auto Glass in trade and turnover his 49% ownership in ShieldSaver. Shikiar refused.

97.     In July 2020, Greg and Ralston went to a Wells Fargo branch and withdrew all monies in both the Jiffy Auto Glass and the ShieldSaver bank accounts.

98.     On July 26, 2020, Ralston filed Articles of Dissolution of Jiffy Auto Glass LLC but did so without Shikiar's consent and forged Shikiar's signature on the dissolution filing.

99.     Before, and in both acquisitions, SinglePoint promised to fund Jiffy and ShieldSaver, but has not done so, despite making representations in public securities filings that it had indeed funded these companies.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

100.    To wit, in the 10-K for SinglePoint for the calendar year ending on December 31, 2018, which was signed and certified by SinglePoint's officers and directors, including the Individual Counterdefendants, SinglePoint made the following material statements:

> Jiffy Auto Glass Corporation (JAG) –JAG provides windshield replacement services in Denver Colorado and Phoenix Arizona. The company works closely with ShieldSaver to test and drive new technological development in the automotive market. JAG is able to fulfill work orders for ShieldSaver in markets the company has a presence, such as Denver and Phoenix.

101.    SinglePoint made the following material statements despite the fact that Jiffy had become defunct, due to SinglePoint's failure to fund Jiffy and ShieldSaver.

102.    Moreover, in the 10-K's for SinglePoint for the calendar years ending on December 31, 2019 and December 31, 2020, which was signed and certified by SinglePoint's officers and directors, including the Individual Counterdefendants, SinglePoint made the following identical statements:

> ShieldSaver, LLC ("ShieldSaver") The Company owns fifty one percent (51%) of the outstanding interests of ShieldSaver. ShieldSaver is a technology focused automotive company working to efficiently track records of vehicle repairs. They pair shops with potential customer via proprietary technology. The ShieldSaver technology solution drives B2B leads and conversion to sales of windshield repair and replacement. The ShieldSaver technology is designed to increase efficiency by quickly delivering a vehicle specific quote for windshield replacement and delivering those leads to local installers looking to expand and grow their business. ShieldSaver has relationships with large parking lot management companies at airports and other locations around the United States to obtain the data needed to operate.

103.    SinglePoint made such statements, but refused to fund Jiffy, which made it impossible to provide the infrastructure to accomplish the promised expansion of Jiffy and ShieldSaver.

## CHAFFINO, SUNUP SOLAR, AND ECO

104.    Greg and Ralston as SinglePoint's officers and directors and as managers of Direct Solar purchased 51% of Chaffino's company, SunUp Solar (which was done without any meeting or notice thereof to the third Direct Solar manager, Diaz).

105.    Ralston, Greg, and Corey, without Chaffino's knowledge or approval, incorrectly and improperly added themselves personally as members of the company in the

official public records of the Arizona Corporation Commission. This would have required notice, a meeting, a vote, and unanimous consent, none of which happened.

106. As this was a Direct Solar merger of 51% of SunUp Solar, Direct Solar, not its managers, would be listed as the member of the Company.

107. Ralston opened a SunUp Solar bank account. Again, this was incorrect and improper because Ralston was not a party to the SunUp Solar transaction and nothing authorized him to open or be added to a SunUp Solar account.

108. As it did with Diaz, SinglePoint promised that it would cause SunUp Solar to pay bonuses for achieving certain milestones.

109. Chaffino has earned $80,000 in bonus pay for accomplishing milestones per the contracts that SinglePoint created.

110. Chaffino has not been paid these commissions.

111. SinglePoint and Chaffino discussed a merger or acquisition of Chaffino's company, ECO, but this transaction did not close.

112. No agreement was made for ECO.

113. Nothing was ever signed for ECO.

114. Yet, on or about July 2020, SinglePoint issued at least two (2) press releases in which it announced that Direct Solar of America had acquired ECO.

115. These announcements were false and have caused confusion and damages in the marketplace.

## SINGLEPOINT SECURITIES

116. During the relevant time period, as detailed herein, Counterdefendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of SinglePoint stock price and operated as a fraud or deceit on the market by misrepresenting the Company's business and prospects.

