**Marquis Aurbach Coffing**
Cody S. Mounteer, Esq. *(admitted, pro hac vice)*
Nevada Bar No. 11220
Alexander K. Calaway, Esq. *(admitted, pro hac vice)*
Nevada Bar No. 15188
Kathleen Wilde LaBay Esq.
Arizona Bar No. 035862
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
cmounteer@maclaw.com
acalaway@maclaw.com
kwilde@maclaw.com
*Attorneys for Defendants/Counterclaimants*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SinglePoint Direct Solar, LLC; and SinglePoint, Inc., | Case Number:  2:21-cv-01076-JAT |
| Plaintiffs, | Consolidated with: 2:21-cv-00989-MSB |
| vs. | |
| Pablo Diaz Curiel; Kjelsey Johnson; Brian Odle; Solar Integrated Roofing Corporation; USA Solar Network, LLC; David Massey; Elijah Chaffino; Christina Berume; and Jessica Hernandez, | |
| Defendants. | |
| Pablo Diaz, individually and derivatively on behalf of Nominal Counterdefendant SinglePoint Direct Solar, LLC; JAGUSA Holdings, LLC; Elijah Chaffino; Kjelsey Johnson; Brian Odle; Direct Solar LLC; and AI Live Transfers LLC. | **VERIFIED FIRST AMENDED COUNTERCOMPLAINT** |
| Counterclaimants, | |
| vs. | |
| SinglePoint Inc.; SinglePoint Direct Solar, LLC (as to direct counterclaims); Greg Lambrecht; Wil Ralston; Corey Lambrecht; Does I-X, Inclusive; and Roe Corporations I-X, Inclusive, | |
| Counterdefendants. | |

1

2   and

3   SinglePoint Direct Solar, LLC,

4       Nominal Counterdefendant.

5       Counterclaimants, PABLO DIAZ; JAGUSA HOLDINGS; LLC; ELIJAH

6   CHAFFINO; KJELSEY JOHNSON; BRIAN ODLE; DIRECT SOLAR LLC; AI LIVE

7   TRANSFERS LLC ("Counterclaimants"), complain and allege as follows:

8   **I.      <u>JURISDICTION AND VENUE</u>**

9       1.      Residential venue may be proper in the United States Court for the District

10  of Nevada pursuant to 28 U.S.C. § 1391(b)(1), since the all of the Counterdefendant entities

11  reside in or have their principal place of business in Clark County, Nevada; all of the

12  Counterdefendant individuals are officers of the Counterdefendant entities; most of the

13  contracts at issue were performed in Clark County, Nevada; and a substantial part of the

14  events or omissions giving rise to the claims occurred in Clark County, Nevada.

15      2.      Transactional venue may be proper in the United States Court for the District

16  of Arizona, pursuant to 28 U.S.C. § 1391(b)(2), since the all of the Counterdefendants

17  engaged in business in Maricopa County, Arizona; upon information and belief, many of

18  the contracts at issue were executed in Maricopa County, Arizona; and some of the material

19  events and material omissions giving rise to the claim may have occurred in Maricopa

20  County, Arizona.

21      3.      In the event the Court finds that the requirements for residential and

22  transactional venue have not been met, then venue may also properly lie in the United

23  States Court for the District of Arizona pursuant to 28 U.S.C. § 1391(b)(3) given that the

24  Counterdefendants are each subject to personal jurisdiction in Arizona.

25      4.      Accordingly, Counterclaimants reserve the right to seek a transfer of venue

26  to the United States Court for the District of Nevada under 28 U.S.C. § 1404(a) since

27  Nevada is the venue: (1) where the action might have been brought, (2) where many of the

28  parties consented to via agreement; and (3) where the interests of justice might be satisfied.

MAC:16632-001 2021-10-12  First Amended Countercomplaint

1

2

## II.    PARTIES

### COUNTERDEFENDANTS

3       5.      Counterdefendant SINGLEPOINT, INC. ("**SING**" or "**SinglePoint**") is a

4   Nevada corporation, and is publicly traded on the OTC market exchange[1] using the ticker

5   symbol SING, and regulated by the U.S. Securities and Exchange Commission (SEC).

6       6.      SING's headquarters are in Maricopa County, Arizona.

7       7.      Nominal Counterdefendant SINGLEPOINT DIRECT SOLAR LLC ("**SDS**")

8   is a Nevada limited liability company, with the following members:

9           a.      SING which owns 51% of the membership interests;

10          b.      Counterclaimant PABLO DIAZ CURIEL ("**Diaz**") who owns 45% of

11  the membership interests; and

12          c.      Counterclaimant KJELSEY JOHNSON ("**Johnson**") who owns 4%

13  of the membership interests.

14      8.      All of SDS's members are domiciled in Maricopa County, Arizona.

15      9.      SING is vicariously liable for all such conduct alleged herein by

16  Counterdefendants GREG LAMBRECHT ("**Greg**"), COREY LAMBRECHT ("**Corey**"),

17  and WIL RALSTON ("**Ralston**"), in their capacity as officers and directors of SING, and

18  the conduct of any party not yet known and which may be added as DOE or ROE.

19      10.    Upon Information and belief and during all times relevant herein,

20  Counterdefendant Greg was a resident of Maricopa County, Arizona.

21      11.    Greg is an officer, director, stockholder, managing-speaking agent, and/or

22  fiduciary of SING.

23      12.    Greg is also a manager of SDS.

24

25

26

27

28

---

[1] OTC Markets Group ("OTC") (formerly known as Pink Sheets) is a financial market in the United States which provides price and liquidity information for almost 10,000 over-the-counter (i.e. OTC) securities. *See* OTC Markets, About Our Company, available at: (https://www.otcmarkets.com/about/our-company) (last visited Sep. 10, 2021). OTC traded securities are organized into three markets to inform investors of opportunities and risks: OTCQX, OTCQB and Pink. *Id.*

MAC:16632-001 2021-10-12  First Amended Countercomplaint

13.     Upon Information and belief and during all times relevant herein, Counterdefendant Corey was a resident of Maricopa County, Arizona.

14.     Corey is an is an officer, director, controlling stockholder, and/or is otherwise a managing-speaking agent and fiduciary of SING.

15.     Upon Information and belief and during all times relevant herein, Counterdefendant Ralston was a resident of Maricopa County, Arizona.

16.     Ralston is an officer, director, controlling stockholder, and/or is otherwise a managing-speaking agent and fiduciary of SING.

17.     Ralston is a manager of SDS.

18.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Counterdefendants named herein as DOES I-X, inclusive, and ROE CORPORATIONS I-X, inclusive, are presently unknown to Counterclaimants and cannot be known or confirmed until such time as discovery is permitted.

19.     Upon information and belief, said DOE and ROE Counterdefendants are responsible for damages suffered by Counterclaimants.  As a result, Counterclaimants sue said Counterdefendants by such fictitious names. Counterclaimants will seek leave to amend its pleading to reflect the true names and capacities of each DOE and ROE Counterdefendant at such time as the same have been ascertained.

20.     Collectively, each and every Counterdefendant is hereinafter collectively referred to as "**Counterdefendants**."  Greg, Corey, and Ralston are hereinafter collectively referred to as the "**Individual Counterdefendants**."

## **COUNTERCLAIMANTS**

21.     Diaz is an individual and a resident of Maricopa County, Arizona.

22.     Diaz is a stockholder of SING.

23.     Diaz is a member of SDS, and was previously a manager of SDS.

24.     Johnson is an individual and a resident of Maricopa County, Arizona.

25.     Johnson is a stockholder of SING.

26.     Johnson is a member of SDS.

27.     BRIAN ODLE ("**Odle**") is an individual and a resident of Maricopa County, Arizona.

28.     Odle is a stockholder of SING.

29.     Counterclaimant ELIJAH CHAFFINO ("**Chaffino**") is a resident of Maricopa County, Arizona.

30.     Chaffino is a stockholder of SING.

31.     Chaffino is a member and owns 49% of non-party entity called SunUp Solar LLC ("**SunUp Solar**"), a Nevada limited liability company, and SDS owns the remaining 51% of the membership interests.

