**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SinglePoint Direct Solar LLC, et al., | CV-21-1076-PHX-JAT (Lead) |
| Plaintiffs/Counterdefendants, | CV-21-0989-PHX-JAT (Cons) |
| v. | **ORDER** |
| Pablo Diaz Curiel, et al., | |
| Defendants/counterclaimants. | |

Pending before the Court are Defendants Solar Integrated Roof Corporation's ("SIRC") and David Massey's Motion for Partial Dismissal of Plaintiff's Second Amended Complaint (Doc. 98) and both Plaintiffs' Motion to Compel Arbitration (Doc. 116) and Plaintiffs' Partial Motion to Dismiss Verified First Amended Counterclaim (Doc. 117). The Court has reviewed the pleadings, briefs, declarations, and exhibits submitted by the parties. For the reasons cited herein, the Court grants in part and denies in part Defendants SIRC's and David Massey's Motion for Partial Dismissal of Second Amended Complaint (Doc. 98), grants Plaintiffs' Motion to Compel Arbitration (Doc. 116) and grants in part and denies in part Plaintiffs' Partial Motion to Dismiss Verified First Amended Counterclaim (Doc. 117).

## I.     Procedural Background

On June 8, 2021, Defendants/Counterclaimants SinglePoint Direct Solar, LLC ("SDS"), Pablo Diaz, JAGUSA Holdings, Inc. ("JAGUSA"), Dan Shikiar, Elijah Lee Chaffino, and Kjelsey Johnson in this case filed a lawsuit, No. CV-21-00989-PHX-SMB,

against Plaintiffs/Counterdefendants SinglePoint, Inc. ("SinglePoint"), Greg Lambrecht, Wil Ralston, and Corey Lambrecht to bring claims for securities fraud, breach of fiduciary duty, multiple breaches of contract, tortious interference of contract, breach of covenant of good faith and fair dealing, breach of Diaz's employment agreement, violation of state and federal whistleblower statutes, acts of civil conspiracy, aiding and abetting criminal conduct, various fraud claims, and violations of RICO. *SinglePoint Direct Solar, LLC et al. v. SinglePoint, Inc. et al.*, CV-21-00989-PHX-SMB, Doc. 1.

Separately, on June 21, 2021, Plaintiffs filed their Complaint in this case against Defendants Diaz, Johnson, and Brian Odle claiming trademark infringement, breach of the asset purchase agreement, breach of Diaz's employment agreement, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, unfair competition, state and federal trade secret misappropriation, intentional interference with contract, conversion, and unjust enrichment. (Doc. 1 at 1, 20–21). On the same day, Plaintiffs filed a Motion for a Temporary Restraining Order (TRO) and Preliminary Injunction, seeking to enjoin Defendants from misappropriating SDS's confidential and other proprietary data and breaching noncompete and non-solicitation covenants in the Asset Purchase Agreement and Diaz's Employment Agreement. (Doc. 3 at 11–13).

At a June 30, 2021 hearing, the parties stipulated to a TRO requiring Defendants Diaz and Johnson to provide Plaintiffs with all login information for SDS accounts and enjoining them from soliciting SDS clients or otherwise using SDS client lists or other confidential or proprietary information, using the name Direct Solar in their business dealings, and destroying or deleting any materials related to Plaintiffs' claims. (Doc. 32 at 2–3).

On July 13, 2021, Plaintiffs filed a motion for an order to show cause regarding Defendants' violation of the TRO. (Doc. 34). Following the appointment of a special master to oversee the parties' compliance with the TRO, the Court denied Plaintiff's motion without prejudice as moot. (Doc. 36).

On July 14, 2021, Plaintiffs filed a First Amended Complaint, adding Defendants

SIRC, Massey, USA Solar Network, LLC ("USA Solar"), Elijah Chaffino, Christa Berume, and Jessica Hernandez. (Doc. 37). On July 16, 2021, Plaintiffs filed an Application for an Amended TRO and Preliminary Injunction (Doc. 44), which the Court denied (Doc. 56). On the same day, the parties filed a Stipulated Motion for Leave to Take Limited Expedited Discovery relating to the upcoming preliminary injunction hearing and Defendant SIRC's involvement with Defendant USA Solar (Doc. 47), which the Court granted (Doc. 49). In their response to Plaintiffs' Application for an Amended TRO and Preliminary Injunction, Defendants also included a Motion to Dismiss Plaintiffs' First Amended Complaint. (Doc. 51 at 14).

On August 2, 2021, the parties filed a Stipulated Motion to Consolidate Case No. CV-21-00989-PHX-SMB with this case. (Doc. 71). On August 10, 2021, the cases were consolidated. (Doc. 82).

On August 4, 2021, the Court held a preliminary injunction hearing, and on August 6, 2021, the Court granted in part and denied in part Plaintiff's Motion, enjoining Defendants Diaz and Johnson from "using any information specific to SDS that was the subject of the Asset Purchase Agreement or Employment Agreement" including "any specific customer information, price lists, accounts, web pages, and the like." (Doc. 77 at 1, 9, 16). The Court also found the noncompete and non-solicitation clauses in both the Asset Purchase Agreement and Diaz's Employment Agreement unenforceable. (*Id.*) In that same order, the Court denied Defendants' Motion to Dismiss Plaintiff's First Amended Complaint without prejudice for failure to comply with the certification requirements of Local Rule of Civil Procedure 12.1(c). (Doc. 77 at 1, n. 1).

On August 27, 2021, Plaintiffs filed their Second Amended Complaint ("SAC"), adding a copyright infringement claim against USA Solar and a defamation claim against Diaz. (Doc. 90 at 28–30). On September 10, 2021, Defendants SIRC and David Massey filed a Motion for Partial Dismissal of Plaintiffs' SAC arguing that this Court does not have personal jurisdiction over either party, or, in the alternative, Plaintiffs failed to state a claim for relief against them. (Doc. 98).

On September 11, 2021, Defendants/Counterclaimants filed their complaint from Case No. CV-21-00989-PHX-SMB as a Counterclaim, adding Odle as a Counterclaimant, adding DOES I-X and ROE Corporations I-X as Counterdefendants, and removing SDS as a Counterclaimant and adding it as a Counterdefendant. (Doc. 100 at 1). On October 12, 2021, Counterclaimants filed their First Amended Counterclaim, adding Direct Solar, LLC ("Direct Solar") and AI Live Transfers, LLC as Counterclaimants, removing Dan Shikiar as a Counterclaimant, and asserting derivative action claims on behalf of SDS, multiple breaches of various contracts, breach of the implied covenant of good faith and fair dealing, nonpayment of wages, accounting and appointment of a receiver over SDS, securities fraud, fraud by inducement and concealment, conversion, civil conspiracy, and alternatively, negligent misrepresentation and unjust enrichment. (*See* Doc. 110). On October 19, 2021, Plaintiffs filed a Motion to Compel Arbitration of Defendant Diaz's counterclaims arising under his employment agreement with SDS (Doc. 116) and a Motion to Dismiss the First Amended Counterclaim for failure to state a claim (Doc. 117).

On January 21, 2022, the Court held oral arguments on the pending motions. (Doc. 136).

## II.   Evidence Considered by the Court

As a threshold matter, the Court must determine whether the parties' proffered exhibits are properly before it at the motion to dismiss stage.

On August 27, 2021, Plaintiffs filed the SAC that cites to, but does not properly attach, Plaintiffs' exhibits. (Doc. 90). Upon realizing their failure to properly attach exhibits to the SAC, Plaintiffs filed a Notice of Errata on October 20, 2021, effectively refiling the SAC with the exhibits attached. (Doc. 123). Plaintiffs did not seek leave to amend or refile the SAC, therefore those exhibits are not properly before the court. Defendants did not file a motion to strike Plaintiffs' exhibits, but Defendants SIRC and Massey raised authenticity concerns in their Reply Brief regarding the Court's consideration of the exhibits at the motion to dismiss stage. (Doc. 119 at 5). Additionally, on October 12, 2021, in response to Defendants' Motion to Dismiss, Plaintiffs attached a

two-page excerpt from Defendant Odle's deposition transcript. (Doc. 109-1). In their Reply Brief, Defendants objected to the authenticity of the deposition transcript excerpt because the excerpt did not include the court reporter's certification. (Doc. 119 at 6). Finally, in support of their Motion to Dismiss, Defendants reference (Doc. 119 at 7), but do not attach, a previously filed affidavit from Defendant Massey (Doc. 51-1).

When reviewing a motion to dismiss for lack of personal jurisdiction brought under Federal Rule of Civil Procedure 12(b)(2), "a court may consider extrinsic evidence—that is, materials outside the pleadings, including affidavits submitted by the parties." *Stewart v. Screen Gems-EMI Music, Inc.*, 81 F.Supp.3d 938, 951 (N.D. Cal. 2015) (citing *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004)). Conversely, in the Federal Rule of Civil Procedure 12(b)(6) context, courts are generally prohibited from considering evidence outside the pleadings without conversion of the motion to dismiss into a motion for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

However, the Ninth Circuit allows its courts to discretionarily consider extra-pleading evidence contained in documents referenced in a complaint that are essential to the underlying claims via the doctrine of incorporation by reference. *Stewart*, 81 F.Supp.3d at 951 (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir. 1998)). Incorporation by reference allows courts to consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not attached to the [plaintiff's] pleading." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005)). "A court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Id.* (quoting *U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)). "When a defendant files a motion on 12(b)(2) and 12(b)(6) grounds, the court may consider extra-pleading material when

determining whether it has personal jurisdiction over defendants but exclude the same evidence from consideration of whether the complaint states a claim, even when the two questions turn on the same issue." *Stewart*, 81 F.Supp.3d. at 951.

Accordingly, in evaluating the Court's ability to exercise personal jurisdiction over Defendants SIRC and Massey pursuant to 12(b)(2), the Court exercises its discretion to consider the extra-pleading materials before it and has considered the following evidence submitted by Plaintiffs: 1) the SAC (Doc. 90); 2) Plaintiffs' exhibits (Doc. 123); 3) Plaintiffs' Response to the Motion to Dismiss (Doc. 109); and 4) the excerpt of Defendant Odle's deposition transcript (Doc. 109-1). In addition, the Court has considered the following evidence submitted by Defendants SIRC and Massey: 1) the Motion to Dismiss (Doc. 98); 2) Defendants' Reply Brief (Doc. 119; and 3) the Defendant Massey Declaration filed under seal (Doc. 51-1).

With respect to the 12(b)(6) motion, Defendants object to the Court's consideration of Plaintiffs' exhibits, arguing that "[e]ven if these exhibits were properly cited to (which they are not), Plaintiffs have not made any attempt to authenticate the documents." (Doc. 119 at 5). Additionally, moving Defendants object to the authenticity of the two-page deposition transcript attached to Plaintiffs' Response Brief because it does not include the court reporter's certification of authenticity. (*Id.* at 6). Thus, in reviewing the 12(b)(6) motion, the Court declines to consider any of Plaintiffs' proffered evidence because the moving Defendants here question the exhibits' authenticity. *See Davis*, 691 F.3d at 116; *Knievel*, 393 F.3d at 1076.

Finally, the Court will not consider the Defendant Massey Declaration for purposes of the 12(b)(6) motion either because this affidavit relates to Defendants' defense to personal jurisdiction and not the 12(b)(6) motion.

Accordingly, for Defendants' Motion to Dismiss pursuant to 12(b)(6), the Court will not consider any evidence outside of the SAC and the parties' briefing.

**III.    Defendants SIRC's and David Massey's Motion for Partial Dismissal of Second Amended Complaint**

### a. Factual Background

The following facts are either undisputed or recounted in the light most favorable to the non-moving party. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

Defendant SIRC is a Nevada corporation headquartered in California. (Doc. 98 at 7). Plaintiffs allege that, upon information and belief, SIRC does business in Arizona. (Doc. 90 ¶ 10). Defendant Massey is a California resident and CEO of SIRC. (*Id.* ¶ 11). USA Solar is a Delaware limited liability company with its principal place of business in Arizona and Defendant Diaz is an Arizona resident. (*Id.* ¶¶ 4, 12).

Defendants SIRC's and David Massey's involvement in this case stems from their June 30, 2021 Membership Interest Purchase and Employment Agreement ("SIRC Agreement") with Defendant Diaz to purchase a 60% stake in USA Solar "in exchange for $200,000 cash and $12,000,000 worth of SIRC common stock." (Doc. 90 ¶¶ 99, 100).

Plaintiffs allege that Defendant Diaz misappropriated SDS's confidential and proprietary information by abusing his authority as CEO of SDS to transfer SDS assets into a new company, USA Solar, and prevent SinglePoint managers from "accessing client lists, current projects and [SDS] data portals." (*Id.* ¶¶ 53, 65–81). Plaintiffs further allege that on May 26, 2021, Defendant Diaz "sent an email to Mr. Massey seeking 'to potentially find a new home' for his companies, staff, infrastructure, relationships, and revenue stream." (*Id.* ¶ 62). Plaintiffs also allege that the "sole purpose" of Defendant Diaz's actions was "to steal SDS assets and move them into a new company in order to effectuate the sale of SDS assets to SIRC consistent with Mr. Diaz's May 26 proposal to Mr. Massey." (*Id.* ¶ 66).

Plaintiffs further allege that Defendant Diaz failed to appear at the June 30, 2021 hearing before this Court on Plaintiffs' Application for TRO because "he was actively signing the SIRC agreement with SIRC." (*Id.* ¶ 99). Plaintiffs further allege that SIRC valued USA Solar at over $20 million dollars and that any valuable assets held by USA Solar "belong to SDS and were wrongfully diverted by" Defendants Diaz, Johnson, Odle,

Berume, and Hernandez. (*Id.* ¶¶ 101–02). According to Plaintiffs, "SIRC and Mr. Massey had actual notice of Plaintiffs' Complaint against Mr. Diaz, the fact of Mr. Diaz's various contractual obligations including his obligation not to compete with SDS, and Plaintiffs' request for a TRO based on these obligations because this action was disclosed in Schedule A of the SIRC Agreement." (*Id.* ¶ 103).