117. Specifically, the Individual Counterdefendants have utilized a scheme to "purchase" Counterclaimants' entities to inflate the price of their SinglePoint Stock, but in lieu of funding the Counterclaimant entities by this additional raised capital, upon

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

1    information and belief, the Individual Counterdefendants have lined their own pockets with

2    such capital, or otherwise used promised funding for their sole and exclusive benefit.

3        118.    Upon information and belief, this scheme is carried out by the Individual

4    Counterdefendants utilizing an exclusive preferred class of stock utilized (owned only by

5    the Individual Counterdefendants).

6        119.    During the relevant period, the Counterdefendants misled Counterclaimants

7    by making misrepresentations as to their intention to fund DSA, Jiffy, ShieldSaver, and

8    SunUp Solar.

9        120.    Greg and Ralston, in their capacity as directors, officers, or other managing-

10   speaking agents for SinglePoint, sold SinglePoint stock to Diaz, Shikiar, Chaffino,

11   Johnson, and Odle.

12       121.    The Individual Counterdefendants also made false representations in

13   publicly filed statements (including SinglePoint's 10-K's, 8-K's, and S-3/A), to the market,

14   regarding the financial viability of the Counterclaimant entities, all while these same

15   Individual Counterdefendants were seeking to loot these entities and squeeze out

16   Counterclaimants.

17       122.    As a result of their purchases of SinglePoint common stock at artificially

18   inflated prices, Counterclaimants suffered damages when the truth was revealed.

19       123.    Counterdefendants' wrongful conduct, as alleged herein, directly and

20   proximately caused the damages suffered by Counterclaimants. This is evident by the stock

21   price of SinglePoint which has plummeted from $5.62 to $0.21 per share in a span of

22   approximately eight months.

23       124.    Counterdefendants' false and misleading statements and omissions in their

24   SEC filings and other public statements caused damages to Counterclaimants. On the

25   strength of these false and misleading statements, SinglePoint's stock price was artificially

26   inflated to $5.62 per share on February 9, 2021.

27       125.    Those misrepresentations and omissions that were not immediately followed

28   by an upward movement in SinglePoint's stock price served to pump the share price at

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

artificially inflated levels. The allegations herein suffice under a general proximate cause theory, a corrective disclosure theory, and a materialization of the risk theory of loss causation.

126.    The Individual Counterdefendants, because of their positions with SinglePoint, possessed the power and authority to control the contents of SinglePoint's reports to the SEC, press releases, and presentations to Counterclaimants.

127.    Each of the Individual Counterdefendants had a duty to (1) promptly disseminate complete, accurate, and truthful information about the commercial viability of SinglePoint, specifically those facts concerning the rejections of SinglePoint; (2) correct any previously issued statements that were materially misleading or untrue when made so that the market could accurately price the Company's stock based upon truthful, accurate, and complete information; and (3) update any previously-issued forward-looking statements that became materially misleading or untrue so that the market could accurately price of SinglePoint's securities based upon truthful, accurate, and complete information.

128.    Each of the Individual Counterdefendants were provided with copies of the SinglePoint reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

129.    Because of their positions and access to material non-public information available to them, each of the Individual Counterdefendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

130.    At all relevant times, the market for SinglePoint's common stock was an efficient market for the following reasons, among others:

    a.    SinglePoint's common stock was listed and actively traded on the OTC market exchange (symbol SING), an efficient market;

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

b.       As a registered and regulated issuer of securities, SinglePoint filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

c.       SinglePoint regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.       The market reacted to public information disseminated by SinglePoint;

e.       The material misrepresentation and omissions alleged herein would tend to induce a reasonable investor to overvalue SinglePoint's stock; and

f.       Without knowledge of the misrepresented or omitted facts, Counterplaintiffs purchased SinglePoint common during the time that the Counterdefendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of SinglePoint common stock was artificially inflated by Counterdefendants' misrepresentations and omissions.

131.   As a result of the above, the market for SinglePoint stock promptly digested current, reasonably available information with respect to SinglePoint from all public sources and reflected such information in the stock's prices.[2] Under these circumstances, the Counterclaimants purchased SinglePoint stock and suffered similar injuries through their purchases of common stock at prices which were artificially inflated by Counterdefendants' misrepresentations and omissions. A presumption of reliance therefore applies.