32.     Chaffino is the only current authorized manager of SunUp Solar.

33.     Counterclaimant JAGUSA HOLDINGS, LLC ("**JAGUSA**") is a Colorado limited liability company headquartered in Arapahoe County, Colorado.

34.     At all relevant times in the instant action, Nonparty Dan Shikiar ("**Shikiar**") has owned 100% of the membership interests in JAGUSA and he is a resident of Arapahoe County, Colorado.

35.     JAGUSA currently owns 49% of the membership interests of nonparty Jiffy Auto Glass, LLC ("**Jiffy**"), a Colorado limited liability company, and SING owns the remaining 51% of the membership interests.

36.     JAGUSA currently owns 49% of nonparty ShieldSaver LLC ("**ShieldSaver**") a Colorado limited liability company, and SING owns the remaining 51% of the membership interests.

37.     At all times relevant herein, Shikiar served as CEO of both nonparty Jiffy and ShieldSaver.

38.     Prior to the Jiffy Agreement and the SheildSaver Agreement as defined¸ *infra*, JAGUSA owned 100% of the membership interests in Jiffy and ShieldSaver, and 100% of the consideration that was paid as part of the Jiffy Agreement and ShieldSaver Agreement was intended to be transferred to JAGUSA.

39.     JAGUSA is currently a stockholder of SING.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

40.     DIRECT SOLAR LLC ("**DSA**") is a Delaware limited liability company, with one or more of its members domiciled in Maricopa County, Arizona.

41.     AI LIVE TRANSFERS LLC ("**ALT**"), is a Delaware limited liability company, with one or more of its members domiciled in Maricopa County, Arizona.

## III.     FACTUAL ALLEGATIONS

42.     This case involves an ongoing scheme of SING and the Individual Counterdefendants to:

a.     Acquire controlling interests in privately owned businesses by promising these business owners funding for expansion and acquisitions;

b.     Then issue press releases and public filings with the SEC to tout the acquisitions and boost the price of its stock;

c.     Coordinate the sale of shares at the heightened price amongst themselves; and

d.     Renege on their promises to fund the private business, and instead divert millions of dollars of profit from these businesses to cover the perpetual financial losses of SING.

## THE JAGUSA CONTRACTS

### A. The Jiffy Agreement

43.     On October 11, 2017, SING and JAGUSA (which owned 100% of Jiffy at the time) executed a "Stock Purchase Agreement" (the "**Jiffy Agreement**").

44.     Pursuant to the Jiffy Agreement, SING acquired 51% of the membership interests in Jiffy from JAGUSA, in exchange for issuing JAGUSA the following consideration:

a.     SING shares with an aggregate value of $325,000.00;

b.     $50,000.00 cash; and

c.     A $25,000.00 convertible note.

45.     Thereafter, SING promised to fund Jiffy's operations in exchange for SING's proportionate share of the Jiffy's distributions.

46.     In or about early 2018, SING took over the accounting for Jiffy, and promised to fulfill tax-related duties, including remitting the company's state sales taxes, and provide capital to fund the operational expenses of the Jiffy, as needed.

47.     Shikiar was to continue in his role as CEO of Jiffy and run day-to-day operations. of Jiffy.

**B. The ShieldSaver Agreement**

48.     On January 16, 2018, SING and ShieldSaver executed a Stock Purchase Agreement (the "**ShieldSaver Agreement**").

49.     Pursuant to the ShieldSaver Agreement, SING acquired 51% of the membership interests in ShieldSaver from JAGUSA, in exchange for

    a.     SING common stock in the amount of $670,000.00;

    b.     $200,000.00 cash to be paid over time as certain milestones were achieved by ShieldSaver; and

    c.     A commitment to fund $150,000.00 to develop software for ShieldSaver over time.

50.     Shortly after closing, in or about January 2018, SING took control of the bookkeeping and accounting for ShieldSaver, and JAGUSA agreed to allow SING this control since SING agreed to provide capital to fund the operational expenses of ShieldSaver.

51.     Shikiar was to continue in his role as CEO of Jiffy and run day-to-day operations of ShieldSaver .

52.     In or around September 2018, SING stopped funding ShieldSaver, despite numerous verbal commitments from SING officers to continue funding as promised.

53.     This left ShieldSaver without cash to cover payroll.

54.     In or around January 2019, SING stopped paying the operational expenses and otherwise funding Jiffy.

55.     This left the company Jiffy without money to pay $21,000 owed for glass to its glass supplier Mygrant Glass.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

56.     SING actions left Jiffy unable to operate, insolvent and unable to pay its primary vendor, Mygrant Glass.

57.     SING provided Jiffy used the with a company credit card which Jiffy used to pay its vendors.

58.     SING, contrary to its promise of funding, later contested payments of these expenses and had these and $40,000 in other expenses reversed.

59.     One of these vendors, Mygrant Glass, is now suing Jiffy for this amount.

60.     SING also caused Jiffy to go delinquent with its sales tax obligations, and as a result, there are still about $30,000 in unpaid and past due sales taxes owed by Jiffy.

61.     As the majority owner and member in charge of the books and accounts of Jiffy SING is the tax matters representative personally liable on these unpaid taxes.

62.     In an attempt to escape the sale tax and other liability, Greg and Ralston repeatedly demanded that Shikiar take back SING's shares of Jiffy in trade and turnover his 49% ownership in ShieldSaver. Shikiar refused.

63.     In July 2020, Greg and Ralston went to a Wells Fargo branch and withdrew all monies in both the Jiffy and the ShieldSaver bank accounts.

64.     On July 26, 2020, Ralston filed Articles of Dissolution of Jiffy but did so without JAGUSA's consent and forged Shikiar's signature on the dissolution filing.

## THE DSA ACQUISITION CONTRACTS AND EXPANSION CONTRACT

65.     In or about late 2018, Diaz began communicating with his friends Greg and Ralston, who were officers of the company SING, regarding a mutually beneficial deal between SING and his company DSA (the "**DSA Acquisition**").

66.     Diaz knew because SING was publicly traded on the OTC market exchange, this allowed SING the unique ability to raise capital to fund DSA and the expansion of its operations.

67.     From the outset in 2018, Diaz, Greg, and Ralston collectively prepared a capital flow statement (the "**Capital Flow Statement**") which memorialized the discussions regarding each traunch of capital that SING would provide DSA to continue to

MAC:16632-001 2021-10-12  First Amended Countercomplaint

grow (the "**Traunch**"); and projected the revenue and profits that would be realized on the capital provided by SING.

68.     On February 22, 2019, Greg, on behalf of SING and Diaz and Johnson, as beneficial interest holders and authorized representatives of DSA and ALT, executed the Asset Purchase Agreement, which contemplated a final closing of the DSA Acquisition to take place at a later time.

69.     As consideration for DSA and ALT assigning 51% of their interests in DSA to SING, SING agreed to provide an initial investment of $250,000.00 and to transfer shares of SING stock to DSA, ALT, or their members as properly determined among the owners.

70.     Greg and Ralston also agreed that Diaz would act as CEO of the newly formed company (SDS) and the parties would prepare an operating agreement (the "**SDS Operating Agreement**"), that an employment agreement would be executed for Diaz as CEO ("**Diaz Employment Agreement**"), which included a bonus system for hitting certain targets.

71.     In sum, there were four transaction documents that memorialized the DSA Acquisition:

        a.     The Capital Flow Statement;

        b.     The Asset Purchase Agreement;

        c.     The Diaz Employment Agreement; and

        d.     The SDS Operating Agreement.