Plaintiffs further allege that on June 13, 2021, Defendants SIRC and Diaz issued a joint press release to publicly announce the SIRC Agreement ("Press Release"). (*Id.* ¶ 104). According to the SAC, the Press Release claims that USA Solar "is a solar energy and EV charging infrastructure developer with a 'vast network of sales companies, dealers, and installation partners' operating in 37 states" and the USA Solar team has "over 7,000 solar projects completed to date." (*Id.* ¶ 105). Plaintiffs allege that the network and completed projects described in the Press Release are attributable to SDS and SinglePoint because an apparent draft of the Press Release directs readers to visit SDS's website, directsolaramerica.com. (*Id.* ¶¶ 106–08). Plaintiffs further allege that a news outlet reporting on the Press Release incorrectly attributed the SIRC and USA Solar deal to SinglePoint, causing shareholder confusion. (*Id.* ¶ 109).

While the majority of claims brought against Defendants SIRC and Massey are pleaded generally against "all Defendants," Plaintiffs' conversion claim specifically alleges that Defendants Massey, SIRC, and USA Solar "intentionally and substantially interfered with Plaintiffs' property rights by misappropriating SDS's confidential and proprietary information, trade secrets, and other assets for use in their business operations." (*Id.* ¶ 195).

### b. Personal Jurisdiction

#### i. Legal Standard

A plaintiff bears the burden of establishing personal jurisdiction. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (citing *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990)). A defendant may move prior to trial to dismiss a complaint for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2); *see, e.g.,*

*Data Disc, Inc. v. Sys tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (citing Rule 12(b)(2)). When a defendant does so, "the plaintiff is 'obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction'" over the defendant. *Cummings v. W. Trial Lawyers Ass'n*, 133 F.Supp.2d 1144, 1151 (D. Ariz. 2001) (quoting *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986)). Conflicts over statements contained in plaintiff's and defendant's affidavits "must be resolved in the plaintiff's favor." *Schwarzenegger*, 374 F.3d at 800 (citing *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)). If the Court decides a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). Uncontroverted allegations in the complaint are deemed true for purposes of resolving the motion. *Id.*

When, as here, no federal statute governs personal jurisdiction, the Court applies the law of the forum state. *Id.* The Arizona long-arm statute provides for personal jurisdiction to the extent permitted by the Due Process Clause of the United States Constitution. Ariz. R. Civ. P. 4.2(a); *see also A. Uberti & C. v. Leonardo*, 892 P.2d 1354, 1358 (Ariz. 1995) (stating that under Rule 4.2(a), "Arizona will exert personal jurisdiction over a nonresident litigant to the maximum extent allowed by the federal constitution.").

Absent traditional bases for personal jurisdiction (i.e., physical presence, domicile, consent), the Due Process Clause requires that a nonresident defendant have certain minimum contacts with the forum state such that the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice. *See Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Doe v. Am. Nat'l Red Cross*, 112 F.3d 1048, 1050 (9th Cir. 1997). The Due Process Clause protects a defendant's "liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties or relations.'" *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 269–70 (9th Cir. 1995) (quoting *Burger King Corp, v, Rudzewicz*, 471 U.S. 462, 471–72, (1985)).

If the Court determines that Defendants SIRC's and Massey's contacts with Arizona are sufficient to satisfy the Due Process Clause, then the Court must exercise either "general" or "specific" jurisdiction over Defendants SIRC and Massey. *See Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–15 nn.8–9 (1984) (citations omitted). The nature of Defendants SIRC's and Massey's contacts with Arizona will determine whether the Court exercises general or specific jurisdiction. *Id.* Here, Plaintiff does not contend that the Court has general jurisdiction over either SIRC or Massey. (Doc. 109 at 3–4). Thus, the Court will only consider whether it has specific jurisdiction over Defendants SIRC and Massey. Although Defendants SIRC and Massey are similarly situated in some respects, the Court will address whether it has personal jurisdiction over SIRC and Massey separately.

### ii.  Specific Jurisdiction over SIRC

The Court must determine whether SIRC has established sufficient contacts with the forum state such that the exercise of specific jurisdiction over the company would not offend the Due Process Clause. *See Int'l Shoe*, 326 U.S. at 316. The Ninth Circuit applies a three-part test to determine whether a defendant's contacts with the forum state are sufficient to subject it to a state's specific jurisdiction. Under this three-part test, specific jurisdiction exists only if: (1) the defendant purposefully availed itself of the privilege of conducting activities in the forum, thereby invoking the benefits and protection of its laws, or purposely directed conduct at the forum that had effects in the forum; (2) the claim arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction comports with fair play and substantial justice, i.e., it is reasonable. *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 741–42 (9th Cir. 2013). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Schwarzenegger*, 374 F.3d at 802. "If the plaintiff succeeds in satisfying both of the first two prongs, the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Id.* (internal quotations omitted). "[C]ourts must examine the defendant's contacts with the forum at the time of the events underlying the

dispute when determining whether they have jurisdiction," not at the time of the suit or any events that occur thereafter. *Steel v. U.S.*, 813 F.2d 1545, 1549 (9th Cir. 1987).

### 1. Purposeful Direction

The first prong may be satisfied by either showing that the defendant "purposefully availed himself of the privilege of conducting activities in the forum" or "purposefully directed his activities toward the forum." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006) (internal quotations omitted). Though these two concepts both fall under the umbrella of "purposeful availment," the Ninth Circuit has clarified that "availment and direction are, in fact, two distinct concepts." *Id.* "A purposeful availment analysis is most often used in suits sounding in contract…. A purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802 (internal citations omitted). Here, the underlying seven causes of action asserted against Defendants SIRC and Massey allege trademark infringement, trade secret appropriation under both federal and state law, unfair competition, intentional interference, conversion, and unjust enrichment (*see* Doc. 90), all of which are akin to a tort case. *See Panavision Int'l L.P. v. Toeppen,* 141 F.3d 1316, 1321 (9th Cir. 1998). Plaintiffs do not allege that Defendants SIRC or Massey breached any contracts with Plaintiffs. Thus, the Court will apply the purposeful direction analysis.

The three-part *Calder* effects test, taken from the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), is used to evaluate purposeful direction. Under this test, "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006).

At the outset, Plaintiffs appear to suggest that the controlling analysis for purposeful direction is whether Defendants SIRC and Massey purposefully directed their activities at *residents* of the forum, rather than the forum itself. (Doc. 109 at 5). However, courts must "look[ ] to the defendant's contacts with the forum [s]tate itself, not the defendant's

contacts with persons who reside there." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (citing *Int'l Shoe*, 326 U.S. at 319); *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069–70 (9th Cir. 2017) ("[W]e must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum."). "[M]ere injury to a forum resident is not a sufficient connection to the forum." *Walden*, 571 U.S. at 290. Rather, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way," *id.*, subject to the further contacts discussed in *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021).

### a.  Intentional Act

To satisfy the first requirement of the effects test, it is enough that a defendant performed "an actual, physical act in the real world." *Schwarzenegger*, 374 F.3d at 806. The defendant need not have intended "to accomplish a result or consequence of that act." *Id.* Here, Defendant SIRC's actions in entering into the SIRC Agreement to purchase a stake in USA Solar, an Arizona company, with alleged notice of this lawsuit, constitute intentional acts. (*See* Doc. 90 ¶ 99). Defendant SIRC does not dispute the existence of that contract. (*See* Doc. 98 at 5). Thus, the first prong of the *Calder* effects test is satisfied.

### b.  Express Aiming

"The second part of the *Calder*-effects test requires that the defendant's conduct be expressly aimed at the forum." *Brayton Purcell LLP v. Recordon & Recordon,* 606 F.3d 1124, 1129 (9th Cir. 2010), *abrogated on other grounds by Walden*, 571 U.S. at 287–91. As a general principle, express aiming requires more than "'untargeted negligence' that merely happened to cause harm to [a plaintiff]." *Schwarzenegger*, 374 F.3d at 807 (quoting *Calder*, 465 U.S. at 789).

Here, Plaintiff satisfies the second element by alleging that Defendant's act in acquiring USA Solar was expressly aimed at the forum state because Defendant Massey,

acting as Defendant SIRC's representative, traveled to Arizona to negotiate and execute the SIRC Agreement with alleged knowledge of Plaintiffs' accusations regarding Defendant Diaz's misappropriation of Plaintiffs' assets. (Doc. 109 at 5; *see also* Doc. 90 ¶¶ 4, 12, 99–103). Regarding this second element, the Supreme Court instructs a court to consider "whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290. Here, the fact that Defendant allegedly signed an agreement to purchase a stake in USA Solar in Arizona connects Defendant to Arizona in a meaningful way.

Specifically, Plaintiff argues that Defendant SIRC purposefully directed its actions at Arizona because: (a) Defendant SIRC negotiated for and entered into a contract to acquire a majority stake in USA Solar, an Arizona-based company; (b) Defendant SIRC issued a press release on June 13, 2021 announcing the acquisition stating it acquired USA Solar, "which has operations in the 'key market' of Arizona"; (c) Defendant Massey had alleged knowledge of Plaintiff's lawsuit in Arizona against Defendant Diaz for misappropriation of assets and confidential information; (d) Defendant Massey visited Arizona on June 29, 2021 to meet with Defendant Odle and "specifically negotiate and execute the SIRC Agreement." (Doc. 109 at 5). Additionally, Plaintiff asserts that "SIRC is now the majority owner and continues to operate USA Solar []," which is an Arizona-based company.

Defendants argue that Plaintiffs' evidence supporting personal jurisdiction "cannot rebut the Declaration of David Massey which is already before the Court, and addresses any connection that Moving Defendants have to Arizona, namely only SIRC's purchase of membership interests in [USA Solar] (a Delaware company that does business in Arizona)." (Doc. 119 at 7; *See* Doc. 51-1 ¶¶ 4, 12–15). Defendants further argue that "Mr. Massey's declaration explains that SIRC's purchase of [USA Solar] did not directly or indirectly involve any customer lists, project lists, or other proprietary information of Plaintiffs, let alone any assets of Plaintiffs located in Arizona." (Doc. 119 at 7; *See* Doc. 51-1 ¶ 15). Moreover, Defendant argues that it is unreasonable and untenable that "a single

visit by Mr. Massey to Arizona and a brief interaction between a former SDS employee, Mr. Odle … may serve as a basis to extend personal jurisdiction." (Doc. 119 at 6).

Yet, "[s]o long as it creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King*, 471 U.S. at 475 n.18 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). By alleging that both the intentional act of executing the SIRC Agreement with knowledge that the assets acquired therein were subject to misappropriation claims in this lawsuit and the consequences of that act occurred in Arizona as against SDS, which Defendant Massey admits is "primarily a Phoenix, Arizona company" (Doc. 51-1 ¶ 7), Plaintiffs satisfactorily carry their burden of showing that Arizona is "the focal point both of the story and of the harm suffered." *Walden*, 571 U.S. at 287 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *see Mavrix Photo, Inc. v. Brand Technologies, Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) ("[T]he plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.") (quotations omitted); *see also Schwarzenegger*, 374 F.3d at 800 (conflicts over statements contained in contradicting affidavits "must be resolved in the plaintiff's favor.") (citations omitted).

### c.   Harm Caused in Forum State

The third prong of the effects test requires that Defendants' conduct cause harm that Defendants know is likely to be suffered by Plaintiffs in the forum state. *Yahoo!*, 433 F.3d at 1206. With regard to the amount of harm suffered, the Ninth Circuit has stated that the "brunt" of the harm to Plaintiffs need not be suffered in the forum state. *Id.* at 1207. Rather, "[i]f a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter than even more harm might have been suffered in another state." *Id.*

Here, the alleged harm to Plaintiffs is loss of goodwill and potential business dealings based on Defendants' trademark infringement, trade secret misappropriation, unfair competition, intentional interference with contracts, conversion of assets, and unjust enrichment. Thus, SIRC's conduct, which includes acquiring a majority stake in USA Solar with notice of this lawsuit (alleging that Defendants Diaz and USA Solar wrongfully

possess Plaintiffs' assets and breached contracts with Plaintiffs), did cause the alleged harm to Plaintiffs in Arizona, which Defendant Massey admits is "primarily an Arizona-based company." (*See* Doc. 51-1 ¶ 7). Thus, the Court finds that the three prongs of the *Calder* effects test have been satisfied.

## 2.  Claim Arises Out of Forum-Related Activities

With regard to the second prong of the specific personal jurisdiction test, the Ninth Circuit has adopted a "but for" analysis for determining whether a plaintiff's cause of action arises out of the defendant's forum-related activities. *Doe*, 112 F.3d at 1051. The "arising out of" requirement is met if, but for the contacts between the defendant and the forum state, the cause of action would not have arisen. *Terracom v. Valley Nat'l Bank,* 49 F.3d 555, 561 (9th Cir. 1995).

The "but for" test is satisfied in this matter because the cause of action solely arises out of SIRC's forum-related activities. But for SIRC's negotiation and execution of the SIRC Agreement, including the acquisition of assets alleged to be wrongfully possessed by Defendants Diaz and USA Solar, Plaintiffs claims for trademark infringement, misappropriation of trade secrets, unfair competition, intentional interference with contracts, conversion of assets, and unjust enrichment against SIRC would not have arisen. The Court therefore finds that Plaintiffs alleged harms do arise out of SIRC's Arizona-related activities.

## 3.  Reasonableness

An unreasonable exercise of jurisdiction violates the Due Process Clause even if the "purposeful availment" and "arising out of" requirements of the specific jurisdiction test are satisfied. *Ziegler v. Indian River Cnty.*, 64 F.3d 470, 474–75 (9th Cir. 1995). But the Court presumes that its exercise of jurisdiction over a defendant is reasonable if the first two requirements of the specific jurisdiction test are met. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995). Once a plaintiff satisfies the first two requirements for specific jurisdiction, the burden of proof then shifts to the defendant, which must come forward with a "compelling case" that personal jurisdiction would be unreasonable. *Id.*

The Ninth Circuit considers the following seven factors in determining whether the exercise of specific jurisdiction over a defendant is reasonable: (1) the extent of the defendant's purposeful interjection into the forum state; (2) the burden on the defendant of litigating in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the dispute; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *See Ziegler*, 64 F.3d at 475.

Because the Court found that Plaintiffs met the first two requirements of specific jurisdiction, SIRC must come forward with a compelling case to rebut the presumption that jurisdiction in Arizona is reasonable. *Ballard*, 65 F.3d at 1500. SIRC has failed to meet its burden. Further, because SIRC has not directly addressed the reasonableness requirement in its briefing, the Court will only briefly address the relevant factors.