---

[2] The historical daily trading prices and volumes of SinglePoint stock are incorporated herein by reference.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

132.   The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

133.   First, the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

134.   Second, many, if not all, of the identified false and misleading statements herein were not identified as forward-looking statements.

135.   Third, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

136.   Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings class, or other public statement described herein were general, "boilerplate" statements of risk that would affect any pharmaceutical company, and misleadingly contained no factual disclosure of any of the specific details concerning the Rejections or similar important factors that would give investors adequate notice of such risks.

137.   Fourth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of SinglePoint who actually knew that each such statement was false or misleading when made.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

## COUNT ONE – SECURITIES FRAUD

**(Diaz, Johnson, Shikiar, and Odle vs. Individual Counterdefendants)**

138.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count One.

139.   In SinglePoint's acquisitions of DSA, Jiffy Auto Glass, Shield Saver, and SunUp Solar, the Individual Counterdefendants were the actual persons who made material and false representations of promised funding for expansion.

140.   The Individual Counterdefendants were the control persons under Section 2 of the Securities and Exchange Act of 1934 (the "Exchange Act").

141.   SinglePoint, as communicated by the Individual Counterdefendants, in their capacity as directors, officers, or, otherwise, as managing-speaking agents of SinglePoint, had the motive and opportunity to commit fraud, or, at a minimum were consciously misbehaving or reckless in making such statements.

142.   Specifically, Greg and Ralston, could personally benefit from increasing the apparent value of SinglePoint by promising to acquire and fund the Counterclaimant entities, and then pocketing the additional capital raised by the public announcements of these acquisitions, instead of funding the Counterclaimant entities as promised.

143.   Counterclaimants justifiably relied on these promises in deciding to sell a controlling interest of their companies to SinglePoint.

144.   Each of these acquisitions involved an investment contract, which is a security under Arizona law.

145.   SEC Rule 10b-5 promulgated by the Exchange Act prohibits the use of a scheme to defraud, or material misstatements or omissions related to the purchase or sale of securities.

146.   Counterclaimants have a private cause of action for securities fraud under Section 10b-5 of the Exchange Act and under A.R.S. § 13-2314.04 involving the sale of securities pursuant to (A.R.S. §44-1991) (the shares of stock or membership interests in the Counterclaimant companies are securities), intentional or reckless sale of unregistered

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

1   securities or real property securities (A.R.S. § 44-1841), a scheme or artifice to defraud
2   (A.R.S. § 13-2310).

3       147.   Counterdefendants knew their statements relating to the purchase and sale of
4   securities were false when made.

5       148.   Contrary to its promises, SinglePoint did not fund the companies; rather, it
6   took their available cash, and failed to pay sales tax due, glass suppliers, other bills. In
7   other words, contrary to promises made, the target acquisition companies were looted of
8   their available cash and left insolvent.

9       149.   In addition, the Individual Counterdefendants discussed various stock
10  manipulation schemes, including the use of relatives, press releases, and coordinated
11  buying and selling, and other improper conduct completed by Individual
12  Counterdefendants.

13      150.   These actions violate the Penny Stock Reform Act, of the Securities
14  Enforcement Remedies and Penny Stock Reform Act of 1990.

15      151.   This Count is brought under Section 10(b) of the Exchange Act (15 U.S.C. §
16  78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17      152.   Counterdefendants violated Section 10(b) and Rule 10b-5 in that they:

18          a.     (a) employed devices, schemes, and artifices to defraud;

19          b.     (b) made untrue statements of material facts and/or failed to disclose
20  material facts necessary in order to make the statements made, in light of the circumstances
21  under which they were made, not misleading; and/or

22          c.     (c) engaged in acts, practices, and a course of business that operated
23  as a fraud or deceit upon Counterplaintiffs in connection with their purchases of
24  SinglePoint common stock.

25      153.   Counterdefendants, individually and in concert, directly and indirectly, by
26  use of means or instrumentalities of interstate commerce, the mails, and/or other oral and
27  electronic communications made the false and misleading statements specified herein,
28  including the statements in SEC filings, presentations, press release, and conference calls

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

regarding the commercial viability of SinglePoint as related to the intent to properly fund the Counterclaimant entities, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false or misleading.