72.     These four documents are also referred to as the "**DSA Acquisition Contracts**."

73.     On May 15, 2021, the Capital Flow Statement, the Asset Purchase Agreement, and the Diaz Employment Agreement were all finalized and executed by Diaz, Johnson, Greg, and Ralston.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

74.     Diaz and his solar sales team substantially exceeded the milestones by late 2019 and early 2020, yet SING refused to pay each Traunch as the respective milestones were reached.

75.     Greg, Ralston, and Diaz understood and ratified this plan, as reflected in the Capital Flow Statement and the bonus schedule attached to the Diaz Employment Agreement.

76.     Greg, Ralston and Diaz had the Capital Flow Statement in front of them when they negotiated and executed the Asset Purchase Agreement.

77.     On May 14, 2019, Ralston formed SDS.

78.     On or about the same date of May 14, 2019, SDS and Diaz entered into the Diaz Employment Agreement to continue as the CEO of SDS, which was executed by Greg as the CEO of SING and as manager of SDS.

79.     The Diaz Employment Agreement included a bonus compensation program based on revenues generated.

80.     On or about May 15, 2019, Greg, Ralston, Johnson, and Diaz signed the SDS Operating Agreement.

81.     Contrary to the promises made to Diaz to sign the Asset Purchase Agreement and in violation of the SDS Operating Agreement, SING refused to fund SDS each Traunch as outlined in the Capital Flow Statement.

82.     This Condition to funding was never a part of the DSA Acquisition or Employment. But for the promise of continued funding, Diaz would not have agreed to the DSA Acquisition.

83.     Therefore, Diaz and SDS were placed in the impossible position of needing SDS earnings for growth, but not having the requisite capital to generate those earnings from SING.

84.     To induce Diaz and Johnson to continue to work on growing SDS, Greg and Ralston further promised Diaz that SING would add an additional $400,000.00 in capital (the "**Expansion Contract**").

MAC:16632-001 2021-10-12  First Amended Countercomplaint

85. SING failed to fulfill its obligations under the Expansion Contract.

86. Greg and Ralston are the majority stockholders, directors, and/or officers of SIN, but also serve and control SDS as managers. Thus, the same persons serve as the management of both SING and SDS.

87. The failure to fund SDS as described herein undermined the entire purpose of the DSA Acquisition, as it would require SDS to effectively fund its own operations and acquisitions, which would have placed SDS in essentially the same funding position as before the DSA Acquisition (i.e., using SDS funds for operations and future acquisitions).

88. This is why the SDS Operating Agreement provided, among other things, that:

a. The profits and losses of SDS would be calculated for each fiscal year to Profits for each year would be allocated among the members in proportion to their membership interest;

b. That the managers of SDS would make distributions of net cash flow, if any, to the members of SDS within thirty (30) days after the expiration of each calendar quarter; and

c. That Net Cash Flow would equal the gross cash proceeds of SDS less the portion thereof used to pay or establish reserves for all SDS expenses.

89. Over the one-year period between May 14, 2019 – May 14, 2020, Diaz generated $11,122,273.90 in sales revenue for SDS, which has provided millions of dollars in profits to SDS, yet SING, Greg, and Ralston, refused to fund SDS as promised.

90. Greg and Ralston also refused to distribute SDS profits to Diaz and Johnson according their membership interests.

91. Instead, upon information and belief, profits that were generated by SDS went to line the pockets of Greg and Ralston, and pay the expenses of SING.

92. Upon information and belief, Greg and Ralston have diverted millions of dollars SDS profit to SING.

93.     According to Diaz Employment Agreement and bonus compensation spreadsheet, Diaz has earned approximately $506,000 in compensation.

94.     To date, this promised bonus compensation has not been paid.

95.     SDS has been made insolvent by Greg and Ralston by diversion of expenses and by SING's refusal to provide the agreed upon funding.

96.     Despite promises to fund SDS and making despite making numerous representations in public securities filings, SING has not properly funded SDS.

97.     In or around May 2021, SING sent notice to Diaz and the SDS employees that Diaz Employment Agreement would not be renewed and that his employment with the company had ended.

## THE CHAFFINO CONTRACTS

98.     Greg and Ralston as SING's officers and directors and as managers of SDS purchased 51% of Chaffino's company, SunUp Solar.

99.     Without Chaffino's knowledge or approval (as the only authorized manager), Ralston, Greg, and Corey, added themselves personally in the official public records of the Nevada Secretary of State.

100.    This would have required notice, a meeting, a vote, and unanimous consent of the member, none of which happened.

101.    As this was a deal between Chaffino and SDS, these parties formed SunUp Solar as a solar installation company, per a letter agreement between Chaffino and SDS (the "**SunUp Solar Letter Agreement**").

102.    As Chaffino had experience in the solar installation industry, and SING represented that it had capital, this joint venture appeared to be a mutually beneficial deal.

103.    Per the Agreement, SING would provide operating capital and would own 51% of the membership interests of SunUp Solar, and Chaffino would own 49% of the membership interests and be the manager, and Chaffino would run day-to-day operations and oversee the installs.

MAC:16632-001 2021-10-12  First Amended Countercomplaint

104.   SING, working through SDS, promised that SING would pay Chaffino in SING stock bonuses for achieving certain milestones.

105.   SDS also agreed to fund the operational expenses of SunUp Solar.

106.   To date, Chaffino has earned hundreds of thousands of dollars in SING stock for accomplishing milestones per the contracts that SING created.

107.   Chaffino has not been paid pursuant to the agreement.

### SING SECURITIES FRAUD ALLEGATIONS

108.   Upon information and belief, during the relevant time period, Counterdefendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of SING Stock price and operated as a fraud or deceit on the market by misrepresenting the Company's business and prospects.

109.   Upon information and belief, the Individual Counterdefendants have utilized a scheme to "purchase" Counterclaimants' entities to inflate the price of their SING Stock, but in lieu of funding the Counterclaimant entities by this additional raised capital, the Individual Counterdefendants have lined their own pockets with such capital, or otherwise used promised funding for their sole and exclusive benefit.

110.   Upon information and belief, this scheme is carried out by the Individual Counterdefendants utilizing an exclusive preferred class of stock utilized (owned only by the Individual Counterdefendants).

111.   Upon information and belief, during the relevant period, the Counterdefendants misled Counterclaimants by making misrepresentations as to their intention to fund DSA, Jiffy, ShieldSaver, and SunUp Solar.

112.   Upon information and belief, the Individual Counterdefendants:

a.   Coordinated their buying and selling of SING thereby deceiving investors into believing that the natural interplay of supply and demand were in effect;

b.   Influenced market price through their buying and selling schemes;

c.   Engaged in open market manipulation;

d.   Engaged in Prohibited manipulative activities,

Page 13 of 40

MAC:16632-001 2021-10-12 First Amended Countercomplaint

e. Falsified financial statements to reflect non-existent profits for SING;

f. Engaged in a pump and dump scheme, which involved the use of promotional or trading activity to artificially inflate the price and volume of an owned stock and sales of the stock at a higher price;

g. Engaged in matched trades, meaning the placement of offers for the purchase or sale of SING with the knowledge that a known prearranged counterparty has or will enter orders of substantially the same size and at substantially the same time and price in the same security;

h. Engaged in wash sales, meaning sales in which the Individual Counterdefendants acted as both buyer and seller to give the appearance of actual trades without assuming any actual risk;

i. Engaged in painting the tape, which refers to a scheme in which prearranged market players buy and sell securities among themselves to create the appearance of an increase in the volume of transactions in the stock; and

j. Engaged in price rigging, also known as price fixing, which occurs when the participants and insiders on the same side in the market buy and/or sell securities at a fixed price or control supply and demand to maintain the market conditions that result in a fixed price. Greg and Ralston, in their capacity as directors, officers, or other managing-speaking agents for SING, sold SING Stock to Diaz, Shikiar, Chaffino, Johnson, and Odle.