Based on its acquisition of a company in Arizona, the Court finds that SIRC has purposefully interjected itself into Arizona to conduct business. Further, though it is arguably more inconvenient for SIRC to litigate this case in Arizona than in its home state of Nevada or principal place of business of California, the Court finds that there would only be a marginal increase in inconvenience. With respect to California, litigating in Arizona is likely just as inconvenient to SIRC as litigating in California would be to Plaintiffs. There is also no apparent conflict with the sovereignty of California, and Arizona clearly has an interest in adjudicating a dispute involving alleged infringement of one of its resident's trademarks and misappropriation of that resident's assets and confidential information. SIRC has put forth no evidence that resolution of this dispute will be less efficient in Arizona. Finally, though California presents an alternative forum, there is no indication, with regard to the question of whether exercising personal jurisdiction over SIRC is appropriate, that litigating the case there would be more reasonable. And while Plaintiffs SinglePoint and SDS and Defendant SIRC are all residents of Nevada, none of the parties have expressed that Nevada would be a more appropriate venue to litigate this

1    lawsuit and it appears that many of the relevant witnesses reside in Arizona.

2        After a review of all the factors, the Court finds SIRC has failed to present a

3    compelling case that the exercise of jurisdiction would not comport with fair play and

4    substantial justice. Because Plaintiffs have satisfied the specific jurisdiction test, the Court

5    finds that it may exercise personal jurisdiction over SIRC. The Court therefore denies

6    Defendants' motion to dismiss for lack of personal jurisdiction as to SIRC.

7                    **iii.  Specific Jurisdiction over David Massey**

8        Defendant Massey's contacts with Arizona arise from his activity as an officer of

9    SIRC. As this Court discussed in *Revolution Distribution v. Evol Nutrition Associates, Inc.*,

10   No. CV-11-2120-PHX-JAT, 2012 WL 2368634, at *7–8 (D. Ariz. Jun. 21, 2012), the Court

11   must apply the "fiduciary shield" doctrine to determine whether exercising jurisdiction

12   over Massey is proper. "Under the fiduciary shield doctrine, a person's mere association

13   with a corporation that causes injury in the forum state is not sufficient in itself to permit

14   that forum to assert jurisdiction over the person." *Davis v. Metro Prods., Inc.*, 885 F.2d

15   515, 520 (9th Cir. 1989). Instead, some other reason for the court to disregard the corporate

16   form must exist. *Id.*

> Because the corporate form serves as a shield for the
> individuals involved for purposes of liability as well as
> jurisdiction, many courts search for reasons to 'pierce the
> corporate veil' in jurisdictional contexts parallel to those used
> in liability contexts. Thus, the corporate form may be ignored
> in cases in which the corporation is the agent or alter ego of the
> individual defendant … or where there is an identity of
> interests between the corporation and the individuals." *Id.* at
> 520–21 (internal citations omitted). Further, the party seeking
> to invoke jurisdiction has the burden of proving that the court
> should pierce the corporate veil and exercise jurisdiction.

24   *Revolution Distribution*, 2012 WL 2368634, at *7 (quoting *Flynt Dist. Co., Inc. v. Harvey*,

25   734 F.2d 1389, 1393–94 (9th Cir. 1984)). Additionally, the *Davis* decision noted that, in

26   *Calder* and *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984), the Supreme Court

27   appeared to reject the notion that an individual's status as an employee could prevent the

28   exercise of personal jurisdiction over that individual. *Davis*, 885 F.2d at 521. The *Davis*

court also observed that "although Arizona courts previously recognized a corporate shield limit on their long-arm jurisdiction, … Arizona has more recently focused on corporate officers' individual contacts to assert personal jurisdiction, rather than restricting their jurisdiction to cover the corporate entity only." *Id.* (citation omitted). The Ninth Circuit further reasoned that "because the Arizona long-arm statute extends to the limit of constitutional due process … and because it is not equitably limited by the fiduciary shield doctrine, the reach of the long-arm jurisdiction in Arizona is effectively stretched by the reasoning of *Calder* and *Keeton*." *Id.* at 522. Hence, "Arizona's long-arm statute may, consistent with constitutional due process, allow assertion of personal jurisdiction over officers of a corporation as long as the court finds those officers to have sufficient minimum contacts with Arizona." *Id.*

Defendant Massey argues that Plaintiffs' SAC fails to establish that Massey, in his individual capacity, "has sufficient minimum contacts with Arizona" because the SAC does not contain any allegations that describe any specific contacts Defendant Massey has with Arizona, other than his role as CEO for SIRC. (Doc. 98 at 7). Indeed, Defendant Massey points out that he is a California resident and the CEO of a Nevada corporation and argues that neither his receipt of Defendant Diaz's May 26, 2021 email nor his close association with companies allegedly doing business in Arizona are enough. (*Id.*) The Court agrees.

Here, Plaintiffs' SAC does not include any facts or allegations that would support piercing the corporate veil with respect to Defendant Massey. Plaintiffs also have not submitted any declarations or affidavits alleging facts that would provide a prima facie showing of jurisdiction against Defendant Massey. Rather, most of Plaintiffs' response to Defendants' motion to dismiss makes the same arguments with respect to SIRC and Massey. The Court finds that those arguments, which simply assume that Massey is responsible for all of SIRC's activities, fail to establish personal jurisdiction over Massey.

Accordingly, Defendants' Motion to Dismiss is granted with respect to Defendant Massey.

1

### c.  Failure to State a Claim

Because the Court finds that Plaintiffs failed to establish personal jurisdiction over Defendant Massey, the Court need not evaluate whether Plaintiffs have sufficiently stated a claim against him. Thus, the Court will only analyze the sufficiency of the SAC as against Defendant SIRC.

### i.  Legal Standard

The Court may dismiss a complaint for failure to state a claim under 12(b)(6) for two reasons: (1) lack of a cognizable legal theory and (2) insufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To survive a 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Federal Rule of Civil Procedure 8(a)(2). Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

Although a complaint attacked for failure to state a claim does not need detailed factual allegations, the pleader's obligation to provide the grounds for relief requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). The factual allegations of the complaint must be sufficient to raise a right to relief above a speculative level. *Id.* Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.* (citing 5 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1202, pp. 94, 95 (3d ed. 2004)).

Rule 8's pleading standard demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Twombly*, 550 U.S. at 555). A complaint that offers nothing more than naked assertions

1    will not suffice. To survive a motion to dismiss, a complaint must contain sufficient factual

2    matter, which, if accepted as true, states a claim to relief that is "plausible on its face."

3    *Iqbal*, 556 U.S. at 678. Facial plausibility exists if the drafter pleads factual content that

4    allows the court to draw the reasonable inference that the defendant is liable for the

5    misconduct alleged. *Id.* Plausibility does not equal "probability," but plausibility requires

6    more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Where a complaint

7    pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the

8    line between possibility and plausibility of entitlement to relief.'" *Id.* (citing *Twombly*, 550

9    U.S. at 557).

10        In deciding a motion to dismiss under Rule 12(b)(6), the Court must construe the

11   facts alleged in the complaint in the light most favorable to the drafter of the complaint and

12   the Court must accept all well-pleaded factual allegations as true. *See Schwarz v. United*

13   *States*, 234 F.3d 428, 435 (9th Cir. 2000). Nonetheless, the Court does not have to accept

14   as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265,

15   286 (1986).

16                               **ii.  Analysis**

17        Plaintiffs bring seven causes of action against SIRC: (1) false designation of origin

18   in violation of the Lanham Act, 15 U.S.C. § 1125(a); (2) misappropriation of trade secrets

19   in violation of 18 U.S.C. § 1836 et seq.; (3) unfair competition; (4) violation of the Arizona

20   Uniform Trade Secrets Act; (5) intentional interference with contract/business expectancy;

21   (6) conversion; and (7) unjust enrichment. Of those seven, only the conversion claim

22   references Defendant SIRC—the remaining claims are asserted against "all Defendants"

23   generally.

24                          **1.  False Designation of Origin**

25        False designation of origin claims are brought under 15 U.S.C. § 1125(a), which

26   provides:

27                    Any person who, on or in connection with any goods or
                     services, or any container for goods, uses in commerce any ...
28                    false designation of origin, false or misleading description of

> fact, or false or misleading representation of fact which ... is
> likely to cause confusion ... shall be liable in a civil action by
> any person who believes that he or she is or is likely to be
> damaged by such act.

The key inquiry here is the same as for trademark infringement claims: "whether an alleged infringer's [conduct] creates a likelihood that the consuming public will be confused as to who makes what product." *Jada Toys, Inc. v. Mattel*, 518 F.3d 628, 632 (9th Cir. 2008) (citation and internal quotation marks omitted); *see also Adidas Am., Inc. v. Calmese*, 662 F. Supp. 2d 1294, 1298 (D. Or. 2009) (same).

Plaintiff's allegations, taken as true, suggest a high likelihood of confusion. The SAC alleges that Defendant Diaz was CEO of SDS and publicly held himself out to be CEO of SDS, including to SIRC and Massey and on the SDS website, even after the termination of the Employment Agreement. (Doc. 90 ¶¶ 35, 63–64, 84–86). The SAC further alleges that on June 13, 2021, SIRC and Diaz issued the joint Press Release "announcing the SIRC Agreement," claiming that "USA Solar [] is a solar energy and EV charging infrastructure developer with a 'vast network of sales companies, dealers and installation partners' operating in 37 states'" and "Pablo and his team have 'over 7,000 solar projects completed to-date.'" (*Id.* ¶¶ 104–05). The SAC further alleges that "the 'network' described in the Press Release belongs to SDS and SinglePoint," "a portion of the completed projects described in the Press Release were completed by SDS following SinglePoint's acquisition of [Direct Solar]," and a draft version of the Press Release included SDS's website link for further information. (*Id.* ¶¶ 104–05). Additionally, Plaintiffs have pleaded that Defendant SIRC's Press Release is likely to cause, and has actually caused, confusion amongst the media and SinglePoint shareholders as to whether SinglePoint authorized the sale of USA Solar and SDS's assets to SIRC. (*Id.* ¶ 109). As a result, Plaintiffs have suffered harm in the form of damage to SinglePoint and SDS's reputation and industry goodwill. (*Id.*) Accordingly, the Court concludes that Plaintiffs have sufficiently stated a claim for false designation of origin under the Lanham Act against Defendant SIRC.

### 2.  Federal Trade Secret Misappropriation

The Defend Trade Secrets Act of 2016 ("DTSA") "creates a private right of action for 'any misappropriation of a trade secret ... for which any act occurs on or after the date of the enactment of [the] Act.'" *Attia v. Google*, LLC, 983 F.3d 420, 424 (9th Cir. 2020) (quoting 18 U.S.C. § 1831 et seq.). "An owner of a trade secret that is misappropriated may bring a civil action … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines a "trade secret" as information that an owner has taken reasonable measures to keep secret and that "derives independent economic value, actual or potential, from not being generally known to ... another person who can obtain economic value from the disclosure or use of the information." *Id.* (quoting 18 U.S.C. § 1839(3)). "The statute provides the following three definitions of 'misappropriation': (1) the 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means;' (2) the disclosure of a trade secret without the owner's consent; and (3) the use of a trade secret without the owner's consent." *Id.* (quoting 18 U.S.C. §§ 1839(5)(A), (5)(B)).

Plaintiffs state a plausible claim for relief under the DTSA that comports with the requirements of Rule 8. Plaintiffs allege that at all relevant times SDS was "in the business of providing homeowners and small businesses [with] solar energy brokerage services" (Doc. 90 ¶ 1), which is a product or service in interstate commerce. Plaintiffs further allege that SinglePoint entered into an Asset Purchase Agreement with Defendants Diaz and Johnson for the acquisition of the assets of both Direct Solar and AI Live, including those companies' trade secrets. (*Id.* ¶¶ 18–21, 25). Plaintiffs further allege that Defendants Diaz and Johnson were subject to restrictive covenants regarding "all confidential, non-public, or proprietary information and materials regarding" the business and purchased assets, and that Plaintiffs made reasonable efforts to preserve the confidentiality of their trade secrets. (*Id.* ¶¶ 22, 140). Plaintiffs further allege that Defendant Diaz, with the help of Defendants Odle, Berume, and Hernandez, wrongfully transferred SDS assets, including trade secrets, from SDS to USA Solar. (*Id.* ¶¶ 65–80, 102) ("To the extent that USA Solar [] has any

valuable assets, any and all of the valuable assets attributed to USA Solar … belong to SDS and were wrongfully diverted by Mr. Diaz, Ms. Johnson, Mr. Odle, Ms. Berume, and Ms. Hernandez."). Plaintiffs further allege that SIRC acquired USA Solar from Defendant Diaz via the SIRC Agreement during the pendency of this lawsuit. (*Id.* ¶ 99). Plaintiffs further allege that SIRC had knowledge, or at least a reason to know, of this lawsuit and its underlying causes of action against Defendants because Defendants Diaz and Chaffino disclosed it as an ongoing legal proceeding in Schedule A to the SIRC Agreement. (*Id.* ¶ 103).

Defendants argue that Plaintiffs have not identified what trade secrets, if any, SIRC misappropriated (Doc. 119 at 10), but the SAC alleges that "Plaintiffs have developed, maintained, and possess trade secrets and confidential business information and documents including, but not limited to proprietary and confidential information, material, work product, client information, processes, produces, [sic] methods, strategies, protocols, and intellectual property which constitute a trade secret within the meaning of 18 U.S.C. § 1839(3)" (Doc. 90 ¶ 138). And this Court previously stated that "[T]he Intellectual Property Assets SinglePoint purchased in the Asset Purchase Agreements such as customer lists and purchase history have value because they provide information that a business can use to generate revenues and are not publicly available." (Doc. 77 at 8).

Thus, the Court finds that Plaintiffs have sufficiently stated a claim for relief under the DTSA to survive Defendants' Motion to Dismiss.

### 3.  Unfair Competition

Common law unfair competition claims may be pled under several tort theories. *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998) (internal citations omitted). However, the Arizona Uniform Trade Secrets Act ("AUTSA"), Ariz. Rev. Stat. § 44–407, preempts "conflicting tort, restitutionary and other laws of this state that provide civil remedies for misappropriation of trade secrets." *HTS, Inc. v. Boley*, 954 F.Supp.2d 927, 945 (D. Ariz. 2013) (quoting Ariz. Rev. Stat. § 44–407(A)). "The AUTSA further 'preempts all common law tort claims based on misappropriation of information,

whether or not it meets the statutory definition of a trade secret.'" *Id.* (quoting *Universal Engraving, Inc. v. Metal Magic, Inc.*, No. CV-08-1944-PHX-GMS, 2012 WL 4358942, at *2 (D. Ariz. Sept. 21, 2012) (citations omitted).