154. Counterdefendants, individually and in concert, directly and indirectly, by use of means or instrumentalities of interstate commerce, the mails, and/or other oral and electronic communications, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct to conceal SinglePoint's intention not to fund the Counterclaimant entities, and their intention to fraudulently induce Counterclaimants to divest their respective entities, solely in order to inflate SinglePoint's share prices.

155. Counterdefendants acted with scienter throughout the relevant time period, because each acted with either the intent to deceive, manipulate, or defraud, or with deliberate recklessness. Counterdefendants possessed actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

156. SinglePoint is liable for the acts of the Individual Counterdefendants and other SinglePoint agents and personnel referenced herein under the doctrine of *respondeat superior*, as those persons were acting as the officers, directors, attorneys and/or agents of SinglePoint in taking the actions alleged herein.

157. Counterclaimants purchased SinglePoint common stock, without knowing that Counterdefendants had misstated or omitted material facts about SinglePoint's operations and financial performance or prospects.

158. In so doing, Counterclaimants relied on false and misleading statements made by Counterdefendants, and/or an absence of material adverse information that was

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

1   known to Counterdefendants or recklessly disregarded by them but not disclosed in
2   Counterdefendants' public statements.

3        159.   Counterplaintiffs have suffered damages in that, in direct reliance on the
4   integrity of the market, they paid artificially inflated prices for SinglePoint common stock,
5   which inflation was removed from the prices of their shares when the true facts became
6   known.

7        160.   Counterplaintiffs would not have purchased SinglePoint common stock at
8   the prices they paid, or at all, if they had been aware that the market price had been
9   artificially and falsely inflated by Counterdefendants' materially false and misleading
10  statements.

11       161.   As a direct and proximate result of Counterdefendants' wrongful conduct,
12  Counterplaintiffs suffered damages in connection with their purchases of SinglePoint
13  common stock when the truth was revealed.

14       162.   WHEREFORE, Counterclaimants request that judgment be entered in their
15  favor, and against Counterdefendants SinglePoint, Greg, Ralston and Corey, jointly and
16  severally as follows:

17         a.   For actual damages in an amount to be proven at trial, and in any event
18  greater than $50,000;

19         b.   For punitive damages in an amount to be proven at trial;

20         c.   For Counterclaimants' costs and attorney's fees incurred herein; and

21         d.   For such other and further relief as the Court deems just and proper.

22  ## COUNT TWO – BREACH OF CONTRACT

23  **(Diaz and Johnson vs. Greg, Corey, and Ralston)**

24       163.   Counterclaimants re-allege the allegations set forth in the preceding
25  paragraphs in this Count Two.

26       164.   Under the Direct Solar operating agreement, as discussed herein, and as
27  managers, Greg and Ralston agreed in section 5.1(a) to direct, manage, and control the

28

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

business of the Direct Solar to the best of their ability and they had the authority and duty to act as reasonably required.

165.    Greg and Ralston breached this operating agreement by not acting to the best of their ability or as reasonably required for the benefit of Direct Solar. To the contrary, Greg and Ralston passively let SinglePoint act for itself to the detriment of Direct Solar.

166.    As of January 2021, Corey became President of SinglePoint and has replaced Greg as a manager of Direct Solar. After this change, the wrongful acts of SinglePoint and the SinglePoint executives as managers of Direct Solar have continued unabated.

167.    As a result of Counterdefendants failure to manage Direct Solar to the best of their ability Direct Solar lost the income it otherwise would have earned from acquisitions and Diaz and Johnson lost the net income from their distributions.

168.    WHEREFORE, Counterclaimants Direct Solar and Diaz request the Court to enter judgment against Counterdefendants Greg, Corey, and Ralston, and award to Counterclaimants:

        a.    Damages of not less than $50,000;

        b.    Punitive damages as appropriate;

        c.    Attorney's fees and costs, and

        d.    Such other relief as the Court deems just and proper.

## COUNT THREE - TORTIOUS INTERFERENCE WITH CONTRACTS AND BUSINESS RELATIONSHIPS

### (Diaz vs. Counterdefendants)

169.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Three.