113. Upon information and belief, the Individual Counterdefendants also made false representations in publicly filed statements (including SING's 10-K's, 8-K's, and S-3/A), to the market, regarding the financial viability of the Counterclaimant entities, all while these same Individual Counterdefendants were seeking to loot these entities and squeeze out Counterclaimants.

114. To wit, in the 10-K for SING for the calendar year ending on December 31, 2018, which was signed and certified by SING's officers and directors, including the Individual Counterdefendants, SING made the following material statements:

Jiffy Corporation (JAG) –JAG provides windshield replacement services in Denver Colorado and Phoenix Arizona. The company works closely with ShieldSaver to test and drive new technological development in the automotive market. JAG is able to fulfill work orders for ShieldSaver in markets the company has a presence, such as Denver and Phoenix.

115.    SING made the above material statements despite the fact that Jiffy had become defunct, due to SING's failure to fund Jiffy and ShieldSaver.

116.    Moreover, in the 10-K's for SING for the calendar years ending on December 31, 2019 and December 31, 2020, which was signed and certified by SING's officers and directors, including the Individual Counterdefendants, SING made the following identical statements:

ShieldSaver, LLC ("ShieldSaver") The Company owns fifty one percent (51%) of the outstanding interests of ShieldSaver. ShieldSaver is a technology focused automotive company working to efficiently track records of vehicle repairs. They pair shops with potential customer via proprietary technology. The ShieldSaver technology solution drives B2B leads and conversion to sales of windshield repair and replacement. The ShieldSaver technology is designed to increase efficiency by quickly delivering a vehicle specific quote for windshield replacement and delivering those leads to local installers looking to expand and grow their business. ShieldSaver has relationships with large parking lot management companies at airports and other locations around the United States to obtain the data needed to operate.

117.    SING made such statements, but refused to fund Jiffy, which made it impossible to provide the infrastructure to accomplish the promised expansion of Jiffy and ShieldSaver.

118.    In its 10-K annual financial disclosure filed for the calendar year ending December 31, 2020, which was signed and certified by SING's officers and directors, including Greg (as CEO) and Corey (as CFO), SING made the following statement, despite the fact that SING had failed to fund SDS as agreed:

In May 2019 the Company bought 51% of SDS America (as defined below) a solar brokerage company headquartered in Phoenix, Arizona. SDS America currently works with homeowners to define the best solar installation provider and financer for their particular need. The unique brokerage model is scalable nationally and in its first 10 months of operation has expanded into multiple states and is expected to continue expanding into additional markets. In connection with this acquisition the Company has issued an aggregate value of approximately $2,000,000 in common stock and has committed to additional cash capital for business expansion upon business milestone goal achievements. In addition to the multistate expansion of the residential solar brokerage model, SDS America post acquisition, has

MAC:16632-001 2021-10-12  First Amended Countercomplaint

identified market opportunities related to small and medium commercial solar projects and has committed staff and resources adding to its core business competencies to pursue these types of underserved commercial solar opportunities. The majority of the targeted projects are comprised of commercial buildings, schools, parking lot structures looking for solar based solutions that offset and reduce traditional energy consumption through a green solution that saves them money while reducing their impact on the planet.

119.    In its 10-K filed for the calendar year ending on year ending on December 31, 2020, signed and certified by SING's officers and directors, including the Individual Counterdefendants, SING made the following material statement:

SING SDS, LLC ("SDS America") In May 2019 the Company formed SDS America, and owns fifty one percent of the membership interests. SDS America is a solar brokerage company headquartered in Phoenix, Arizona that currently works with homeowners to define the best solar installation provider and financer for their particular need in multiple cities around the United States. We believe the unique brokerage model is scalable nationally and in its first 10 months of operation has expanded into multiple states and is expected to continue expanding into additional markets. In addition to the multistate expansion of the residential solar brokerage model. In October 2020 SDS America entered into a first-of-its-kind collaboration agreement with Soligent the allows approved and licensed EPC's, Contractor's, or Installer's that are within and operate under the SDS of America network additional procurement and financial flexibility. SDS America acts as the principal and is the guarantor under this collaboration agreement and a majority of the residential solar projects in 2021 will operate within the framework of this agreement in which SDS America will benefit from additional incremental margins and as the principal will benefit from recognizing the entire project revenue versus a portion under the historical DSA Residential Brokerage Model. SDS America has identified market opportunities related to small and medium commercial solar projects and has committed staff and resources, adding to its core business competencies to pursue these types of underserved commercial solar opportunities. The majority of the targeted projects are comprised of commercial buildings, schools, parking lot structures looking for solar based solutions that offset and reduce traditional energy consumption through a green solution that saves them money while reducing their impact on the planet.

120.    Furthermore, in its Form S-3/A, filed on March 1, 2021, signed and certified by SING's officers and directors, including the Individual Counterdefendants, SING made the following statement:

Our subsidiary, SinglePoint SDS LLC ("SDS America", 51% interest) operating as Direct Solar of America is focused on providing renewable energy and storage solutions to residential consumers and small commercial businesses and growing its national footprint, which has grown to operate in 38 states in U.S. during 2020 alone.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

121.    Upon information and belief, the Individual Counterdefendants made such statements, knowing that SDS was not actually operating in 38 states and was, in reality, financially insolvent.

122.    Those misrepresentations and omissions that were immediately followed by an upward movement in SING's stock price served to pump the share price at artificially inflated levels. The allegations herein suffice under a general proximate cause theory, a corrective disclosure theory, and a materialization of the risk theory of loss causation.

123.    The Individual Counterdefendants, because of their positions with SING, possessed the power and authority to control the contents of SING's reports to the SEC, press releases, and presentations to Counterclaimants.

124.    Each of the Individual Counterdefendants had a duty to

a.    Promptly disseminate complete, accurate, and truthful information about the commercial viability of SING, specifically those facts concerning the rejections of SING;

b.    Correct any previously issued statements that were materially misleading or untrue when made so that the market could accurately price the Company's stock based upon truthful, accurate, and complete information; and

c.    Update any previously-issued forward-looking statements that became materially misleading or untrue so that the market could accurately price SING's securities based upon truthful, accurate, and complete information.

125.    Each time that SING executed the various agreements with Counterclaimants' entities and such deals would be disclosed, there would be a spike in stock prices, within the following months, with a steep drop in share price.

126.    For example, after the execution of the Jiffy Agreement on October 11, 2017, the SING stock price spiked to over $9.00 per share by end of 2017.

127.    Thereafter, the execution of the ShieldSaver Agreement, upon information and belief, was intended to artificially bolster the SING share price (which remained

MAC:16632-001 2021-10-12  First Amended Countercomplaint

1   consistently over $4.00 and $5.00 per share, as it was executed on January 16, 20218, until

2   April 2018, when the share price plummeted to less than $2.00 per share for most of 2018.

3       128.   Thereafter, the stock price remained consistently low in late 2018 and early

4   2019, where the share price fell consistently below $1.00 per share in May 2019, leading

5   up to the DSA Acquisition.

6       129.   During, the month immediately following the DSA Acquisition (June 2019),

7   the SING share price spiked above $1.50 per share, before dropping off to less than $1.00

8   per share again.

9       130.   This drop-off in share price continued through late 2020, hitting its lowest

10   point in years at $0.19 per share in October 2020, just before the execution of the agreement

11   with SunUp Solar.

12       131.   After the SunUp Solar deal was executed, the price has one of its largest

13   spikes ever up above $5.00 per share by February 2021, with almost an immediate drop of

14   to less than $2.00 per share in March.