Here, Plaintiffs' theory of unfair competition stems from allegations that all of the Defendants generally "engaged in activities which include the use of confidential information to solicit customers, theft of trade secrets, and breach of restrictive covenants." (Doc. 90 ¶ 168). However, based on the factual allegations in the SAC specific to SIRC, as outlined above, it is unclear how Plaintiffs' unfair competition claim applies to SIRC outside of a trade secret misappropriation context, where Plaintiffs have not alleged that SIRC was subject to any confidentiality agreements or other restrictive covenants. Thus, the Court finds that Plaintiff's unfair competition claim against SIRC is preempted by the AUTSA. *HTS*, 954 F.Supp.2d at 946 ("Plaintiff's claim of unfair competition is not qualitatively different from his misappropriation of trade secrets claim and thus, it is preempted.").

Accordingly, the Court grants Defendant SIRC's motion to dismiss as to the unfair competition claim.

### 4.  Arizona Uniform Trade Secrets Act Violation

Arizona has adopted the Uniform Trade Secrets Act, which "codifies the basic principles of common-law trade-secret protection." *Enter. Leasing Co. of Phoenix v. Ehmke*, 3 P.3d 1064, 1068 (Ariz. Ct. App. 1999). A trade secret is:

> information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

A.R.S. § 44–401(4). In an action for misappropriation, the plaintiff "must identify the trade

secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993); *see also Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 (Ariz. Ct. App. 2013). Plaintiffs "should describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons ... skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–65 (9th Cir. 1998).

The "[a]cquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means" constitutes misappropriation. A.R.S. § 44–401(2)(a). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy or espionage through electronic or other means." *Id.* § 44–401(1). Misappropriation also occurs, in relevant part, when a person discloses or uses "a trade secret of another without express or implied consent" and "[a]t the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret ... was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use." *Id.* § 44–401(2)(b).

For the reasons stated above with respect to Plaintiffs' DTSA claim, Plaintiffs have also sufficiently stated their claim under the AUTSA.

### 5.  Intentional Interference with Contract/Business Expectancy

Under Arizona law, the elements of an intentional interference with a business relationship claim require "the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." *Miller v. Hehlen*, 104 P.3d 193, 202 (Ariz. Ct. App. 2005). Furthermore, "[t]he interference must be improper before liability will attach. And, a competitor does not act improperly if his purpose at least in part is to advance his own economic interests." *Id.* (internal quotations and citations omitted).

Defendants argue that the SAC fails to state a claim for intentional interference with a contract or business expectancy because it leaves them to speculate: "what contracts did Moving Defendants (apart from Diaz or Johnson) allegedly interfere with?" (Doc. 119 at 10). The Court agrees.

In its SAC, Plaintiffs allege in general terms that "Defendants' intentional interference caused [SDS's] relationships [with clients and prospective clients] to terminate." (Doc. 90 ¶¶ 183, 184, 188). While it is not completely clear what contracts Plaintiffs are alleging that Defendant SIRC intentionally interfered with, Plaintiffs do allege that "SDS had a valid business expectancies" in "a potential contract with Richland School District One worth $7 million" and "in the benefits flowing from the Asset Purchase Agreement and Employment Agreement." (*Id.* ¶¶ 184, 185). However, Plaintiff fails to link SDS's business expectancies and contracts with Defendants Diaz and Johnson to any intentional interference from SIRC. Assuming that Plaintiffs' allegations are true that SIRC had knowledge of this lawsuit prior to entering into an acquisition agreement with Defendants Diaz and USA Solar (*id.* ¶ 103), Plaintiffs still fail to explain how those facts constitute intentional interference with the Richland School District project or the Asset Purchase Agreement and Employment Agreement. Indeed, the allegations regarding the Richland School District project are directed towards Defendants Diaz and Odle (*id.* ¶¶ 88–92), and the SAC specifically states that it was Defendant Diaz, not Defendants SIRC or Massey, who first proposed the idea of the USA Solar acquisition (*id.* ¶¶ 62, 63). Finally, even assuming that Plaintiffs' allegations could rise to the level of intentional interference required for this claim, Plaintiffs have also failed to allege that Defendant SIRC's actions were improper. Instead, the only allegations of impropriety in the SAC regarding the intentional interference claim state that "Defendants acted intentionally, purposefully, and with an evil mind when they solicited SDS's clients and prospective clients." (Doc. 90 ¶ 187). However, the SAC does not allege that SIRC or Massey solicited SDS client or prospective clients and only vaguely implies that SIRC and Massey interfered with its Asset Purchase Agreement and Employment Agreements with Diaz and Johnson by

entering into the SIRC Agreement to purchase USA Solar. (*See id.* ¶ 185). The SAC fails to allege that SIRC and Massey acted with an improper purpose, which is a requisite element of an intentional interference claim. The Court cannot infer that SIRC acted with improper purpose where it is equally possible that SIRC entered the SIRC Agreement "to advance [its] own economic interests," not to harm SDS or SinglePoint. *See Miller*, 104 P.3d at 202; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'") (citing *Twombly*, 550 U.S. at 557).

Thus, the Court grants Defendant SIRC's motion to dismiss this claim under Federal Rule of Civil Procedure 12(b)(6).

### 6. Conversion

To succeed on a conversion claim under Arizona law, Plaintiffs must plead "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Focal Point, Inc. v. U-Haul Co. of Ariz.*, 746 P.2d 488, 489 (Ariz. Ct. App. 1986) (quoting Restatement (Second) of Torts § 222(A)(1) (1965)). Furthermore, "[a]n action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Id.* As discussed in this Court's previous order, the Arizona Court of Appeals has held that a claim for conversion is not appropriate where the plaintiff "did not allege that [the defendant] took a customer list in the form of a single, unified document that had value as tangible property." *Id.*; *see also Swisher Hygiene Franchise Corp. v. Clawson*, No. CV-15-1331-PHX-DJH, 2017 WL 11247886, at *9 (D. Ariz. Sept. 11, 2017) (finding that "the customer and pricing information at issue is not the proper subject of a conversion action. The information is intangible but has not been merged in a document that has its own value in the same sense as a stock certificate or insurance policy").

Here, Plaintiffs' SAC alleges that Plaintiffs "have a right to possess their confidential and proprietary business information and trade secrets," "the revenues that

flow from their contracts with customers, clients, dealers, and installers," and "the funds in its First International Bank and Trust Account." (Doc. 90 ¶¶ 191–93). Plaintiffs further allege that "Defendants Mr. Massey, SIRC, and USA Solar Network intentionally and substantially interfered with Plaintiff's property rights by misappropriating SDS's confidential and proprietary information, trade secrets, and other assets for use in their business operations." (*Id.* ¶ 195). These allegations are not enough under Rule 8's pleading standards where Plaintiff has not alleged that SIRC has intentionally exercised control over Plaintiffs' revenues flowing from their contracts or funds in their accounts. Moreover, even though Plaintiff asserts that Defendant SIRC converted Plaintiff's confidential and proprietary business information, as discussed in this Court's previous Order, "although this information may be valuable, it is neither tangible property, nor is it merged in a document that has its own value." (Doc. 77 at 13).

In their response Plaintiffs attempt to bolster the bare allegations in the complaint by explaining that:

> Massey caused SIRC to enter into an agreement to purchase from USA Solar an ownership interest in a company Massey knew or should have known belonged to Plaintiff. At a minimum, Massey knew that Plaintiffs disputed Mr. Diaz's right to operate a reconstituted company using Plaintiffs' assets and information and that USA Solar was that company.

(Doc. 109 at 6). However, Plaintiffs have failed to tie its alleged ownership interest in USA Solar to a document that has independent value, and it cannot be said that Plaintiffs have a tangible ownership interest by way of the intangible assets that Plaintiffs allege Defendant Diaz removed from SDS and rehomed at USA Solar.

Thus, the Court finds that Plaintiffs have failed to state a plausible claim for conversion against SIRC.

### 7. Unjust Enrichment

A claim of unjust enrichment under Arizona law has five elements: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the absence of justification for the enrichment and impoverishment,

and (5) the absence of a remedy provided by law." *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011) (citing *City of Sierra Vista v. Cochise Enters., Inc.*, 697 P.2d 1125, 1131–32 (Ariz. Ct. App. 1984)). "In order to be granted restitution, [the plaintiff] must demonstrate that [the defendant] received a benefit, that by receipt of that benefit [the defendant] was unjustly enriched at [the plaintiff's] expense, and that the circumstances were such that in good conscience [defendant] should make restitution." *Pyeatte v. Pyeatte*, 661 P.2d 196, 202 (Ariz. Ct. App. 1982). "'However, the mere receipt of a benefit is insufficient' to entitle a plaintiff to compensation. Instead, for an award based on unjust enrichment, a plaintiff must show 'that it was not intended or expected that the services be rendered or the benefit conferred gratuitously, and that the benefit was not conferred officiously.'" *Freeman*, 245 P.3d at 936–37 (citing *Murdock–Bryant Constr., Inc. v. Pearson*, 703 P.2d 1197, 1202 (Ariz. 1985).

Here, Plaintiffs have alleged no facts showing that Plaintiffs directly conferred any benefit to Defendant SIRC. While Plaintiffs claim generally that "Defendants have benefitted and been enriched by their receipt and use of Plaintiffs' work product, confidential and proprietary information, and misappropriation of Trade Secrets and trade secret information as alleged in this [SAC]" (Doc. 90 ¶ 200), Plaintiffs fail to show that they have rendered services or otherwise handed over their work product and confidential information to Defendant SIRC that specifically benefitted Defendant SIRC at Plaintiffs' expense. Moreover, Plaintiffs generally claim that "Defendants have also benefitted and been enriched by their relationship and association with SinglePoint and their exploitation of SinglePoint's and SDS's industry good will" (*Id.* ¶ 201), but the SAC does not allege any facts to support this statement with respect to Defendant SIRC.

Plaintiffs allege no facts in the SAC that, even if taken as true, plausibly state a claim for unjust enrichment against Defendant SIRC. Instead, the majority of allegations in the SAC regarding unjust enrichment relate to Defendants Diaz's and Johnson's conduct and dealings with SinglePoint and SDS. Plaintiffs fail to allege any relationship between Defendant SIRC and the other Defendants where a benefit on those Defendants could be

imputed onto SIRC.

Even assuming that Plaintiffs properly alleged that SIRC's acquisition of USA Solar included Plaintiff's confidential and trade secret information and that constitutes a benefit for purposes of an unjust enrichment claim, Plaintiffs' allegations are entirely based on the misappropriation of confidential information and trade secrets. As discussed above, "[t]he AUTSA 'preempts all common law tort claims based on misappropriation of information, whether or not it meets the statutory definition of a trade secret.'" *HTS*, 954 F.Supp.2d at 945 (quotations omitted); *see also Arizona Grain Inc. v. Barkley Ag Enterprises LLC*, No. CV-18-03371-PHX-GMS, 2020 WL 4365726, at *2–3 (D. Ariz. Jul. 30, 2020) ("[T]he allegations supporting [plaintiff's] unjust enrichment claim encompass only allegations of trade secret misappropriations. [Plaintiff] has failed to identify any allegation in its Third Amended Counterclaims that falls outside the AUTSA definition of a trade secret. This claim is therefore preempted as to all Defendants.")

Therefore, the Court will grant the motion to dismiss Plaintiffs' unjust enrichment claim.

### iii.  Conclusion

For the reasons stated above, the Court grants in part and denies in part Moving Defendants' Motion to Dismiss for failure to state a claim as to SIRC, and the following claims are dismissed: (a) unfair competition (count seven); (b) intentional interference with contract/business expectancy (count nine); (c) conversion (count ten); and (d) unjust enrichment (count eleven). The remaining claims against SIRC survive the motion to dismiss and remain before the Court.

## IV.    Plaintiffs' Motion to Compel Arbitration

### a.  Factual Background

On February 22, 2019, Plaintiff/Counterdefendant SDS and Defendant/Counterclaimant Pablo Diaz agreed to enter into an Employment Agreement where Diaz would serve as CEO for SDS. (Doc. 110 ¶¶ 68, 70). The Employment Agreement was finalized and executed on May 14, 2019. (*Id.* ¶¶ 73, 78). The Employment

Agreement contains a mandatory arbitration clause that applies to every term in the contract, except for Sections 5 (Confidential Information and Inventions) and 6 (Non-competition, Non-Solicitation, and Non-Disparagement). (Doc. 116-1 at 3, 5, 10). Diaz alleges that the Employment Agreement "included a bonus compensation program based on revenues generated" and a base salary term that Counterdefendants failed to honor. (Doc. 110 ¶¶ 79, 94). Diaz further alleges that under the Agreement, he is still owed approximately $506,000 in bonus compensation based on his generation of over $11 million dollars in sales revenue for SDS during his employment. (*Id.* ¶¶ 89, 93–94). Diaz further alleges that in addition to the unpaid bonuses, Counterdefendants also failed to pay his base salary for the duration of his employment. (*Id.*)

Diaz filed the relevant action on June 8, 2021. (Doc. 37). As relevant here, he alleges that Counterdefendants breached the Employment Agreement and asserts claims for breach of contract (count three), breach of the implied covenant of good faith and fair dealing (count five), unpaid wages (count six), fraud by inducement and concealment (count nine), alternatively, negligent misrepresentation (count ten), conversion (count eleven), civil conspiracy (count twelve), and in the absence of a written contract, unjust enrichment (count thirteen). (*See* Doc. 110).

Based on the mandatory arbitration provisions of the Employment Agreement, Counterdefendants filed a Motion to Compel Arbitration. (Doc 116). Counterdefendants ask the Court to order the parties to arbitrate Diaz's claims arising under the Employment Agreement and to dismiss the same from this lawsuit. (Doc. 116 at 1–2).

### b.  Legal Standard

The Federal Arbitration Act ("FAA") governs arbitration agreements in contracts involving interstate commerce. 9 U.S.C. § 1. Arbitration agreements, "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA demonstrates the federal policy favoring arbitration agreements. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). If a court finds that an arbitration cause is valid and enforceable, the

court must stay or dismiss the action to allow the arbitration to proceed. *Kam-Ko Bio-Pharm Trading Co. Ltd-Australasia v. Mayne Pharma (USA)*, 560 F.3d 935, 940 (9th Cir. 2009). Any "doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 480 U.S. at 24–25.