170.    Diaz had valid pending agreements and existing business relationships with, without limitation, the companies listed above as acquisitions.

171.    SinglePoint knew of Diaz' relationships with these companies but attempted to freeze Diaz out of the deals and to induce the acquisition targets to do the deals directly.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

172.   SinglePoint did this for the improper purpose of maximizing gain to SinglePoint by eliminating distributions to Diaz as the other member, and depriving Diaz of his bonus compensation.

173.   As a result, Diaz has earnings and has lost his bonus incentive compensation.

174.   WHEREFORE, Diaz requests the Court to enter judgment against Counterdefendants, and award to Diaz:

      a.    Damages of not less than $50,000;

      b.    Punitive damages as appropriate;

      c.    Attorney's fees and costs; and

      d.    Such other relief as the Court deems just and proper.

## COUNT FOUR – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

### (Diaz and Johnson vs. Greg, Corey, and Ralston)

175.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Four.

176.   The applicable law implies the covenant of good faith into every contract.

177.   The covenant of good faith requires the parties to act with honestly and fair dealing in transactions and not to act affirmatively to impair the other party's right to the benefits of the transaction.

178.   Counterdefendants, and each of them, have breached the covenant of good faith and fair dealing by acting deliberately to deprive Counterclaimants the benefit of their bargain, monies that would and could be earned and paid as distributions, then to Diaz and Johnson as members, and paid as bonus compensation under Diaz Employment Agreement.

179.   WHEREFORE, Diaz and Johnson request the Court to enter judgment against Counterdefendants SinglePoint, Greg Ralston and Corey as follows:

      a.    Damages of not less than $50,000;

      b.    Attorney's fees and costs, and

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

c.      Such other relief as the Court deems just and proper.

**COUNT FIVE - BREACH OF CONTRACT**

**(Diaz and Chaffino vs. Counterdefendants)**

180.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Five.

181.    Direct Solar owes Diaz about $506,700 in bonus commissions and that number is increasing.

182.    This amount became due immediately upon Diaz termination on or about May 27, 2021, and if not paid by the next regular payday triple damages in the amount of $1,520,100.

183.    Direct Solar cannot pay this compensation due Diaz because of the intervening actions and control exercised by Greg and Ralston as the management of both companies, including interference with acquisitions, operations and the taking of federal PPP funds from Direct Solar's account.

184.    By operating under the same name, with the same management, and whose actions have diverted Direct Solar opportunities and taken funds from its accounts SinglePoint has caused Direct Solar to become insolvent, insufficiently capitalized and deliberately thin in derogation of the rights of Direct Solar's creditors.

185.    As a result, Diaz has had to loan the company $150,000 to pay for operations, rent, bills and payroll.

186.    But for the actions by SinglePoint to subvert the efforts and take the opportunities and funds generated by Direct Solar, Direct Solar would have the funds to pay its debts, including the commissions due to Diaz and Diaz would not have had to fund the company.

187.    For the above reasons it would be inequitable for SinglePoint's corporate veil to shield and company and its officers and directors from liability, particularly on an employment compensation claim, on services that benefitted SinglePoint.

188.    Chaffino is due $80,000 in unpaid bonuses earned, but not paid.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

189.    WHEREFORE, Diaz and Chaffino seek judgment against Direct Solar and SinglePoint as follows:

a.    Bonus commissions earned in the amount of $506,700 plus $80,000 tripled to $1,760,100;

b.    Repayment of his loan to fund operations in the amount of $150,000;

c.    Attorneys' Fees and Costs; and

d.    Such other relief as the Court deems just and proper.

## COUNT SIX - VIOLATION OF STATE AND FEDERAL WHISTLEBLOWER STATUTES

### (Diaz vs. Counterdefendants)

190.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Six.

191.    As delineated above in the factual allegations, Diaz through counsel in March 2021 gave notice, advice, and warning ("Notice") to the officers and directors of Single Point and as managers of Direct Solar that they had made and were continuing to make a number of statutory violations in addition to other instances of unlawful conduct.

192.    This Notice of statutory violations included the payroll claim, the PPP claim and alluded to the actions of such a serious nature that same would be discussed personally. These were the concerns about securities law violations.