15       132.   Upon information and belief, these steep drops in share prices were the result

16   of Greg, Ralston, and Corey entering into agreements, issuing press releases, and making

17   statements in SING's public disclosures to boost the prices, and then coordinate the sale of

18   stock with, family members, friends, and other "insiders" to line their own pockets rather

19   than providing promised capital to Jiffy, ShieldSaver, SDS, and SunUp Solar and to allow

20   these entities to become profitable, which has prevented JAGUSA, Diaz, Johnson, Odle,

21   and Chaffino from receiving their distributions and/or bonuses from the respective entities.

22       133.   Upon information and belief, there has been a downward trend in SING's

23   share price as a result of this repeated "pump-and-dump" scheme perpetuated by the

24   Individual Defendants, to the detriment of Counterclaimants, as the share price continues

25   to remain well below $1.00 per share.

26       134.   The Individual Defendants improper conduct has caused investors to have

27   lost confidence in the performance of SING's stock, and has directly and proximately

28

MAC:16632-001 2021-10-12  First Amended Countercomplaint

caused damages to JAGUSA, Diaz, Johnson, and Chaffino who are unable to obtain a fair price for their SING shares.

135.    Counterdefendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Counterclaimants. This is evident by the stock price of SING which has plummeted from $5.62 to $0.21 per share in a span of approximately eight months.

136.    Counterdefendants' false and misleading statements and omissions in their SEC filings and other public statements caused damages to Counterclaimants. On the strength of these false and misleading statements, SING's stock price was artificially inflated to $5.62 per share on February 9, 2021.

137.    Before, and in both acquisitions, SING promised to fund Jiffy and ShieldSaver, but has not done so, despite making representations in public securities filings that it had indeed funded these companies.

138.    Each of the Individual Counterdefendants were provided with copies of the SING reports and press releases alleged herein to be false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

139.    Because of their positions and access to material non-public information available to them, each of the Individual Counterdefendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

140.    At all relevant times, the market for SING's common stock was an efficient market for the following reasons, among others:

a.    SING's common stock was listed and actively traded on the OTC market exchange (symbol SING), an efficient market;

b.    As a registered and regulated issuer of securities, SING filed periodic reports with the SEC, in addition to the frequent voluntary dissemination of information;

MAC:16632-001 2021-10-12  First Amended Countercomplaint

c.      SING regularly communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.      The market reacted to public information disseminated by SING;

e.      The material misrepresentation and omissions alleged herein would tend to induce a reasonable investor to overvalue SING's stock; and

f.      Without knowledge of the misrepresented or omitted facts, Counterplaintiffs purchased SING common during the time that the Counterdefendants made the material misrepresentations and omissions and the time that the truth was revealed, during which time the price of SING common stock was artificially inflated by Counterdefendants' misrepresentations and omissions.

141.    As a result of the above, the market for SING Stock promptly digested current, reasonably available information with respect to SING from all public sources and reflected such information in the stock's prices.[2] Under these circumstances, the Counterclaimants purchased SING Stock and suffered similar injuries through their purchases of common stock at prices which were artificially inflated by Counterdefendants' misrepresentations and omissions.

142.    Upon information and belief, during the relevant time period, as detailed herein, Counterdefendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value of SING stock price and operated as a fraud or deceit on the market by misrepresenting the Company's business and prospects.

143.    Specifically, the Individual Counterdefendants have utilized a scheme to "purchase" Counterclaimants' entities to inflate the price of their SING Stock, but in lieu

---

[2] The historical daily trading prices and volumes of SING stock are incorporated herein by reference.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

of funding the Counterclaimant entities by this additional raised capital, upon information and belief, the Individual Counterdefendants have lined their own pockets with such capital, or otherwise used promised funding for their sole and exclusive benefit.

## NO STATUTORY SAFE HARBOR

144.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

145.    First, the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current or historic fact, or are actionable in context because they omit then-existing material facts.

146.    Second, many, if not all, of the identified false and misleading statements herein were not identified as forward-looking statements.

147.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

148.    Such statements were also not accompanied by cautionary language that was meaningful because any such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings class, or other public statement described herein were general, "boilerplate" statements of risk that would affect any solar company, and misleadingly contained no factual disclosure of any of the specific details concerning the acquisition and financials  or similar important factors that would give investors adequate notice of such risks.

149.    Fourth, to the extent there were any forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or, by reason of what the speaker failed to

MAC:16632-001 2021-10-12  First Amended Countercomplaint

note, was materially false and/or misleading, and/or that each such statement was authorized and/or approved by a director and/or executive officer of SING who actually knew that each such statement was false or misleading when made.

### **ALTER EGO ALLEGATIONS**

150. Counterclaimants are informed and believe, and on that basis allege, that there exists, and at all times herein mentioned there existed, a unity of interest in ownership between SING and the Individual Counterdefendants such that individuality and separateness between SING and the Individual Counterdefendants ceased, and that SING is the alter ego of the Individual Counterdefendants.

151. Upon information and belief, at all relevant times SING was without capital or assets and, SING was conceived, intended and used by the Individual Counterdefendants to carry out their improper and unlawful conduct as described herein, to unjustly enrich themselves, to substitute a financially insolvent corporation (i.e., SING) in the place of the Individual Counterdefendants, for purposes of liability.

152. Upon information and belief, SING is, and at all times herein mentioned was, so inadequately capitalized that, compared with the business to be done by SING, and the risks of loss attendant thereto, its capitalization was illusory.

153. The Individual Counterdefendants completely controlled, dominated, managed and operated SING.

154. The business of SING was carried out without the required meetings (especially annual shareholder meetings).

155. Upon information and belief, the Individual Counterdefendants failed to properly maintain books and records.

156. Upon information and belief, the Individual Counterdefendants entered into personal transactions with SING, ignored and abused corporate laws and requirements, and converted funds belonging exclusively to SING.

157. Adherence to the fiction of the separate existence of SING as an entity distinct from the Individual Counterdefendants, would permit the abuse of the limited

MAC:16632-001 2021-10-12  First Amended Countercomplaint

liability Privilege, would sanction fraud, and would result in an injustice to Counterclaimants.

158.    Moreover, after the expiration of the Diaz Employment Agreement in May 2021, upon information and belief, the Individual Counterdefendants began to convert funds from SDS for their own benefit.

159.    To the extent that the Individual Counterdefendants have taken profits from SDS to unjustly enrich themselves, SDS is the alter ego of the Individual Counterdefendants.

<u>**COUNT ONE – BREACH OF CONTRACT**</u>

**(Breach of the Asset Purchase Agreement– DSA and ALT against SING)**

160.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

161.    The Asset Purchase Agreement, as defined herein, is a valid contract, including the Capital Flow Statement, and is supported by consideration.

162.    SING breached the Agreement by failing to fund the Traunch in accordance with the Capital Flow Statement (which was a Transaction Document set forth on page 48 of the Asset Purchase Agreement).

163.    SING failing to provide DSA and ALT the benefit of their bargain, by diluting their interests (taking 51% of the interest their solar operations) without providing the necessary funding to allow DSA to expand its operations.

164.    Also, Diaz led SDS's sales force to accomplish all of the milestones set forth in the Capital Flow Statement (making 540 sales), and therefore, SING was obligated to perform by providing the $750,000.00 in operating capital.

165.    As a proximate cause of SING's breach, DSA and ALT are entitled to compensatory damages, or equitable remedies, including recission and specific performance, as set forth in page 48 of the Asset Purchase Agreement.

166.    WHEREFORE, Counterclaimants and Diaz request the Court to enter judgment against SING:

MAC:16632-001 2021-10-12  First Amended Countercomplaint

a.    Damages of not less than $50,000;

b.    Attorney's fees and costs; and

c.    Such other relief as the Court deems just and proper.