Whether a particular dispute is arbitrable is an issue for the Court. *Howsam v. Dean Witter Reynolds*, 537 U.S. 79 (2002). In making the arbitrability decision, the Court applies a standard similar to the summary judgment standard. *The O.N. Equity Sales Co. v. Thiers*, 590 F.Supp.2d 1208, 1212 (D. Ariz. 2008). If there is no doubt as to the existence of an agreement to arbitrate, then the Court can decide as a matter of law that the parties entered into such an agreement. *Three Valleys Mun. Water Dist. V. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991). Here, the parties do not dispute the existence of a valid and enforceable agreement to arbitrate Diaz's claims arising out of the employment agreement. (*See* Doc. 110 ¶ 182).  Instead, Diaz contends that Counterdefendants have waived their right to arbitration by also bringing claims under the Employment Agreement that are subject to arbitration. (Doc. 125 at 2).

### c.  Analysis

The Employment Agreement contains an arbitration clause that includes the following:

> Any dispute arising out of, or relating to, this Agreement or the breach thereof (other than Sections 5 and 6 thereof), or regarding the interpretation thereof, shall be finally settled by arbitration conducted in Arizona in accordance with the rules of the American Arbitration Association then in effect before a single arbitrator appointed in accordance with such rules. Judgment upon any award rendered therein may be entered and enforcement obtained thereon in any court having jurisdiction. The arbitrator shall have authority to grant any form of appropriate relief, whether legal or equitable in nature, including specific performance. For the purpose of any judicial proceeding to enforce such award or incidental to such arbitration or to compel arbitration and for purposes of

> Sections 5 and 6 hereof, the parties hereby submit to the nonexclusive jurisdiction of the Supreme Court of the State of Arizona, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon it if sent by registered mail addressed to it at the address referred to in paragraph (g) below…. Judgment on the arbitration award may be entered by any court of competent jurisdiction.

(Doc. 116-1 at 10).

Like other contractual rights, arbitration agreements are subject to the equitable doctrine of waiver. However, "waiver of a contractual right to arbitration is not favored and any party arguing waiver bears a heavy burden of proof." *Newrith by and through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 940 (9th Cir. 2019) (quotations omitted). "[W]here the waiver of the right to compel arbitration implicates questions of arbitrability that 'affect the allocation of power' between a court and arbitrator," the federal law standard of waiver governs. *Id.* (quoting *Sovak v. Chugai Pharm. Co.*, 280 F.3d 1266, 1270 (9th Cir. 2002)). Moreover, courts have the power to decide questions of waiver in all cases that do not have "clear and unmistakable language" in the arbitration clause evidencing the parties' intent for an arbitrator to decide issues of waiver. *Id.* (quoting *Martin v. Yasuda*, 829 F.3d 1118, 1124 (9th Cir. 2016). Here, the parties agree that it is appropriate for the Court to decide on the issue of waiver. (Doc. 125 at 5; Doc. 129 at 4).

Waiver under federal law is "the intentional relinquishment or abandonment of a known right." *Id.* (quotations omitted). "A party seeking to prove waiver of a right to arbitration must demonstrate: (1) knowledge of an existing right to compel arbitration; (2) acts inconsistent with that existing right; and (3) prejudice to the party opposing arbitration resulting from such inconsistent acts." *Fisher v. A.G. Becker Paribas Inc.,* 791 F.2d 691, 694 (9th Cir. 1986). Neither party disputes that Counterdefendants knew they had the right to compel arbitration, as evidenced from their Motion to Compel Arbitration in lieu of an answer to Diaz's claims under the Employment Agreement. Thus, the Court will only consider the second and third elements of waiver.

Here, the Court does not find that Counterdefendants waived their right to compel

1    Diaz to arbitrate his claims arising out of the Employment Agreement.

2            First, Counterdefendants have not acted in any manner inconsistent with their right

3    to compel Diaz's claims under the Employment Agreement. While Diaz argues that

4    Counterdefendants waited almost five months to file this Motion while "furiously

5    litigat[ing] this case" through amending their complaint twice, moving for multiple TROs

6    and preliminary injunction, engaging in discovery, and filing various documents in the case

7    (Doc. 125 at 6), none of those activities are sufficiently related to the arbitrable claims of

8    the Employment Agreement to be considered acts inconsistent with Plaintiffs' right to

9    arbitrate.

10           Diaz notes that Counterdefendants did file the SAC alleging claims against Diaz for

11   breach of the Employment Agreement (Doc. 125 at 5, n. 1), but fails to mention that those

12   claims all arise under Sections 5 and 6 of the Employment Agreement that are expressly

13   excluded from the scope of the mandatory arbitration clause (*see* Doc. 116-1 at 10).

14   Moreover, on June 25, 2021, in a report filed regarding the relationship between this case

15   and CV 21-989-PHX-SMB, Counterdefendants explicitly asserted their right to compel

16   arbitration on Diaz's employment-related claims: "Despite a clear mandatory arbitration

17   provision in this Employment Agreement[,] Mr. Diaz also brings unpaid wage and

18   wrongful termination claims against SDS, though SDS is not named as a defendant in the

19   Derivative Complaint." (Doc. 15 ¶ 4). Subsequently, on July 7, 2021, Counterdefendants'

20   counsel sent an email to Counterclaimants' counsel noting the arbitration provision and

21   asserting that Diaz's claims for breach of the implied covenant of good faith and fair

22   dealing and wrongful termination are also subject to arbitration. (Doc. 129-1). Such

23   assertions are consistent with Counterdefendants' right to seek arbitration. Additionally,

24   Counterdefendants' Motion to Compel Arbitration was timely filed and is their first

25   responsive pleading to Diaz's claims under the Employment Agreement. Thus, the Court

26   does not find Counterdefendants' actions in litigating its non-arbitrable claims inconsistent

27   with its right to arbitrate Diaz's employment-related claims. *See Fisher*, 791 F.2d at 697

28   (finding no waiver even after extensive discovery taken into both arbitrable and non-

arbitrable claims if the discovery is available for non-arbitrable claims to be tried in federal district court).

Finally, the Court considers whether Counterclaimants will be prejudiced. Diaz argues that he is prejudiced by Counterdefendants' failure to file their Motion to Compel Arbitration sooner because he incurred costs of litigating his claims that he would not otherwise have incurred, and he will be forced to relitigate the merits of issues that have already been addressed by this Court. (Doc. 125 at 8).

The Court is not persuaded that Diaz incurred additional costs that he would not have otherwise incurred. Diaz and his fellow Counterclaimants are asserting multiple claims against multiple parties regarding various business transactions and are all named Defendants in the SAC asserting additional claims regarding the same or related business transactions. Even if Counterdefendants had moved to compel arbitration earlier than their deadline to answer the Verified First Amended Counterclaim, Diaz would still be litigating and defending against multiple claims in this Court. Regardless, as a party to the Employment Agreement, Diaz should have been aware of the mandatory arbitration clause when bringing his claims. "A party is not prejudiced by self-inflicted wounds 'incurred as a direct result of suing in federal court contrary to the provisions of an arbitration agreement.'" *Newirth*, 931 F.3d at 943 (quoting *Martin*, 829 F.3d at 1126).

Additionally, Diaz argues that he would be forced to relitigate the merits of "a key issue on which the district court has ruled in his favor," namely, that the noncompetition and non-solicitation clauses are unenforceable. (Doc. 125 at 10). However, as discussed above, the noncompetition and non-solicitation clauses are found within Section 6 of the Agreement, which are expressly excluded from mandatory arbitration. (*See* Doc. 116-1 at 10 ("Any dispute arising out of, or relating to, this Agreement or the breach thereof (***other than Sections 5 and 6 thereof***), or regarding the interpretation thereof, shall be finally settled by arbitration….") (emphasis added). Moreover, Diaz does not explain why the arbitrator would have to relitigate the enforceability of the noncompetition and non-solicitation clauses in order to arbitrate his claims for unpaid wages and breach of contract,

as Diaz appears to have no rights and only responsibilities under the noncompetition and non-solicitation clauses in the agreement. The Court is not persuaded that Diaz will be prejudiced if the Court grants Counterdefendants' Motion. *Newirth*, 931 F.3d at 943 ("a plaintiff is not prejudiced by 'the possibility that there may be some duplication from … parallel proceedings' in litigation and arbitration." (quoting *Fisher*, 791 F.2d at 698)). Thus, the Court does not find waiver of Counterdefendants' clear right to compel arbitration of Diaz's claims brought under the Employment Agreement.

While it is not entirely clear to the Court that Counts 5 and 9-13 are brought under the Employment Agreement because they are plead in general and vague terms referring to all contracts and Counterclaimants, it is plausible that Diaz could bring such claims based on Counterdefendants' alleged breach of the Employment Agreement. Thus, to the extent that any portion of Counts 5 and 9-13 are based on Diaz's causes of action for Counterdefendants' alleged breach the Employment Agreement, the Court finds that those claims are also subject to arbitration. *See Fisher*, 791 F.2d at 697.

### d. Conclusion

Accordingly, the Court grants Counterdefendants' Motion to Compel Arbitration of all of Counterclaimant Diaz's counterclaims under his Employment Agreement with SDS and orders the dismissal of the following claims from the Verified First Amended Countercomplaint (Doc. 110): count three in its entirety, count six as to Diaz, and counts five, nine, ten, eleven, and thirteen as to Diaz, to the extent those claims are based on Diaz's rights and responsibilities under the Employment Agreement subject to arbitration.

## V.   Plaintiffs' Partial Motion to Dismiss Verified First Amended Counterclaim
### a. Factual Background

The following facts are either undisputed or recounted in the light most favorable to the non-moving party. *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

Defendants/Counterclaimants generally allege that Plaintiff/Counterdefendant

SinglePoint and its officers and directors[1] engaged in a scheme to:

> Acquire controlling interests in privately owned businesses by promising these business owners funding for expansion and acquisitions; Then issue press releases and public filings with the SEC to tout the acquisitions and boost the price of [SinglePoint] stock; Coordinate the sale of shares at the heightened price amongst themselves; and Renege on their promises to fund the private business, and instead divert millions of dollars of profit from these businesses to cover the perpetual financial losses of [SinglePoint].

(Doc. 110 ¶ 42). Specifically, Counterclaimants allege that SinglePoint engaged in this alleged scheme on four separate occasions against multiple parties. (*See id.* ¶¶ 43–107).

### i. The JAGUSA Contracts

Counterclaimants allege that on October 11, 2017, SinglePoint and Counterclaimant JAGUSA holdings, LLC ("JAGUSA") entered into a Stock Purchase Agreement (the "Jiffy Agreement") whereby SinglePoint acquired a controlling stake in Jiffy Auto Glass, LLC ("Jiffy") in exchange for a combination of cash, debt, SinglePoint stock, and SinglePoint's promises "to fund Jiffy operations in exchange for [SinglePoint's] proportionate share of [] Jiffy's distributions." (*Id.* ¶¶ 43–45). Counterclaimants further allege that SinglePoint "stopped paying operational expenses or otherwise funding Jiffy" around January 2019, leaving Jiffy insolvent and unable to operate or pay outstanding liabilities. (*Id.* ¶¶ 54–60). Counterclaimants further allege that in July 2020, Greg and Ralston withdrew all of the money in the Jiffy bank accounts and filed forged "Articles of Dissolution of Jiffy" without JAGUSA's consent. (*Id.* ¶¶ 63, 64).

Counterclaimants further allege that on January 16, 2018, SinglePoint and JAGUSA entered into a Stock Purchase Agreement (the "Shield Saver Agreement") whereby

---

[1] Counterclaimants allege that SinglePoint is vicariously liable for the actions of its officers and directors, Counterdefendants Greg Lambrecht ("Greg"), Corey Lambrecht ("Corey"), and Wil Ralston ("Ralston") (together, the "Individual Counterdefendants") (*id.* ¶ 9), and that SinglePoint and SDS operate as alter egos of the Individual Counterdefendants by virtue of their misconduct and abuse of corporate laws to unjustly enrich themselves while attempting to substitute in SinglePoint for purposes of liability (*id.* ¶¶ 150–59).

SinglePoint acquired a controlling stake in ShieldSaver LLC ("ShieldSaver") in exchange for a combination of cash tied to company milestones, SinglePoint stock, and SinglePoint's promises to fund the development of ShieldSaver software programs. (*Id.* ¶¶ 43–45).

Counterclaimants further allege that SinglePoint, around September 2018, "stopped funding ShieldSaver, despite numerous verbal commitments from [SinglePoint] officers to continue funding as promised," leaving ShieldSaver "without cash to cover payroll." (*Id.* ¶¶ 52, 53). Counterclaimants further allege that in July 2020, Greg and Ralston withdrew all of the money in the ShieldSaver bank accounts. (*Id.* ¶ 63).

### ii.  The SDS Contracts

Near the end of 2018, SinglePoint directors Greg and Ralston and Counterclaimants Diaz and Johnson entered into negotiations for the sale of Diaz's and Johnson's companies, Direct Solar and AI Live. (*Id.* ¶ 65). Counterclaimants allege that Diaz, Greg, and Ralston "collectively prepared a capital flow statement (the "Capital Flow Statement") which memorialized the discussions" regarding SinglePoint's promises to fund Direct Solar and its operational expansion. (*Id.* ¶¶ 66, 67). On February 22, 2019, "Greg, on behalf of [SinglePoint], and Diaz and Johnson," on behalf of both Direct Solar and AI Live, entered into the Asset Purchase Agreement. (*Id.* ¶ 68). As part of that agreement, the parties agreed that SinglePoint would purchase a majority stake in both Direct Solar and AI Live in exchange for a combination of cash, SinglePoint stock, and Diaz's appointment as CEO of a newly formed entity, SDS. (*Id.* ¶¶ 69, 70). The parties agreed to execute an SDS Operating Agreement and the Diaz Employment Agreement at a later time. (*Id.* ¶ 70).

Counterclaimants allege that the Capital Flow Statement, the Asset Purchase Agreement, the Diaz Employment Agreement, and the SDS Operating Agreement were executed on May 15, 2021, and all constitute "Transaction Documents," as that term is defined in the Asset Purchase Agreement. (*Id.* ¶¶ 71–80).

Counterclaimants further allege that SinglePoint and its directors Greg and Ralston reneged on their promises and refused to fund SDS. (*Id.* ¶¶ 81–83). Instead, Greg and Ralston further promised that SinglePoint would add an additional $400,000 dollars in

capital to SDS under an Expansion Contract. Counterclaimants allege that Counterdefendants failed to meet these obligations as well. (*Id.* ¶¶ 84, 85).