193.    All of the above trigger whistleblower protection and statutory and civil penalties, and Counterclaimant advised SinglePoint and its officers and directors of that point.

194.    Nevertheless, SinglePoint has acted to terminate Diaz' employment in obvious retaliation for acts by Diaz and the other Counterclaimants to alert SinglePoint's other directors and public stockholders of SinglePoint's unlawful acts and willful misconduct.

195.    WHEREFORE, Diaz seeks the following statutory and civil damages:

a.    Per the Dodd-Frank Act, 15 U.S.C. § 78u-6(h)(1)(B)(i);

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

i. Reinstatement;

ii. Two times the back pay otherwise owed (with Arizona statutory penalties this amount would be $3,040,000).

iii. interest; and

iv. costs and attorneys' fees;

b. Per Arizona Law

i. Damages for wrongful termination of not less than $50,000;

ii. punitive damages;

iii. costs and attorney's fees; and

iv. other relief the court deems just and proper.

## COUNT SEVEN - BREACH OF CONTRACT

### (Shikiar and JAGUSA vs. Counterdefendants)

196. Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Seven.

197. SinglePoint told Shikiar that it would fund the acquired companies, Jiffy Auto Glass and ShieldSaver.

198. The ShieldSaver operating agreement states that SinglePoint would fund ShieldSaver.

199. SinglePoint did not fund the companies, did not pay the bills, and went to the bank to take the available cash of both companies.

200. SinglePoint breached its contracts with JAGUSA by not providing the funding as promised.

201. WHEREFORE, Counterclaimant Shikiar requests the Court to enter judgment against Counterdefendant SinglePoint and award to Counterclaimants for:

a.   Damages of not less than $50,000;

b.   Attorney's fees and costs; and

c.   Such other relief as the Court deems just and proper.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

## COUNT EIGHT – BREACH OF FIDUCIARY DUTY

### (Shikiar and JAGUSA vs. Counterdefendants)

202.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Eight.

203.   As majority owner of the companies SinglePoint had a fiduciary duty to Jiffy Auto Glass and ShieldSaver.

204.   As managers of each company Counterdefendants Ralston and Corey had a fiduciary duty to Jiffy Auto Glass and ShieldSaver.

205.   Counterdefendants SinglePoint, Greg, Ralston and Corey breached their fiduciary duties to the companies by acting out of self-interest for the benefit of SinglePoint rather than for Jiffy Auto Glass and ShieldSaver.   Such acts of self-interest include the taking of funds, the threat to shut down Jiffy Auto Glass and the unauthorized filing of dissolution papers for Jiffy auto Glass.

206.   When Counterdefendant Ralston filed dissolution papers for Jiffy Auto Glass LLC Counterclaimant Shikiar became personally liable for all debts of the company including sales tax which SinglePoint did not pay.

207.   WHEREFORE, Counterclaimant Shikiar requests the Court to enter judgment against Counterdefendant SinglePoint and award to Counterclaimant:

    a.   Damages equal to all sums for which Shikiar becomes personally liable as a result of Ralston's dissolution of the company;

    b.   Attorney's fees and costs, and

    c.   Such other relief as the Court deems just and proper.

## COUNT NINE - SINGLEPOINT, GREG, RALSTON'S AND COREY'S ACTS OF CIVIL CONSPIRACY AGAINST DIAZ, DIRECT SOLAR, SHIKIAR, JIFFY AUTO GLASS, SHIELD SAVER, CHAFFINO, SUN UP SOLAR AND ECO

208.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this this Count Nine.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

209.   These Counterdefendants acted unlawfully to divert ownership, earnings, and monies away from Counterclaimants Diaz, Direct Solar, Shikiar, Jiffy Auto Glass and ShieldSaver, Chaffino and SunUp Solar.

210.   The Counterdefendants did so intentionally with the purpose of enriching themselves at the expense of and harm to Counterclaimants.

211.   These were not isolated acts but a pattern and practice of conduct from 2017 to today.

212.   As a result of these unlawful, concerted, and intentional acts ownership, income and funds were diverted from Counterclaimants causing great financial harm to them.