## COUNT TWO – BREACH OF CONTRACT

**(Breach of the SDS Operating Agreement and the Expansion Contract– Johnson, and Diaz, directly and derivatively on behalf of SDS, against SING, Greg, and Ralston)**

167.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

168.    The SDS Operating Agreement and Expansion Contract, as described herein, are valid contracts, including the Capital Flow Statement, and is supported by consideration.

169.    Diaz led SDS's sales force to accomplish all of the milestones set forth in the Capital Flow Statement (making 540 sales), and therefore, SING was obligated to perform by providing $750,000.00 in operating capital.

170.    SING breached the agreement to Diaz and Johnson, as members of SDS who executed the operating agreement, and according to the terms of the Expansion Contract, by promising to fund each Traunch and paying the $400,000.00 in expansion capital, but failing to do so.

171.    Greg and Ralston have refused to distribute SDS profits to Diaz and Johnson according their membership interests.

172.    Instead, upon information and belief, profits that were generated by SDS went to line the pockets of Greg and Ralston, and pay the expenses of SING.

173.    Upon information and belief, Greg and Ralston have diverted millions of dollars in profit from SDS to SING.

174.    Diaz, and Johnson have all been proximately damaged as a result of the breach, by not receiving their proper amount of distributions under the SDS Operating Agreement.

MAC:16632-001 2021-10-12  First Amended Countercomplaint

175.   SDS has been damaged because profits and losses were not accurately accounted for by Greg and Ralston.

176.   Greg and Ralston have caused SDS to become insolvent due to their diversions of profit from SDS to SING.

177.   This has reduced any distributions to Diaz and Johnson as members of SDS, and has deprived SDS of expanding and fulfilling its goals under the SDS Operating Agreement and the Expansion Contract.

178.   Diaz, Johnson, and SDS's damages were proximately caused as a result of the breach, which breach was unexcused and the damages were foreseeable as a result of the breach.

179.   WHEREFORE, Counterclaimants request that judgment be entered as follows:

      a.   For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

      b.   For punitive damages in an amount to be proven at trial;

      c.   For Counterclaimants' costs and attorney's fees incurred herein; and

      d.   For such other and further relief as the Court deems just and proper.

## COUNT THREE – BREACH OF CONTRACT

**(Breach of the Diaz Employment Agreement - Diaz against SDS)**

180.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

181.   The Diaz Employment Agreement, and bonus compensation spreadsheet included therein, entitled Diaz to $506,000.00 in bonus compensation, and unpaid base salary accrued by Diaz while employed as CEO of SDS.

182.   The Diaz Employment Agreement is a valid contract

183.   Diaz has been damaged in the nonpayment of these wages.

184.   WHEREFORE, Counterclaimants request that judgment be entered as follows:

MAC:16632-001 2021-10-12  First Amended Countercomplaint

a.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

b.      For punitive damages in an amount to be proven at trial;

c.      For Counterclaimants' costs and attorney's fees incurred herein; and

d.      For such other and further relief as the Court deems just and proper.

## COUNT FOUR– BREACH OF CONTRACT

**(Breach of the SunUp Solar Agreement - Chaffino against SDS and SING)**

185.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

186.    Chaffino entered into the SunUp Solar Letter Agreement with SDS.

187.    The SunUp Solar Letter Agreement is a valid contract.

188.    Diaz has been damaged in as SING has not made payment of the bonus stock, when he has fully performed and met the first four milestones set forth therein.

189.    WHEREFORE, Counterclaimants request that judgment be entered as follows:

a.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

b.      For punitive damages in an amount to be proven at trial;

c.      For Counterclaimants' costs and attorney's fees incurred herein; and

d.      For such other and further relief as the Court deems just and proper.

## COUNT FIVE – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

**(Breach of the Covenant implied in all contracts between Counterclaimants and Counterdefendants))**

190.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

191.    Each of the contracts described herein:

a.      Were valid and enforceable contracts; and

MAC:16632-001 2021-10-12 First Amended Countercomplaint

b.      Contained an implied covenant to act in good faith in performance and enforcement of the contract.

192.    Each of the Counterplaintiffs who were parties to these contracts justifiably expected to receive certain benefits consistent with the spirit of the agreement agreements.

193.    Counterdefendant performed in a manner that was in violation of or unfaithful to the spirit of the contract (the terms of the contract are complied with in a literal sense, but the spirit of the contract is breached).

194.    Counterdefendants did not intend on performing under the contracts.

195.    Unfaithful actions by the Counterdefendants were deliberate, and proximately caused damages to Counterclaimants.

196.    The covenant of good faith implied in each of these contracts required Counterdefendants to act with honesty and fair dealing in transactions and not to act affirmatively to impair the other party's right to the benefits of the transaction.

197.    Counterdefendants, and each of them, have breached the covenant of good faith and fair dealing by acting deliberately to deprive Counterclaimants the benefit of their bargain.,

198.    WHEREFORE, Counterclaimants request that judgment be entered as follows:

a.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

b.      For punitive damages in an amount to be proven at trial;

c.      For Counterclaimants' costs and attorney's fees incurred herein; and

d.      For such other and further relief as the Court deems just and proper.

### COUNT SIX– NONPAYMENT OF WAGES

### (Diaz, Odle, and Chaffino against SDS)

199.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

200.    Diaz, Odle, and Chaffino are all entitled to salary or bonuses, that have not been paid by SDS.

201.    A.R.S. Section 23–355 states, in pertinent part, that "if an employer ... fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." *See* A.R.S. § 23–355.

202.    In this context, "wages" refers to "nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation." A.R.S. § 23–350.

203.    In their Acquisitions of DSA, Jiffy, Shield Saver, and SunUp Solar Counterdefendants SING, Greg and Ralston promised funding for expansion.

204.    WHEREFORE, Counterclaimants request that judgment be entered as follows:

        a.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

        b.      For punitive damages in an amount to be proven at trial;

        c.      For Counterclaimants' costs and attorney's fees incurred herein; and

        d.      For such other and further relief as the Court deems just and proper.

## COUNT SEVEN - ACCOUNTING & APPOINTMENT OF A RECEIVER OVER SDS

**(Johnson, and Diaz, directly and derivatively on behalf of SDS as a Nominal Defendant, against SING, Greg, and Ralston))**

205.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

206.    Greg and Ralston are the majority stockholders, directors, and/or officers of SING.

207.    Greg and Ralston are managers of SDS.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

208.    The SDS Operating Agreement provided, among other things, that:

a.      Profits for each year would be allocated among the members in proportion to their membership interest;

b.      The managers shall make distributions of Net Cash Flow, if any, to the Members within thirty (30) days after the expiration of each calendar quarter; and

c.      Net Cash Flow is the gross cash proceeds of SDS less the portion thereof used to pay or establish reserves for all SDS expenses.

209.    SDS is a Nevada limited liability company, organized and governed by the internal laws Nevada.

210.    Diaz generated at least $11,122,273.90 in sales revenue for SDS in a single year.

211.    This provided millions of dollars in profits to SDS.

212.    SING, Greg, and Ralston have refused to fund SDS as promised despite these achievements.

213.    Greg and Ralston refused to distribute SDS profits to Diaz and Johnson according their membership interests.

214.    Upon information and belief, profits that were generated by SDS went to line the pockets of Greg and Ralston, and to pay the expenses of SING.

215.    Upon information and belief, Greg and Ralston have diverted millions of dollars in profit from SDS to SING.

216.    SDS has been made insolvent by Greg and Ralston's diversion of expenses and by SING's refusal to provide the agreed upon funding.

217.    Despite promises to fund SDS and numerous representations in public securities filings, SING failed to fund SDS.

218.    An equitable accounting is proper where the accounts are so complicated that an ordinary legal action demanding a fixed sum is impracticable.