Counterclaimants allege that despite Diaz generating over $11 million dollars in revenue for SDS in one year, SinglePoint, Greg, and Ralston refused to fund SDS or distribute SDS profits to Diaz and Johnson as promised, and instead diverted the SDS revenues into SinglePoint to pay for its operating expenses and profit distribution to its directors, Greg and Ralston. (*Id.* ¶¶ 84, 85). Counterclaimants further allege that SinglePoint, Greg, and Ralston caused SDS to become insolvent and contradicted "numerous representations in public securities filings." (*Id.* ¶¶ 95, 96).

### iii. The Chaffino Contracts

Counterclaimants allege that SinglePoint, Greg, and Ralston , acting as managers of SDS, entered into an agreement ("SunUp Solar Agreement") whereby SDS purchased a controlling interest in Elijah Chaffino's company, SunUp Solar LLC ("SunUp Solar") in exchange for SinglePoint's promises to provide operating capital to SunUp Solar and milestone-based SinglePoint stock bonuses to Chaffino. (*Id.* ¶¶ 98, 101, 103–05). Counterclaimants further allege that despite Chaffino's efforts in accomplishing the milestones per the SunUp Solar Agreement, Chaffino has not been paid his promised bonuses. (*Id.* ¶¶ 106, 107).

On October 12, 2021, Counterclaimants filed their FAC, asserting derivative action claims on behalf of SDS, multiple breaches of various contracts, breach of the implied covenant of good faith and fair dealing, nonpayment of wages, accounting and appointment of a receiver over SDS, securities fraud, fraud by inducement and concealment, conversion, civil conspiracy, and alternatively, negligent misrepresentation and unjust enrichment. (*See* Doc. 110). On October 19, 2021, Plaintiffs filed a Motion to Dismiss the First Amended Counterclaim for failure to state a claim. (Doc. 117).

### b. Applicable Law

The Court may dismiss a complaint for failure to state a claim under 12(b)(6) for two reasons: (1) lack of a cognizable legal theory and (2) insufficient facts alleged under a

cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

To survive a 12(b)(6) motion for failure to state a claim, a complaint must meet the requirements of Federal Rule of Civil Procedure 8(a)(2). Rule 8(a) requires a "short and plain statement of the claim showing that the pleader is entitled to relief," so that the defendant has "fair notice of what the … claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations omitted).

Although a complaint attacked for failure to state a claim does not need detailed factual allegations, the pleader's obligation to provide the grounds for relief requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). The factual allegations of the complaint must be sufficient to raise a right to relief above a speculative level. *Id.* Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests." *Id.* (citations omitted).

Rule 8's pleading standard demands more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (citing *Twombly*, 550 U.S. at 555). A complaint that offers nothing more than naked assertions will not suffice. To survive a motion to dismiss, a complaint must contain sufficient factual matter, which, if accepted as true, states a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678. Facial plausibility exists if the drafter pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Plausibility does not equal "probability," but plausibility requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (citing *Twombly*, 550 U.S. at 557).

In deciding a motion to dismiss under Rule 12(b)(6), the Court must construe the facts alleged in the complaint in the light most favorable to the drafter of the complaint and the Court must accept all well-pleaded factual allegations as true. *See Schwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). Nonetheless, the Court does not have to accept as true a legal conclusion couched as a factual allegation. *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

### c.  Analysis

The Court addresses each argument for failure to state a claim below, in the order Counterdefendants discussed them in their Motion to Dismiss. (*See* Doc. 117).

### i.  Derivative Action Claims on Behalf of SDS

Counterclaimants bring derivative action claims on behalf of SDS and its shareholders for (1) breach of the SDS Operating Agreement, Capital Flow Statement, and Expansion Contract (count two); and (2) request for an accounting and appointment of a receiver over SDS (count seven). (*See* Doc. 110). Additionally, the FAC alleges the following claims by all Counterclaimants against all Counterdefendants, without specifying whether or not these claims include a derivative action claim on behalf of SDS: breach of the implied covenant of good faith and fair dealing (count five), conversion (count eleven), civil conspiracy (count twelve), and alternatively, unjust enrichment (count thirteen). (*Id.*)

Counterdefendants argue that Counterclaimants derivative claims fail to comply with Federal Rule of Civil Procedure 23.1(b), namely, Counterclaimants have failed to properly allege that Diaz has statutory standing to bring the derivative action on behalf of SDS and its shareholders. (Doc. 117 at 5). As a result, Counterdefendants seek dismissal of counts two and seven as to SDS, and counts five, eleven, twelve, and thirteen as to SDS "to the extent any of these claims are even properly cognizable as a derivative claim." (*Id.* at 6).

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" *Kamen*

*v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (emphasis in original) (quoting *Ross v. Bernhard*, 396 U.S. 531 (1970)). "Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Id.* (quoting *Cohen v. Beneficial Loan Corp.*, 337 U.S. 541, 548 (1949)).

However, there are limits to a shareholder's use of this derivative right. Use of the derivative right is unavailable unless the shareholder: "(a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). "The purpose of the demand requirement is to affor[d] the directors an opportunity to exercise their reasonable business judgment and waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right." *Kamen*, 500 U.S. at 96 (quotation marks omitted).

Federal Rule of Civil Procedure 23.1 codifies this demand requirement in requiring that a derivative action "state with particularity: … any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and … the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b). Although Federal Rule 23.1 provides the pleading standard required in a derivative action complaint, it does not provide the substantive rule for assessing what reasons are sufficient to excuse demand on the corporation. *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014). The state of incorporation provides this substantive rule. *Kamen*, 500 U.S. at 109. Because SDS is a Nevada limited liability company, the Court looks to Nevada's demand futility rules. (Doc. 110 ¶ 7).

"Nevada courts look to Delaware law for guidance on demand futility." *Arduini v. Hart*, 774 F.3d 622, 628 (9th Cir. 2014) (citing *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1179–84 (Nev. 2006), *abrogated on other grounds*). Under Delaware law, a plaintiff complaining of board inaction and attempting to plead demand futility must allege

"particularized facts that 'create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *In re Citigroup*, 964 A.2d 106, 120 (Del. Ch. 2009) (quoting *Rales v. Blasband*, 634 A.2d 927, 933–34 (Del. 1993)); *see also* Del. Ch. Ct. R. 23.1. In other words, demand is excused if a plaintiff can show that a majority of directors on the board are interested in the alleged wrongdoing, not independent, or would face a "substantial likelihood" of liability if a lawsuit was filed. *Rales*, 634 A.2d at 936. To establish that a director faces a "substantial risk of liability," a plaintiff need only "make a threshold showing, through the allegation of particularized facts, that [his] claims have some merit." *Id.* at 934.

The particularity requirements set out in both Federal Rule of Civil Procedure 23.1 and Delaware Chancery Court Rule ("Delaware Rule") 23.1 create a heightened pleading standard. When a court considers a motion to dismiss for failure to comply with the demand requirements of Federal Rule 23.1 and Delaware Rule 23.1, "[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged, but conclusory allegations are not considered as expressly pleaded facts or factual inferences." *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014) (quotation marks omitted).

Counterclaimants satisfy the heightened pleading standards required for derivative action claims to survive at the motion to dismiss stage. Counterdefendants argue the FAC fails to include any allegations that would show that Counterclaimants have attempted to comply with the demand requirements under Rule 23.1, or that such a demand attempt would have been futile. However, Counterclaimants attached a one-paragraph "Verification" to the FAC which states:

> I, Pablo Curiel Diaz, being duly sworn, deposes and says that I am a Counterclaimant in the above captioned case, Case No. 2:21-cv-01076-JAT, filed in the United States District Court for the District of Arizona. I was a shareholder and member at the time of the transactions complained of herein, or my shares or membership later devolved on me by operation of law. This action is not a collusive one to confer jurisdiction that this Court would otherwise lack. On March 16, 2021, my legal

counsel, The Law Offices of Donald W. Hudspeth, P.C., sent a demand letter outlining the factual basis for the instant Counterclaims, and demanded that the officers, board members, and Majority Managers, of SinglePoint, Inc. and SinglePoint Direct Solar, LLC, respectively, take corrective action to resolve the issues or otherwise to bring [sic]. To my knowledge, no corrective action has been taken, which necessitated the filing of the instant action.

(Doc. 110 at 39). The Court finds that Counterclaimant Diaz's Verification states sufficient facts to establish Counterclaimant Diaz's standing to bring a derivative action by verifying under oath that his legal counsel sent a demand letter to the officers, board members, and majority manages of SinglePoint and SDS "outlining the factual basis of the instant Counterclaims." (*Id.*)

Counterdefendants argue, without citation to any authority, that "it must be evident from the face of the allegations what, specifically, the derivative plaintiffs asked the corporate directors and officers to do and how the directors and officers failed to comply." (Doc. 130 at 2). While the demand letter is not mentioned in the body of the FAC itself, the Verification is included as the last page of the FAC and is thus a part of the pleading itself. The Court does not construe Rule 23.1 to be so exacting as to require the Counterclaimants to reproduce the exact contents of the demand letter within the FAC, where the Court may reasonably infer what the demand letter stated based on the counterclaims contained in the FAC. *Rosenbloom*, 765 F.3d at 1148 ("[p]laintiffs are entitled to all reasonable factual inferences that logically flow from the particularized facts alleged….") (internal quotations omitted). Moreover, Counterdefendants do not argue that they did not receive the letter or that they attempted to make corrective action in response to Counterclaimants demand. Indeed, Counterdefendants make allegations about receipt of two demand letters in their own SAC. (Doc. 90 ¶ 54 ("On March 16, 2021, while still employed as CEO and while a manager and member of SDS, Diaz sent a letter, through counsel Donald Hudspeth, to SinglePoint and its officers which purported to be a derivative demand on behalf of SDS demanding that SinglePoint take correction action to cure various alleged breaches of the Operating Agreement by SinglePoint…."); *see also id.* ¶ 93 ("On

June 7, 2021, Mr. Hudspeth sent SinglePoint another demand letter on behalf of Mr. Diaz, Ms. Johnson, and others….").

Moreover, Counterdefendants do not argue that the allegations underlying the causes of actions are insufficient to state a claim. Thus, the Court denies the Motion to Dismiss with respect to all of the derivative allegations in the FAC.

### ii.  All Claims against Plaintiff Corey Lambrecht

Counterclaimants appear to assert six claims against Corey Lambrecht by asserting those claims against "all Counterdefendants" generally.[2]

Counterdefendants argue that the FAC only mentions Corey a total of four times by name, and then pleads "Securities Fraud Allegations" generally as to all Individual Counterdefendants, which includes Corey by definition. (Doc. 117 at 6). However, Counterdefendants point out that the single securities fraud claim under count eight is not asserted against Corey. (*Id.*)

With respect to Corey, the FAC states the following: (1) SinglePoint is vicariously liable for the Individual Counterdefendants actions, including Corey (Doc. 110 ¶¶ 9, 20); (2) upon information and belief, Corey was a resident of Maricopa County, Arizona at all relevant times (*id.* ¶ 13); (3) "Corey is an officer, director, controlling stockholders, and/or is otherwise a managing-speaking agent and fiduciary of [SinglePoint]" (*id.* ¶ 14); (4) Corey, in his position as Chief Financial Officer ("CFO"), signed and certified SinglePoint's 10-K for 2020, falsely representing that SDS was being funded and was a profitable entity (*id.* ¶¶ 118, 121); and (5) that, upon information and belief, Corey was involved in SinglePoint's decisions to enter into agreements, issue press releases, and make false representations in public filings (*id.* ¶ 132).

---

[2] While there are six causes of action brought against "all Counterdefendants," Counterclaimant's Response to Counterdefendants' Partial Motion to Dismiss fails to address the claim for breach of implied covenant of good faith and fair dealing (count five), and instead asserts that their securities fraud claim (count eight) is pleaded against all Counterdefendants. (Doc. 124 at 7). However, count eight is pleaded as to "All [Direct Solar], [AI Live], [Diaz], Johnson, JAGUSA against [SinglePoint], Greg and Ralston." (Doc. 110 at 31). Because the FAC fails to bring the securities fraud claim (count eight) against Corey Lambrecht in his individual capacity, and instead appears to assert the breach of implied covenant of good faith and fair dealing claim (count five) against him, the Court will address the sufficiency of count five, but not count eight, as to Corey.

With respect to Counterdefendants, generally, the FAC contains allegations that:
> …the Individual Counterdefendants have utilized a scheme to 'purchase' Counterclaimants' entities to inflate the price of their [SinglePoint] Stock, but in lieu of funding the Counterclaimant entities by this additional raised capital, the Individual Counterdefendants have lined their own pockets with such capital, or otherwise used promised funding for their sole and exclusive benefit.

(*Id.* ¶ 109). The FAC further alleges that the Individual Counterdefendants influenced market prices by coordinating buying and selling of SinglePoint stock; engaged in open market manipulation, improper pre-arranged stock sales, and price rigging; falsified financial statements and SinglePoint's SEC filings; and artificially inflated the price and volume of SinglePoint stock for personal benefit. (*Id.* ¶¶ 109–123).

### 1. Breach of implied covenant of good faith and fair dealing (count five)

Arizona "law implies a covenant of good faith and fair dealing in every contract." *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986). The covenant's purpose is to ensure that "neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Bike Fashion Corp. v. Kramer*, 46 P.3d 431, 434 (Ariz. Ct. App. 2002). A party can breach the covenant "both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain." *Id.* at 435.

Counterclaimants allege that Corey Lambrecht was SinglePoint's CFO, an officer and director, and "otherwise [its] managing-speaking agent and fiduciary," and that, upon information and belief, Corey was involved in SinglePoint's decisions to enter into agreements, issue press releases, and make false representations in public filings. (Doc. 110 ¶¶ 14, 132). Counterclaimants further allege that SinglePoint, through its directors and agents, entered various contracts with Counterclaimants for the sale of Counterclaimants' business and related assets in exchange for SinglePoint's promises to fund the various entities contemplated in the contracts. (*Id.* ¶¶ 42–107). Counterclaimants further allege that

SinglePoint, through its directors and agents, breached those contracts by failing to provide funding, and had no intention of performing under those contracts generally. (*Id.* ¶¶ 193–94). Finally, Counterclaimants allege that they "justifiably expected to receive certain benefits" under those contracts and Counterdefendants' actions deprived them of the benefits of their respective bargains. (*Id.* ¶¶ 192, 197).