213.   These acts constitute the tort of civil conspiracy.

WHEREFORE, Counterclaimants request that judgment be entered in their favor, and against Counterdefendants SinglePoint, Greg, Ralston, and Corey jointly and severally, as follows:

A.     For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.     For punitive damages in an amount to be proven at trial;

C.     For Counterclaimants' costs and attorney's fees incurred herein; and

D.     For such other and further relief as the Court deems just and proper.

## COUNT TEN - AIDING AND ABETTING: SINGLEPOINT, GREG, RALSTON AND COREY

214.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Ten.

215.   SinglePoint, Greg, Ralston and Corey agreed and acted to divert by unlawful means funds which should have been held by Counterclaimants.

216.   Counterdefendants' actions were part of a pattern and practice of conduct.

217.   Counterdefendants knew that they had fiduciary duties by law and that they were breaching same for their own self-interest.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

218.    But for the actions and cooperation of the Counterdefendants the diversion and taking of funds from the various Counterclaimants named herein could not have occurred.

219.    Counterdefendants actions constitute the tort of civil aiding and abetting.

WHEREFORE, Counterclaimants request that judgment be entered in their favor, and against these named Counterdefendants, jointly, and severally, as follows:

A.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.      For punitive damages in an amount to be proven at trial;

C.      For Counterclaimants' costs and attorney's fees incurred herein; and

D.      For such other and further relief as the Court deems just and proper.

## COUNT ELEVEN - CONSTRUCTIVE FRAUD: SINGLEPOINT, GREG, RALSTON AND COREY

220.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Eleven.

221.    SinglePoint, Greg, Ralston and Corey were in a position of fiduciary duty and trust with Counterclaimants.

222.    Greg and Ralston were friends with Diaz prior to their acquisition of the DSA assets.

223.    SinglePoint, Greg, Ralston and Corey falsely and deceptively promised funding to each of the Counterclaimants.

224.    Each of the Counterclaimants justifiably relied on these false and deceptive representations and acted justifiably in accepting Counterdefendants written and oral promises and agreements.

225.    Counterdefendants acts constitute the grounds for the imposition of a constructive trust on those assets taken from Counterclaimants and the proceeds and after-acquired property of those assets.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

WHEREFORE, Counterclaimants request that judgment be entered in their favor, and against Counterdefendants SinglePoint, Greg, Ralston and Corey, jointly and severally as follows:

A.    For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.    For punitive damages in an amount to be proven at trial;

C.    For Counterclaimants' costs and attorney's fees incurred herein; and

D.    For such other and further relief as the Court deems just and proper

## COUNT TWELVE – FRAUD
### SINGLEPOINT, GREG, RALSTON'S AND COREY'S INTENTIONAL AND KNOWING MISREPRESENTATIONS OF PROMISED FUNDING FOR COMPANIES ACQUIRED

226.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Twelve.

227.    In their Acquisitions of DSA, Jiffy Auto Glass, Shield Saver, and SunUp Solar Counterdefendants SinglePoint, Greg and Ralston promised funding for expansion.

228.    In each case the promised funding did not occur.

229.    SinglePoint took the funds of the Company for its own purposes leaving the acquired company insolvent.

230.    SinglePoint's, Greg, Ralston and Corey promise of funding were knowingly false.

231.    Counterclaimants Diaz, Shikiar and Chaffino justifiably relied on this promise in deciding to sell a controlling interest of their companies to SinglePoint.

232.    But SinglePoint did not fund the companies; rather, it took their available cash, e.g., taking Direct Solar's PPP funds and going to the Wells Fargo bank and taking all cash out of the Jiffy Auto Glass and ShieldSaver bank accounts

233.    SinglePoint as the majority and controlling member of Direct Solar, Jiff Auto Glass and ShieldSaver failed to pay sales tax due, glass suppliers, other bills.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

234.   As a result, not only did the Counterclaimants not get the promised funding, but their accounts were also drained causing great financial harm to the Counterclaimants and the companies were left insolvent and the Counterclaimants' interest therein worthless.

235.   Counterdefendants committed similar acts by filing false and perjurious documents with the Arizona Corporation Commission and Counterclaimants' banks.  ARS §29-3502.D and ARS §13-2702. Perjury is a class 4 felony punishable by from 1-3.75 years imprisonment.