219.    Greg and Ralston, as managers of SDS, have a fiduciary relationship with SDS and its members to properly account for the profits and losses of SDS. The

Counterclaimants conferred a benefit upon the Counterdefendants; Counterdefendants benefitted at plaintiff's expense; and it would be unjust to allow Counterdefendants to keep the benefit.

220.    Pablo and Johnsons own more than 10 percent of the outstanding member's interests of SDS.

221.    Pablo owns own more than 10 percent of the outstanding indebtedness of SDS.

222.    SDS is insolvent and is in want of money to carry on its business, such that the business is being conducted at a great loss and greatly prejudicial to the interest of its members.

223.    Upon information and belief, irreparable injury is being threatened to SDS.

224.    Upon information and belief, SDS's managers have:

  a. Willfully violated SDS' charter;

  b. Been guilty of fraud, collusion, and gross mismanagement in the conduct or control of SDS' affairs;

  c. The assets of SDS are in danger of waste, sacrifice or loss through attachment, foreclosure, litigation or otherwise; and

  d.  dissolved, but has not proceeded diligently to wind up its affairs, or to distribute its assets in a reasonable time.

225.    Appointment of a receiver to account for SDS' profits is proper and necessary.

226.    WHEREFORE, Counterclaimants request the following relief:

  a. Annualized accounting of SDS

  b. Appointment of a receiver;

  c. For Counterclaimants' costs and attorney's fees incurred herein; and

  d. For such other and further relief as the Court deems just and proper.

/ / /

MAC:16632-001 2021-10-12  First Amended Counterclaimant

**COUNT EIGHT– SECURITIES FRAUD**

**(All DSA, ALT, Pablo, Johnson, JAGUSA against SING, Greg, and Ralston)**

227.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

228.    In the sale of SING's shares, Greg and Ralston were the actual persons who made the material and false representations of promised funding for expansion.

229.    The Individual Counterdefendants were the control persons under Section 2 of the Securities and Exchange Act of 1934 (the "Exchange Act").

230.    SING, as communicated by the Individual Counterdefendants, in their capacity as directors, officers, or, otherwise, as managing-speaking agents of SING, had the motive and opportunity to commit fraud, or, at a minimum were consciously misbehaving or reckless in making such statements.

231.    Specifically, Greg and Ralston, could personally benefit from increasing the apparent value of SING by promising to acquire and fund the Counterclaimant entities, and then pocketing the additional capital raised by the public announcements of these acquisitions, instead of funding the Counterclaimant entities as promised.

232.    Counterclaimants JAGUSA, and Chaffino justifiably relied on these promises in deciding to sell a controlling interest of their companies to SING.

233.    Each of these Acquisitions involved an investment contract, which is a security under Arizona law. SEC Rule 10b-5 promulgated by the federal Securities Exchange Act of 1934 prohibits the use of a scheme to defraud, or material misstatements or omissions related to the purchase or sale of securities.

234.    Counterclaimants have a private cause of action for securities fraud under Section 10b-5 of the Exchange Act and under A.R.S. § 13-2314.04 involving the sale of securities pursuant to (A.R.S. §44-1991) (the shares of stock or membership interests in the Counterclaimant companies are securities), intentional or reckless sale of unregistered securities or real property securities (A.R.S. § 44-1841), a scheme or artifice to defraud (A.R.S. § 13-2310).

MAC:16632-001 2021-10-12  First Amended Countercomplaint

235.   Counterdefendants knew their statements relating to the purchase and sale of securities were false when made.

236.   Contrary to its promises SING did not fund the companies; rather, it took their available cash, and failed to pay sales tax due, glass suppliers, other bills.

237.   Basically, contrary to promises made, the companies were looted of their available cash and left insolvent.

238.   In addition, with both Diaz and Shikiar, Counterdefendants Greg and Ralston stated that they participated in various stock manipulation schemes, including the use of relatives, press releases, and coordinated buying and selling, and other improper conduct completed to personally enrich themselves.

239.   This Count is brought under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

240.   Counterdefendants violated Section 10(b) and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit Counterdefendants.

241.   Counterdefendants, individually and in concert, directly and indirectly, by use of means or instrumentalities of interstate commerce, the mails, and/or other oral and electronic communications made the false and misleading statements specified herein, including the statements in SEC filings, presentations, press release, and conference calls regarding the commercial viability of SING as related to the intent to properly fund the Counterclaimant Entities, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false or misleading.

242.   Counterdefendants, individually and in concert, directly and indirectly, by use of means or instrumentalities of interstate commerce, the mails, and/or other oral and

1   electronic communications, employed devices, schemes, and artifices to defraud and

2   engaged and participated in a continuous course of conduct to conceal SING's intention

3   not to fund the Counterclaimant entities, and their intention to fraudulently induce

4   Counterclaimants to divest their respective entities, solely in order to inflate SING's share

5   prices.

6          243.   Counterdefendants acted with scienter throughout the relevant time period,

7   because each acted with either the intent to deceive, manipulate, or defraud, or with

8   deliberate recklessness. Counterdefendants possessed actual knowledge of the

9   misrepresentations and omissions of material facts set forth herein, or acted with reckless

10  disregard for the truth by failing to ascertain and to disclose such facts even though such

11  facts were available to them, or deliberately refrained from taking steps necessary to

12  discover whether the material facts were false or misleading.

13         244.   SING is liable for the acts of the Individual Counterdefendants and other

14  SING agents and personnel referenced herein under the doctrine of *respondeat superior*,

15  as those persons were acting as the officers, directors, attorneys and/or agents of SING in

16  taking the actions alleged herein.

17         245.   JAGUSA, Diaz, Johnson, DSA, and ALT purchased SING common stock,

18  without knowing that Counterdefendants had misstated or omitted material facts about the

19  Company's operations and financial performance or prospects.

20         246.   WHEREFORE, Counterclaimants request that judgment be entered as

21  follows:

22         a.     For actual damages in an amount to be proven at trial, and in any event

23  greater than $50,000;

24         b.     For punitive damages in an amount to be proven at trial;

25         c.     For Counterclaimants' costs and attorney's fees incurred herein; and

26         d.     For such other and further relief as the Court deems just and proper.

27  / / /

28

MAC:16632-001 2021-10-12 First Amended Countercomplaint

1      **COUNT NINE–FRAUD BY INDUCEMENT AND CONCEALMENT**

2           **(All Counterclaimants against all Counterdefendants)**

3           247.    Counterclaimants re-allege the allegations set forth in the preceding

4     paragraphs herein.

5           248.    Counterdefendants made false representations concerning facts and

6     concealed facts that were material to the transactions contemplated in their contracts with

7     Counterclaimants, as further described herein.

8           249.    Counterdefendants knew of the falsity of their representations and/or utterly

9     disregarded truthfulness.

10          250.    Counterdefendants intended to induce Counterplaintiffs' reliance on their

11    representations.

12          251.    Counterplaintiffs justifiably relied upon the representations made by

13    Counterdefendants.

14          252.    As a result of Counterdefendants' fraudulent misrepresentations and

15    concealment, Counterclaimants have been directly and proximately damaged. But for

16    Counterdefendants' fraudulent misrepresentations and concealment, Counterplaintiffs

17    would not have entered into their respective agreements with Counterdefendants.

18          253.    WHEREFORE, Counterclaimants request the following relief:

19                  a.      For rescission of the agreements;

20                  b.      For actual damages in an amount to be proven at trial, and in any event

21    greater than $50,000;

22                  c.      For punitive damages in an amount to be proven at trial;

23                  d.      For Counterclaimants' costs and attorney's fees incurred herein; and

24                  e.      For such other and further relief as the Court deems just and proper.