As such, the Court finds that Counterclaimants have sufficiently stated a claim for relief as to their breach of implied covenant of good faith and fair dealing as to Corey Lambrecht.

## 2. Fraud by Inducement and Concealment (count nine)

Under Rule 9(b), plaintiffs have an even higher pleading standard in all allegations of fraud, especially in multi-defendant cases such as these. The Ninth Circuit has repeatedly emphasized that "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007) (internal citation omitted); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("membership in an association does not render an association's members automatically liable" for a conspiracy); *N. Cal. Pharm. Ass'n v. United States*, 306 F.2d 379, 388–89 (9th Cir. 1962) (trade association membership "does not mean, however, that every member of the Association, by reason of his membership alone, becomes a coconspirator").

"Common law fraud in Arizona has nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth; (8) the hearer's right to rely thereon; and (9) consequent and proximate injury." *Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033–34 (Ariz. Ct. App. 2010); *see also Zoldessy v. MUFG Union Bank, N.A.*, No. CV 20-08329-PCT-SPL, 2021 WL 1733398, at *4 (D. Ariz. 2021).

Here, Counterclaimants fail to plead fraud allegations against Corey with the requisite particularity. The FAC alleges generally that Counterdefendants intentionally "made false representations concerning facts and concealed facts that were material" to the various agreements with Counterclaimants to induce Counterclaimants to enter into their respective contracts. (Doc. 110 ¶¶ 248–251). There is no doubt that Counterclaimants have successfully recited the elements of common law fraud, but the factual allegations in the FAC are lacking as to any material false representation that Corey knowingly made regarding any of the contracts between Counterclaimants and Counterdefendants. Corey is not mentioned at all, including as an Individual Counterdefendant, with respect to any of the allegations about Counterclaimant's contract negotiations or related disputes.

While the Counterclaimants plead that Corey was generally "involved in SinglePoint's decisions to enter into agreements, issue press releases, and make false representations in public filings," the FAC is devoid of any connection between such activity and Counterclaimants' reliance or detriment. As such, Counterclaimants failed to meet Rule 9's heightened pleadings standard as to Counterdefendant Corey. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("Mere conclusory allegations of fraud are insufficient.").

### 3. Negligent Misrepresentation (count ten)

"Negligent misrepresentation has five elements: "(1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage." *Zoldessy,* 2021 WL 1733398, at *5 (citations omitted).

Because Counterclaimants' negligent misrepresentation claim is based on the same allegations as their fraudulent inducement claim (*see* Doc. 110 ¶ 259), this claim fails against Corey for the same reasons as the fraud claim, even when applying the lower pleading standard found in *Twombly. See Zoldessy,* 2021 WL 1733398, at *5 ("[F]ollowing

- 48 -

more recent case law, the Court finds [negligent misrepresentation] akin to the fraud claims and analyzed it under the same framework.") (citations omitted); *Twombly*, 550 U.S. at 555 (holding that the pleading standard requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.").

### 4.  Conversion (count eleven)

As discussed in Doc. 77 at 12, to succeed on a conversion claim under Arizona law, Plaintiffs must show "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Focal Point, Inc. v. U-Haul Co. of Ariz.*, 746 P.2d 488, 489 (Ariz. Ct. App. 1986) (quoting Restatement (Second) of Torts § 222(A)(1) (1965)). Furthermore, "[a]n action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Id.*

Counterclaimants have sufficiently pled a claim for conversion as to Corey. The FAC alleges that all Counterdefendants, including Corey, intentionally exercised control over funds that belonged to, or were otherwise owed to, Counterclaimants under their various contracts described in the FAC. (Doc. 110 ¶ 262). The FAC also alleges that "in lieu of funding the Counterclaimant entities by this additional raised capital, the Individual Counterdefendants have lined their own pockets with such capital, or otherwise used promised funding for their sole and exclusive benefit." (*Id.* ¶ 109).

The Court finds that such allegations are sufficient to meet the pleading standards require at this stage.

### 5.  Civil Conspiracy (count twelve)

In Arizona, in order to adequately plead a civil conspiracy, the claimant must allege that "'two or more people [agreed] to accomplish an unlawful purpose or to accomplish a lawful object by unlawful means.'" *Wells Fargo Bank v. Ariz. Laborers*, 38 P.3d 12, 36–37 (Ariz. 2002) (quoting *Baker v. Stewart Title & Trust of Phoenix Inc.*, 5 P.3d 249, 256 (Ariz. Ct. App. 2000)). In addition, "a mere agreement to do wrong imposes no liability;

an agreement plus a wrongful act may result in liability." *Id.* Further, civil conspiracy requires that two or more individuals agree and thereupon accomplish "an underlying tort." *Id.*

Here, as discussed above, the FAC alleges that "the Individual Counterdefendants [Corey, Greg, and Ralston] have utilized a scheme to 'purchase' Counterclaimants' entities to inflate the price of their [SinglePoint] Stock, but in lieu of funding the Counterclaimant entities by this additional raised capital, the Individual Counterdefendants have lined their own pockets with such capital, or otherwise used promised funding for their sole and exclusive benefit." (Doc. 110 ¶ 109). In addition, Counterclaimants allege that as a result of Counterdefendants' market manipulation, Counterclaimants suffered damages in the form of depressed SinglePoint stock prices and loss of funds promised to Counterclaimants. (*Id.* ¶¶ 109–123, 135). These allegations are sufficient to state a claim for relief under Rule 8 because the FAC provides "fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Thus, the Court denies the Motion to Dismiss as to the civil conspiracy claim against Corey.

### 6.  Alternatively, unjust enrichment (count thirteen)

"To sufficiently state a claim for unjust enrichment, a plaintiff must plead five elements: '(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment; and (5) an absence of a remedy provided by law.'" *Zoldessy,* 2021 WL 1733398, at *5 (citations omitted). If a contract governs the relationship between the parties, "the doctrine of unjust enrichment has no application." *Id.* (citing *Beaulieu Grp. LLC v. Inman*, No. CV-10-1590-PHX-LOA, 2011 WL 4971701, at *3 (D. Ariz. Oct. 19, 2011).

Counterclaimants unjust enrichment claim meets the requirements of Rule 8 with respect to the first four elements. In the five paragraphs alleging unjust enrichment, Counterclaimants refer to all of the Counterdefendants in general and vague terms. The FAC generically alleges that "pursuant to the transactions described herein,

Counterclaimants conferred certain benefits upon Counterdefendants" that were accepted and retained "under circumstances where it would be inequitable for Counterdefendants to retain" such benefits without consideration flowing back to Counterclaimants. (Doc. 110 ¶ 270, 271).

However, elsewhere in the FAC, Counterclaimants allege that (1) Corey is an officer, director, controlling stockholders, and/or is otherwise a managing-speaking agent and fiduciary of [SinglePoint]" (*id.* ¶ 14); (2) Corey, in his position as Chief Financial Officer ("CFO"), signed and certified SinglePoint's 10-K for 2020, falsely representing that SDS was being funded and was a profitable entity (*id.* ¶¶ 118, 121); and (3) that, upon information and belief, Corey was involved in SinglePoint's decisions to enter into agreements, issue press releases, and make false representations in public filings (*id.* ¶ 132).

> The FAC contains further allegations that:
>> …the Individual Counterdefendants have utilized a scheme to 'purchase' Counterclaimants' entities to inflate the price of their [SinglePoint] Stock, but in lieu of funding the Counterclaimant entities by this additional raised capital, the Individual Counterdefendants have lined their own pockets with such capital, or otherwise used promised funding for their sole and exclusive benefit.

(*Id.* ¶ 109).

With respect to the fifth element, the Court finds that the FAC also sufficiently states a claim for relief. In Arizona, this element has been applied to preclude recovery under an unjust enrichment claim where there is an express contract that governs the relationship between the parties. *See, e.g., Brooks v. Valley Nat'l Bank*, 548 P.2d 1166, 1171 (Ariz. 1976) ("[W]here there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application"); *Ashton Co., Inc., Contractors & Eng'rs v. State*, 454 P.2d 1004, 1010 (Ariz. Ct. App. 1969) ("[Plaintiff] finally contends that it was entitled to recover under the doctrine of unjust enrichment. We summarily reject this contention for the reason that the doctrine has no application to a situation where there is an explicit contract which has been performed.").

Here, the FAC alleges that Corey and the other Individual Counterdefendants "lined

their own pockets with [Counterclaimants'] capital, or otherwise used promised funding for their sole and exclusive benefit." Additionally, the FAC does not allege a specific contract governing the relationship between Corey (as an individual) and any of Counterclaimants. At this stage of the proceedings, the Court cannot foreclose Counterclaimants' claim for unjust enrichment based upon the presence of an express contract where none has been alleged and the Counterdefendants do not argue otherwise.

### 7.  Conclusion

In conclusion, the Court grants the Motion to Dismiss only with respect to the fraud (count nine) and negligent misrepresentation (count ten) claims as they pertain to Corey Lambrecht. The remaining claims survive the Motion to Dismiss.

### iii.  Breach of the Asset Purchase Agreement (count one)

To state a claim for breach of contract, a plaintiff must allege the formation of a contract, its breach, and damages. *Chartone, Inc. v. Bernini*, 83 P.3d 1103, 1111 (Ariz. Ct. App. 2004). Counterclaimants plead all three elements in its counterclaim.

In Count One, Counterclaimants Direct Solar and AI Live allege that Counterdefendant SinglePoint breached the Asset Purchase Agreement by failing to provide funding to SDS in accordance with a Capital Flow Statement document that Counterclaimants contend is part of the Asset Purchase Agreement (APA) as a Transaction Document. (Doc. 110 at 23).

Counterdefendants first argue that Direct Solar and AI Live have not established that they are proper parties to assert a breach of the APA because they were not to receive any benefit of the bargain from the APA's funding provisions, so they do not have any damages for the alleged breach. (Doc. 117 at 7, 9). However, Direct Solar and AI Live do not have to be the beneficial owners to bring the claim. Direct Solar and AI Live signed the Asset Purchase Agreement (Doc. 117-1 at 55, 56), and the consideration for that agreement was SinglePoint's agreement to fund SDS, regardless of whether that money directly benefitted Direct Solar and AI Live.

Counterdefendants further argue that Counterclaimants have failed to sufficiently

allege a breach of any of the terms of the APA because they have not shown that the Capital Flow Statement, or its terms, are included as part of the APA. (Doc. 117 at 7–8). Counterclaimants point to the APA's Merger Clause and the definition of Transaction Document to support their position and invite the Court to interpret the APA to include the Capital Flow Statement. (*Id.* at 8).

Taking the allegations in the counterclaim as true that the Capital Flow Statement was a part of the transaction, and based on the pleading standard in Federal Rule of Civil Procedure 8(a)(2), Counterclaimants have stated a claim for relief against SinglePoint. Counterdefendants can argue the merits of those claims in a motion for summary judgment at the appropriate time.

### iv.   Fraud Claims (counts eight and nine)

Counterclaimants Direct Solar, AI Live, Diaz, Johnson, and JAGUSA brought a securities fraud claim against SinglePoint, Greg Lambrecht, and Wil Ralston at Count Eight for "promising to acquire and fund the Counterclaimant entities, and then pocketing the additional capital raised" instead, in violation of the Private Securities Litigation Reform Act and A.R.S. § 13-2314.04. (Doc. 110 at 31–33). Additionally, all Counterclaimants brought a fraud by inducement and concealment claim against all Counterdefendants for fraudulently inducing the Counterclaimants to enter into their respective agreements with SinglePoint. (*Id.* at 34).

Counterdefendants argue that Counterclaimants have failed to meet the heightened pleadings standards for either fraud claim under Federal Rule of Civil Procedure 9(b). (Doc. 117 at 9).

Under Rule 9(b), plaintiffs have an even higher pleading standard in all allegations of fraud, especially in multi-defendant cases such as these. The Ninth Circuit has repeatedly emphasized that "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Swartz v. KPMG LLP*, 476 F.3d 756, 765 (9th Cir. 2007)

1   (internal citation omitted); *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008)

2   ("membership in an association does not render an association's members automatically

3   liable" for a conspiracy); *N. Cal. Pharm. Ass'n v. United States*, 306 F.2d 379, 388–89 (9th

4   Cir. 1962) (trade association membership "does not mean, however, that every member of

5   the Association, by reason of his membership alone, becomes a coconspirator").

## 1. Securities Fraud (count eight)

7   Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) (2012), and SEC

8   Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (2017), prohibit fraudulent

9   activities in connection with securities transactions. Specifically, Section 10(b) makes it

10  unlawful

> [t]o use or employ, in connection with the purchase or sale of
> any security ..., any manipulative or deceptive device or
> contrivance in contravention of such rules and regulations as
> the [SEC] may prescribe as necessary or appropriate in the
> public interest or for the protection of investors.

14  15 U.S.C. § 78j(b). Rule 10b–5 describes certain types of behavior proscribed by the

15  statute, including:

> mak[ing] any untrue statement of a material fact or [omitting]
> a material fact necessary in order to make the statements made,
> in the light of the circumstances under which they were made,
> not misleading.

19  17 C.F.R. § 240.10b–5(b).

20  Plaintiffs asserting a claim under Section 10(b) and Rule 10b–5 must adequately

21  allege six elements: (1) a material misrepresentation or omission by the defendants; (2)

22  scienter; (3) a connection between the misrepresentation or omission and the purchase or

23  sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss;

24  and (6) loss causation. *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (citing

25  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011)). Moreover, plaintiffs

26  must satisfy the significantly heightened pleading requirements of Federal Rule 9(b) and

27  the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u (2012). *Reese

28  v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014). Federal Rule 9(b) requires that complaints

"state with particularity the circumstances constituting fraud or mistake." In other words, the complaint must specifically "identify [] the statements at issue[,] what is false or misleading about [each] statement[,] and why the statements were false or misleading at the time they were made." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). The PSLRA requires plaintiffs to plead both falsity and scienter with particularity. *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455 (2013); *see also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). In particular, a complaint alleging that defendants made false or misleading statements must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u–4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' [*id.*] § 78u–4(b)(2)." *Tellabs, Inc. v. Makor Issues & Rights*, *Ltd.*, 551 U.S. 308, 321 (2007).