WHEREFORE, Counterclaimants request that judgment be entered in their favor, and against Counterdefendants SinglePoint, Greg, Ralston and Corey, jointly and severally as follows:

A.     For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.     For punitive damages in an amount to be proven at trial;

C.     For Counterclaimants' costs and attorney's fees incurred herein; and

D.     For such other and further relief as the Court deems just and proper.

## COUNT THIRTEEN – CIVIL RICO

236.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs in this Count Thirteen.

237.   Counterdefendants have engaged in a pattern and practice of acquisitions based on false promises of funding while at the same time maneuvering to gain access and drain the acquisitions of monies in their bank accounts leaving the acquisitions insolvent.

238.   Good companies have been ruined and their owners' finances and reputations seriously, if not irreparably injured, by Counterdefendants actions.

239.   Here we have at least the companies and their owners affected by Counterdefendants' conduct as described with particularity in Counts One to Count Seventeen, herein.

240.   Each of the injuries sustained by the Counterclaimants as a result of Counterdefendants pattern of conduct was foreseeable to the Counterdefendants

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

241.    Each of the transactions involved the sale, purchase or exchange of an investment contract and security under Arizona law.

242.    Thus, Counterclaimants have a private cause of action under A.R.S. § 13-2314.04 involving the sale of securities pursuant to (A.R.S. § 44-1991) (the shares of stock or membership interests in the Counterclaimant companies are securities), intentional or reckless sale of unregistered securities or real property securities (A.R.S. § 44-1841), a scheme or artifice to defraud (A.R.S. § 13-2310).

WHEREFORE, Counterclaimants request that judgment be entered in their favor, and against Counterdefendants SinglePoint, Greg, Ralston and Corey, jointly and severally as follows:

A.    For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.    For mandatory treble damages pursuant to A.R.S. § 13-2314.04(A)(D);

C.    For Counterclaimants' costs and attorney's fees incurred herein; and §

D.    For such other and further relief as the Court deems just and proper

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaimants prays for judgment against Counterdefendants as follows:

A.    For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.    For mandatory treble damages pursuant to A.R.S. § 13-2314.04(A)(D);

C.    For Counterclaimants' costs and attorney's fees incurred herein;

D.    For an award of reasonable attorney fees and costs of suit; and

E.     For Injunctive or Equitable Relief as Requested herein;

F.    For any further relief as the Court deems to be just and proper.

Dated this 10th day of September, 2021.

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

MARQUIS AURBACH COFFING


By:    */s/ Alexander K. Calaway*
    Kathleen Wilde LaBay, Esq.
    Arizona Bar No. 035862
    Alexander K. Calaway, Esq. (*pro hac*)
    10001 Park Run Drive
    Las Vegas, Nevada 89145
    *Attorney for Counterclaimants*

MAC:16632-001 4472631_2 9/11/2021 12:00 AM

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I electronically filed **COUNTERCLAIMANTS PABLO DIAZ CURIEL, KJELSEY JOHNSON, ELIJAH CHAFFINO, DAN SHIKIAR, JAGUSA HOLDINGS, INC., AND BRIAN ODLE'S COUNTERCOMPLAINT** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the ___ day of September, 2021.

☒    I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☐    I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Leon B. Silver, Esq.
Kira N. Barrett, Esq.
Mary M. Curtin, Esq.
Meagan Swart, Esq.
Peter Alex Silverman, Esq.
GORDON REES SCULLY MANSUKHANI, LLC
Two North Central Avenue, Suite 2200
Phoenix, Arizona 85004
knbarrett@grsm.com
lsilver@grsm.com
mswart@grsm.com
mcurtain@grsm.com
psilverman@grsm.com
*Attorney for Plaintiff*


Donald Wayne Hudspeth, Esq.
Mark Stephen Hamilton, Esq.
LAW OFFICES OF DONALD W HUDSPETH PC
3200 N Central Ave., Ste. 2500
Phoenix, AZ 85012
dwh@azbuslaw.com
msh@azbuslaw.com

*/s/ Kathleen Wilde*_____
An employee of Marquis Aurbach Coffing

MAC:16632-001 4472631_2 9/11/2021 12:00 AM