25    **COUNT TEN– ALTERNATIVELY, NEGLIGENT MISREPRESENTATION**

26          **(All Counterclaimants against all Counterdefendants)**

27          254.    Counterclaimants re-allege the allegations set forth in the preceding

28    paragraphs herein.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

255.    Counterdefendants provided false information in their business transactions with Counterclaimants.

256.    Counterdefendants intended for Counterclaimants to rely on the incorrect information or knew that it reasonably would rely.

257.    Counterdefendants to exercise reasonable care in obtaining or communicating the information.

258.    Counterclaimants relied on the incorrect information to their detriment,

259.    As a result of the Counterdefendants' negligent misrepresentations, Counterclaimants have been directly and proximately damaged. But for Counterdefendants fraudulent misrepresentations and concealment, Counterplaintiffs would not have entered into their respective agreements with Counterdefendants.

260.    WHEREFORE, Counterclaimants request that judgment be entered as follows:

   a. For recission of the agreements;

   b. For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

   c. For punitive damages in an amount to be proven at trial;

   d. For Counterclaimants' costs and attorney's fees incurred herein; and

   e. For such other and further relief as the Court deems just and proper

## COUNT ELEVEN– CONVERSION

### (All Counterclaimants against all Counterdefendants)

261.    Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

262.    Counterdefendants intentionally exercised dominion or control over funds legally or contractually belonging to Counterclaimants, which so seriously interferes with Counterclaimants rights, that Counterdefendants should be required to repay the converted funds.

MAC:16632-001 2021-10-12 First Amended Countercomplaint

263.   Counterdefendants have exerted dominion or control over all funds due and owing Counterclaimants as set forth by the various contracts alleged herein, which thereby proximately and directly damaged them in an amount to be determined at trial.

264.   WHEREFORE, Counterclaimants request that judgment be entered as follows:

      a.   For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

      b.   For punitive damages in an amount to be proven at trial;

      c.   For Counterclaimants' costs and attorney's fees incurred herein; and

      d.   For such other and further relief as the Court deems just and proper.

## COUNT TWELVE– CIVIL CONSPIRACY

### (All Counterclaimants against all Counterdefendants)

265.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

266.   Upon information and belief, Counterdefendants agreed to accomplish an unlawful purpose, or to accomplish a lawful object by unlawful means, as described herein, thereby causing Counterclaimants damages.

267.   The Counterdefendants each conspired together to accomplish the unlawful conduct as alleged herein.

268.   WHEREFORE, Counterclaimants request that judgment be entered as follows:

      a.   For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

      b.   For punitive damages in an amount to be proven at trial;

      c.   For Counterclaimants' costs and attorney's fees incurred herein; and

      d.   For such other and further relief as the Court deems just and proper.

/ / /

MAC:16632-001 2021-10-12 First Amended Countercomplaint

## COUNT THIRTEEN – IN THE ABSENCE OF A WRITTEN CONTRACT, UNJUST ENRICHMENT

### (All Counterclaimants against all Counterdefendants)

269.   Counterclaimants re-allege the allegations set forth in the preceding paragraphs herein.

270.   Pursuant to the transactions described herein, Counterclaimants conferred certain benefits upon Counterdefendants.

271.   Counterdefendants appreciated the benefits conferred to them by Counterclaimants.

272.   Counterdefendants accepted and retained the benefit under circumstances where it would be inequitable for Counterdefendants to retain the benefit without the payment of value for the same.

273.    Thus, if any of the transactions described herein did not contain a written contract, then Counterclaimants are entitled to the payment of value from Counterdefendants for the same.

274.   WHEREFORE, Counterclaimants request that judgment be entered as follows:

a.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

b.      For punitive damages in an amount to be proven at trial;

c.      For Counterclaimants' costs and attorney's fees incurred herein; and

d.      For such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants pray for judgment against Counterdefendants as follows:

A.      For actual damages in an amount to be proven at trial, and in any event greater than $50,000;

B.      For punitive treble damages pursuant to A.R.S. § 13-2314.04(A)(D);

MAC:16632-001 2021-10-12 First Amended Countercomplaint

1        C.      For Counterclaimants' costs and attorney's fees incurred herein;

2        D.      For an award of reasonable attorney fees and costs of suit under any contract

3    or statue alleging for the same;

4        E.      For equitable relief as requested herein; and

5        F.      For any further relief as the Court deems to be just and proper.

6        Dated this 12th day of October, 2021.

7                                                MARQUIS AURBACH COFFING

8

9                                                By:/s/ Alexander K. Calaway
                                                      Cody S. Mounteer, Esq. (*pro hac*)
10                                                    Nevada Bar No. 11220
                                                      Kathleen Wilde LaBay, Esq.
11                                                    Arizona Bar No. 035862
                                                      Alexander K. Calaway, Esq. (*pro*
12                                                    *hac*)
                                                      Nevada Bar No. 15188
13                                                    10001 Park Run Drive
                                                      Las Vegas, Nevada 89145
14                                                    *Attorney for Counterclaimants*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**VERIFICATION**

STATE OF ARIZONA                )
                                                     ) ss.:
COUNTY OF MARICOPA        )

I, Pablo Curiel Diaz, being duly sworn, deposes and says that I am a Counterclaimant in the above captioned case, Case No. 2:21-cv-01076-JAT, filed in the United States District Court for the District of Arizona. I was a shareholder and member at the time of the transactions complained of herein, or my shares or membership later devolved on me by operation of law. This action is not a collusive one to confer jurisdiction that this Court would otherwise lack. On March 16, 2021, my legal counsel, The Law Offices of Donald W. Hudspeth, P.C., sent a demand letter outlining the factual basis for the instant Counterclaims, and demanded that the officers, board members, and Majority Managers, of SinglePoint, Inc. and SinglePoint Direct Solar, LLC, respectively, take corrective action to resolve the issues or otherwise to bring. To my knowledge, no corrective action has been taken, which necessitated the filing of the instant action.

_____

PABLO DIAZ CURIEL

Sworn to me this 9 day of Sept, 2021.

_____
Notary Public

DENYSE LIZ PEREZ
Notary Public - Arizona
Maricopa County
Commission # 553213
My Comm. Expires Sep 25, 2022

MAC:16632-001 2021-10-12  First Amended Countercomplaint

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that I electronically filed **VERIFIED FIRST AMENDED**

3   **COUNTERCOMPLAINT** with the Clerk of the Court for the United States District Court

4   by using the court's CM/ECF system on the 12th day of October, 2021.

5      ☒    I further certify that all participants in the case are registered CM/ECF users

6   and that service will be accomplished by the CM/ECF system.

7      ☐    I further certify that some of the participants in the case are not registered

8   CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid,

9   or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days

10   to the following non-CM/ECF participants:

11
                              Leon B. Silver, Esq.
                              Kira N. Barrett, Esq.
12                            Mary M. Curtin, Esq.
                              Meagan Swart, Esq.
13                         Peter Alex Silverman, Esq.
                     GORDON REES SCULLY MANSUKHANI, LLC
14                      Two North Central Avenue, Suite 2200
                             Phoenix, Arizona 85004
15                            knbarrett@grsm.com
                               lsilver@grsm.com
16                             mswart@grsm.com
                              mcurtain@grsm.com
17                           psilverman@grsm.com
                             *Attorney for Plaintiff*
18

19                         Donald Wayne Hudspeth, Esq.
                           Mark Stephen Hamilton, Esq.
20             LAW OFFICES OF DONALD W HUDSPETH PC
                          3200 N Central Ave., Ste. 2500
21                             Phoenix, AZ 85012
                              dwh@azbuslaw.com
22                             msh@azbuslaw.com

23

24

25                            */s/ Cally Hatfield*
                       An employee of Marquis Aurbach Coffing
26

27

28