The FAC's securities fraud allegations meet the Rule 9 pleading standard and state a claim for relief. With respect to element one, the FAC alleges that "the Individual Counterdefendants [] made false representations in publicly filed statements (including [SinglePoint's 10-K's 8-K's, and S-3A), to the market, regarding the financial viability of the Counterclaimant entities" and SinglePoint's funding of the same (Doc. 110 ¶¶ 113, 137). The FAC also alleges that SinglePoint officers and directors, including Greg, Corey, and Ralston, made misrepresentations in SinglePoint's Form S-3A that SDS "as grown to operate in 38 states in the U.S." (*Id.* ¶ 120). Regarding element two, the FAC alleges that Counterdefendants made its misrepresentations with knowledge that it had not provided funding to the Counterclaimant entities (*id.* ¶¶ 115, 117, 118) nor expanded SDS into 38 states (*id.* ¶ 120). Regarding element three, the FAC alleges that following the Counterdefendants misrepresentations caused fluctuations in the price of SinglePoint stock, including inflation of the stock price to artificial levels followed by steep stock price drops in the following months. (*Id.* ¶¶ 121, 125–131). The FAC further alleges that "these steep drops in share prices where the result of Greg, Ralston, and Corey entering into agreements, issuing press releases, and making statements in SING's public disclosures to

boost the prices, and then coordinate the sale of stock with family members, friends, and other 'insiders' to line their own pockets…." (*Id.* ¶ 132). Regarding elements four and five, The FAC further alleges based on Counterdefendants misrepresentations to the market, "the Counterclaimants purchased [SinglePoint] stock and suffered similar injuries through their purchases of common stock at prices which were artificially inflated by Counterdefendants' misrepresentations and omissions." (*Id.* ¶ 132).

The allegations in the FAC that detail a pattern of Counterdefendants alleged behavior with respect to misrepresentations in their public SEC filings provide a strong inference that Counterdefendants acted with the requisite state of mind and their actions led to inflated stock prices that harmed the Counterclaimant stock holders. *See Tellabs, Inc.*, 551 U.S. at 321.

Thus, the Court finds that Counterclaimants satisfied the Rule 9 standard such that their securities fraud claim survives at the motion to dismiss stage.

### 2.   Fraud by Inducement and Concealment (count nine)

In addition to Corey, Counterclaimants assert a fraudulent inducement claim against each of the other Counterdefendants, SinglePoint, Ralston, Greg, and SDS. (Doc. 110 ¶¶ 247–52).

As outlined above, "Common law fraud in Arizona has nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted upon by and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on the truth; (8) the hearer's right to rely thereon; and (9) consequent and proximate injury." *Zoldessy v. MUFG Union Bank, N.A.*, No. CV 20-08329-PCT-SPL, 2021 WL 1733398, at *4 (D. Ariz. 2021) (citations omitted).

Here, Counterclaimants fail to plead fraud allegations against any of the Defendants with the requisite particularity. The FAC alleges generally that Counterdefendants intentionally "made false representations concerning facts and concealed facts that were material" to the various agreements with Counterclaimants to induce Counterclaimants to

enter into their respective contracts. (Doc. 110 ¶¶ 248–251). There is no doubt that Counterclaimants have successfully set forth the elements of common law fraud, but the factual allegations in the SAC are lacking as to any material false representation that any of the Counterdefendants knowingly made regarding any of the contracts between Counterclaimants and Counterdefendants. Counterclaimants refer to all Counterdefendants in general and vague terns but fail to identify the Counterdefendants individually or fraudulent misrepresentations that they made that Counterclaimants relied on during the transactions. The FAC refers to "concealed facts that were material to the transactions contemplated in their contracts," but fails to specifically identify the contracts, individual parties, precise misrepresentations, or which Counterdefendants made the misrepresentations.

As such, Counterclaimants failed to meet Rule 9's heightened pleadings standard as to any Counterdefendant. *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989) ("Mere conclusory allegations of fraud are insufficient.").

### v.  Nonpayment of Wages (count six)

Counterclaimants Chaffino and Odle both bring a claim against Counterdefendant SDS for nonpayment of wages owed under their respective contracts pursuant to A.R.S. § 23-355. (Doc. 110 ¶¶ 199–204).

Counterdefendants argue that Chaffino and Odle are not entitled to bring a claim under A.R.S. § 23-355 because they do not allege that they were employees of SDS or otherwise had employment agreements with SDS. (Doc. 117 at 13). Instead, Counterdefendants argue that because Chaffino and Odle did not specifically allege that they were employees, they could be independent contractors instead. (Doc. 130 at 5).

The statute states, in pertinent part, that "if an employer ... fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." *See* A.R.S. § 23–355. In this context, "employee" refers to "any person who performs services for an employer under a contract of employment either made in this state or to be performed wholly or

partly within this state" and "wages" refers to "nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation." A.R.S. § 23-350.

Chaffino alleges that he is a resident of Maricopa County, Arizona. (Doc. 110 ¶ 29). Chaffino further alleges that Counterdefendants SinglePoint and SDS entered into a contract with him to purchase 51% of his company, SunUp Solar. (*Id.* ¶¶ 98, 101, 103). Chaffino further alleges that based on his experience in the solar industry, the parties also agreed that Chaffino would act as a manager of the company to "run day-to-day operations and oversee installations." (*Id.* ¶¶ 102–103). Chaffino further alleges that the Counterdefendants SinglePoint and SDS promised to pay Chaffino in SinglePoint stock bonuses "for achieving certain milestones." (*Id.* ¶ 104). Chaffino further alleges that "[t]o date, [he] has earned hundreds of thousands of dollars in [SinglePoint] stock for accomplishing milestones per the contracts" but that he has not been paid per the agreement. (*Id.* ¶¶ 106–107). As a result, Chaffino alleges he is entitled to salary or bonuses that Counterdefendant SDS has not paid him. (*Id.* ¶ 200). Thus, the Court finds that Chaffino states a plausible claim for nonpayment of wages.

Odle's nonpayment of wages claim is less clear. The FAC only makes three specific allegations as to Odle: (a) Odle is a resident of Maricopa County, Arizona; (b) Odle is a stockholder of SinglePoint; and (c) "Diaz, Odle, and Chaffino are all entitled to salary or bonuses, that have not been paid by SDS." (Doc. 110 ¶¶ 27, 28, 200). The FAC also alleges with respect to Odle's nonpayment of wages claim, that in acquiring Direct Solar, Jiffy, ShieldSaver, and SunUp Solar, "Counterdefendants [SinglePoint], Greg, and Ralston promised funding for expansion." (*Id.* ¶ 203).

The FAC fails to allege any employment relationship or contract for services that Odle would reasonably be expected to be paid under. Counterclaimant Odle has failed to establish a connection between his position as a SinglePoint stockholder or Counterdefendants' alleged failure to fund entities to Odle's entitlement to salary or

bonuses under A.R.S. § 23-355. Indeed, Odle has failed to allege that he entered into a contract with any Counterdefendant or performed any employment-related services to anyone at all. However, Counterdefendants' arguments that Odle was not an employee of SDS are disingenuous given the following allegations in their own SAC: (1) "Until his resignation on June 3, 2021, Mr. Odle worked as the Finance Director for SDS" (Doc. 90 ¶ 9, 80); "SDS uncovered emails after…Mr. Odle left the [c]ompany…." (*id.* ¶ 75); "SDS was unable to update its official company website which identifies … Mr. Odle as … the Finance Director of SDS…." (*id.* ¶ 84); and "…Mr. Odle continued to have discussions … purportedly on behalf of SDS after [he was] no longer with the company" (*id.* ¶ 89). Given these admissions of Odle's employment relationship, coupled with Odle allegations of non-payment of amounts owed to him, the Court finds sufficient facts have been pleaded by the parties for Odle to survive a motion to dismiss.

And while Counterdefendants invite the Court to engage in an analysis of whether Chaffino and Odle are employees or independent contractors, such a task is not appropriate at the motion to dismiss stage. Here, the factual allegations are sufficient to raise a right to relief for nonpayment of wages above a speculative level, as required by Rule 8. *See Twombly*, 550 U.S. at 555.

Accordingly, the Court denies the Motion to Dismiss Count Six with respect to Counterclaimants Chaffino and Odle.

### vi.  Negligent Misrepresentation (Count Ten)

All Counterclaimants assert an alternative claim for negligent misrepresentation against all Counterdefendants. (Doc. 110 at 35). Counterdefendants contend that Counterclaimants' negligent misrepresentation claim is barred by Arizona's law against claims for negligent misrepresentation based on promises of future conduct. (Doc. 117 at 13). Counterclaimants respond that their claim is instead based on SinglePoint's allegedly fraudulent representations about its present financial ability to fund the Counterclaimant entities at the time the parties entered their respective contracts. (Doc. 124 at 16).

To state a claim for negligent misrepresentation, a plaintiff must allege facts

supporting five elements: "(1) the defendant provided false information in a business transaction; (2) the defendant intended for the plaintiff to rely on the incorrect information or knew that it reasonably would rely; (3) the defendant failed to exercise reasonable care in obtaining or communicating the information; (4) the plaintiff justifiably relied on the incorrect information; and (5) resulting damage." *Zoldessy v. MUFG Union Bank, N.A.*, No. CV 20-08329-PCT-SPL, 2021 WL 1733398 at *5 (D. Ariz. May 3, 2021) (citing *KB Home Tucson, Inc. v. Charter Oak Fire Ins. Co.*, 340 P.3d 405, 412 n.7 (Ariz. Ct. App. 2014). Claims for negligent misrepresentation cannot be based on a promise of future conduct because such a promise "is not a statement of fact," and negligent misrepresentation claims require "a misrepresentation or omission of a fact." *McAlister v. Citibank (Arizona), a Subsidiary of Citicorp*, 829 P.2d 1253, 1261 (Ariz. Ct. App. 1992).

Here, the Court notes that count ten is pled in broad terms without reference to any specific Counterclaimants or Counterdefendants nor any specific business transactions or related false representations. (*See* Doc. 110 ¶¶ 254–260). Instead, count ten is directed against all Counterdefendants for providing "false information in their business transactions with Counterclaimants." (*Id.* ¶ 255). Although the factual allegations throughout the Counterclaim are extensive, the FAC does not allege that Counterdefendants provided any false information in their business dealings with any of the Counterclaimants on which the Counterclaimants relied. Instead, Counterclaimants only allege that "Counterdefendants misled Counterclaimants by making misrepresentations as to their intention to fund" the companies. (*Id.* ¶ 111). However, as stated above, claims for negligent misrepresentation cannot be based on a promise of future conduct because such a promise "is not a statement of fact," and negligent misrepresentation claims require "a misrepresentation or omission of a fact." *McAlister*, 829 P.2d at 1261.

And while Counterclaimants allege that "the Individual Counterdefendants also made false representations in publicly filed statements (including [SinglePoint's 10-K's 8-K's, and S-3A), to the market, regarding the financial viability of the Counterclaimant

entities" and SinglePoint's funding of the same (Doc. 110 ¶¶ 113, 137), they fail to tie those alleged false statements to a business transaction in which JAGUSA detrimentally relied on such false information (*see* Doc. 124 at 16). Indeed, the public financial statements discussed in the FAC appear to post-date each of the business transactions that are the subject of this suit. Thus, there is no plausible claim that these alleged false statements induced Counterclaimants to rely on such statements to their detriment.

Additionally, as discussed above, Counterclaimant Odle's factual allegations in the Counterclaim are scant. The Countercomplaint fails to allege any facts supporting a negligent misrepresentation claim on behalf of Counterclaimant Odle because it does not include any allegations that Odle entered into a business transaction with any of the Counterdefendants or that any of the Counterdefendants provided any false information to Odle upon which he relied. Thus, Counterclaimant Odle failed to state a claim for misrepresentation against any of the Counterdefendants.

Accordingly, the Court grants Counterdefendants' Motion to Dismiss for failure to state a negligent misrepresentation claim against all Counterdefendants by all Counterclaimants (count ten).

### vii.  Civil Conspiracy (Count Twelve)

Counterclaimants assert a claim of civil conspiracy against Counterdefendants for conspiring "together to accomplish the unlawful conduct as alleged herein." (Doc. 110 at 36). Counterdefendants argue that because civil conspiracy is required to be pled with underlying tortious or fraudulent behavior, and because Counterclaimants have failed to state a claim under any of their tort or fraud claims, the Court must also dismiss the claim for civil conspiracy. (Doc. 117 at 14). However, the Court finds that the FAC states a claim for relief under civil conspiracy, for the same reasons discussed above with respect to the civil conspiracy claim against Corey.

### d.  Leave to Amend

Counterdefendants ask this Court to deny Counterclaimants any further leave to amend their FAC with respect to the insufficiently pleaded claims because any

amendments would be futile and cause undue delay. (Doc. 117 at 2). However, Counterclaimants have not moved for leave to amend their FAC, so Counterdefendants arguments are premature and will be denied.

## VI.    Conclusion

Accordingly,

**IT IS ORDERED** that Defendants SIRC and Massey's Motion to Dismiss (Doc. 98) is **GRANTED IN PART** and **DENIED IN PART**. With respect to Defendant Massey, the Court dismisses all claims against him for lack of personal jurisdiction. With respect to Defendant SIRC, the Court dismisses the following claims from the SAC (Doc. 90) under Federal Rule of Civil Procedure 12(b)(6): (a) unfair competition (count seven); (b) intentional interference with contract/business expectancy (count nine); (c) conversion (count ten); and (d) unjust enrichment (count eleven). The remaining claims against Defendant SIRC survive the Motion to Dismiss and remain before the Court.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Compel Arbitration of all of Defendant Diaz's counterclaims under his Employment Agreement with SDS (Doc. 116) is **GRANTED**. The Court orders the dismissal of the following claims from the FAC (Doc. 110): count three in its entirety, count six as to Defendant Diaz, and counts five, nine, ten, eleven, and thirteen as to Diaz, to the extent those claims are based on Diaz's rights and responsibilities under the Employment Agreement subject to arbitration.

**IT IS FURTHER ORDERED** that Counterdefendants' Motion to Dismiss (Doc. 117) is **GRANTED IN PART** and **DENIED IN PART** as described in this order.

- With respect to all Counterdefendants, the Court dismisses the following claims from the FAC (Doc. 110) under Federal Rule of Civil Procedure 12(b)(6): fraud by inducement and concealment (count nine); and negligent misrepresentation (count ten).

- The remaining claims remain pending before the Court.

///

///

Dated this 3rd Day of February, 2022.

_____
James A. Teilborg
Senior United States District Judge